No. 23-40556

# In the United States Court of Appeals For the Fifth Circuit

BLAKE J. WATTERSON,

*Plaintiff-Appellant,*

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; STEVEN DETTELBACH, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; UNITED STATES DEPARTMENT OF JUSTICE; MERRICK GARLAND, in his official capacity as Attorney General of the United States; and UNITED STATES OF AMERICA,

*Defendants-Appellees.*

On Appeal from the United States District Court
For the Eastern District of Texas

## APPELLANT'S MOTION FOR A STAY AND PRELIMINARY INJUNCTION

ROBERT HENNEKE
CHANCE WELDON
AUTUMN HAMIT PATTERSON
CLAYTON WAY CALVIN
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone: (512) 472-2700
Facsimile: (512) 472-2728

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF INTERESTED PERSONS

No. 23-40556; *Watterson v. BATFE*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Plaintiff-Appellant and Counsel | Defendants-Appellants and Counsel |
|---|---|
| <ul><li>Blake J. Watterson</li><li>Robert Henneke</li><li>Chance Weldon</li><li>Autumn Hamit Patterson</li><li>Clayton Way Calvin</li><li>Texas Public Policy Foundation</li></ul> | <ul><li>Bureau of Alcohol, Tobacco, Firearms and Explosives</li><li>Steven Dettelbach</li><li>United States Department of Justice</li><li>Merrick Garland</li><li>United States of America</li><li>Faith E. Lowry</li><li>Michael Drezner</li><li>Jody D. Lowenstein</li><li>Taylor Pitz</li></ul> |

*/s/ Autumn Hamit Patterson*
AUTUMN HAMIT PATTERSON
*Attorney of Record for Plaintiff-
Appellant*

TABLE OF CONTENTS

TABLE OF AUTHORITIES...............................................................................iv

INTRODUCTION AND NEED FOR EXPEDITED CONSIDERATION........................1

BACKGROUND ........................................................................................ 2

STATEMENT OF JURISDICTION ....................................................................8

LEGAL STANDARD....................................................................................8

ARGUMENT ............................................................................................9

I.      PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS. ...........................9

        A.      The Rule Violates the Second Amendment. ................................9

        B.      The Department Lacked Authority to Issue the Rule. ............. 13

                1.      The Rule rewrites the statutes.............................................13

                2.      The Department lacked constitutional authority. ................16

                3.      The Department lacked statutory authority. ......................199

II.     PLAINTIFF WILL SUFFER IRREPARABLE HARM IN THE
        ABSENCE OF RELIEF. ..........................................................................21

III.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH
        IN FAVOR OF GRANTING RELIEF. ....................................................244

CONCLUSION ...........................................................................................27

CERTIFICATE OF COMPLIANCE ...................................................................29

CERTIFICATE OF CONFERENCE ..................................................................29

CERTIFICATE OF SERVICE ..........................................................................30

## TABLE OF AUTHORITIES

### *Cases*

*All. for Hippocratic Med. v. FDA*, 78 F.4th 210 (5th Cir. 2023) ... 8, 23, 25

*Barnett v. Raoul*, No. 3:23-cv-00209-SPM, 2023 U.S. Dist. LEXIS 74756 (S.D. Ill. 2023)..........................................................................26

*Boland v. Bonta*, No. SACV 22-01421-CJC, 2023 U.S. Dist. LEXIS 51031 (C.D. Cal. 2023) ......................................................................26

*BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604 (5th Cir. 2021) ... 22, 23, 25

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ......................................12

*Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) ..............................17, 18

*Clarke v. CFTC*, 74 F.4th 627 (5th Cir. 2023)............................................8

*Collins v. Yellen*, 141 S. Ct. 1761 (2021)....................................................14

*District of Columbia v. Heller*, 554 U.S. 270 (2008)................................11

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ............... 10, 22, 24

*Frein v. Pa. State Police*, 47 4th 247 (3d Cir. 2022) ................................10

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) ....................................24

*Gun Owners of Am. Inc. v. Garland*, 19 F.4th 890 (6th Cir. 2021) (en banc)....................................................................................20, 21

*Gundy v. United States*, 139 S. Ct. 2116 (2019) ......................................17

*Indus. Union Dep't, AFL-CIO v. API*, 448 U.S. 607 (1980)....................17

*Jackson v. City & County of San Francisco*, 746 F.3d 953 (9th Cir. 2014) .....................................................................................10

*Jackson Women's Health Org. v. Currier*, 760 F.3d 448 (5th Cir. 2014) .....................................................................................24

*Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022)..............................16, 18, 19

*Loving v. United States*, 517 U.S. 748 (1996).........................................18

*Miller v. Bonta*, 542 F. Supp. 3d 1009, 1024 (S.D. Cal. 2021) ...............11

*Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023) ...............................*passim*

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111
    (2022)........... ....................................................................10, 11, 24

*Nken v. Holder*, 556 U.S. 418 (2009).................................................8, 9, 24

*Opulent Life Church v. City of Holly Springs*, 697 F.3d 279
    (5th Cir. 2012) ...............................................................................22

*Panama Ref. Co. v. Ryan*, 293 U.S. 388 (1935) .................................16, 17

*Renna v. Bonta*, No. 20-cv-2190-DMS-DEB, 2023 U.S. Dist. LEXIS
    63687 (S.D. Cal. 2023).....................................................................27

*Rest. Law Ctr. v. Dep't of Labor*, 66 F.4th 593 (5th Cir. 2023)..............23

*Spencer v. Nigrelli*, No. 22-CV-6486 (JLS), 2022 U.S. Dist. LEXIS
    233341 (W.D.N.Y. Dec. 29, 2022) ......................................................25

*State v. Biden*, 10 F.4th 538 (5th Cir. 2021)...........................................25

*Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016) ......................................8, 23

*Trans World Airlines v. Mattox*, 897 F.2d 773 (5th Cir. 1990)..............23

*United States v. Davis*, 139 S. Ct. 2319 (2019).......................................17

*United States v. Kuzma*, 967 F.3d 959 (9th Cir. 2020) ..........................20

*United States v. Lopez*, 514 U.S. 549 (1995)...........................................19

*United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023)...........................11

*United States v. Standard Brewery, Inc.*, 251 U.S. 210 (1920) ..............18

*Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014)........................... 16

*Vanderstok v. BlackHawk Mfg. Grp., Inc.*, No. 4:22-cv-00691-O,
   2022 U.S. Dist. LEXIS 200315 (N.D. Tex. Nov. 3, 2022) ............... 26

*VanDerStok v. Garland*, 633 F.Supp.3d 847 (N.D. Tex. 2022)............... 22

*Voting for Am., Inc. v. Andrade*, 488 F. App'x 890 (5th Cir. 2012)
   (per curiam) ........................................................................................ 8

*Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130 (5th Cir.
   2021) .................................................................................................... 8

*West Virginia v. EPA*, 142 S. Ct. 2587 (2022) ......................................... 19

## Statutes

5 U.S.C. § 705 ................................................................................... 4, 8

18 U.S.C. § 921...............................................................................13, 21

18 U.S.C. § 922.......................................................................................3

18 U.S.C. § 926...............................................................................19, 20

18 U.S.C. § 3571.....................................................................................3

26 U.S.C. § 5845....................................................................... 13, 14, 21

26 U.S.C. § 5861.....................................................................................3

26 U.S.C. § 5871................................................................................3, 20

26 U.S.C. § 5872.....................................................................................3

26 U.S.C. § 7801.............................................................................19, 20

28 U.S.C. § 1292.....................................................................................8

Tex. Pen. Code § 46.05...........................................................................4

## *Other Authorities*

ATF, *Final Regulatory Impact Analysis* (Jan. 2023),
https://tinyurl.com/2zdw3rmn ................................................. 16, 19

David B. Kopel, The Second Amendment in the Tenth Circuit:
Three Decades of (Mostly) Harmless Error, 86 DENV. U.L. REV.
901 ................................................................................................ 13

Emily Saladino, *How to Open a Wine Bottle Without a Corkscrew*,
WINE ENTHUSIAST (Aug. 8, 2022),
https://www.winemag.com/2022/08/08/how-to-open-a-wine-
bottle-without-a-corkscrew/ ............................................................ 15

Fed. R. App. P. 8 ...................................................................................... 8

Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*,
54 ST. MARY'S L.J. 35, 45, 61-65, 71-78 (2023) ................................ 11

Nick Gerhardt, *10 Ways to Open a Bottle Without a Corkscrew*,
FAMILY HANDYMAN (Mar. 28, 2023),
https://www.familyhandyman.com/list/10-ways-to-open-wine-
without-a-corkscrew/ ...................................................................... 15

Silver Oak, *How to Open a Wine Bottle Without a Corkscrew*,
YOUTUBE (Aug. 7, 2018),
https://www.youtube.com/watch?v=_4C3WZYuU0A ....................... 15

Stephen P. Halbrook, FIREARMS LAW DESKBOOK, § 7:7 (Oct. 2022
Update) ........................................................................................ 20

Webster's New International Dictionary (2d ed. 1934, 1948) ............... 14

### *Regulations*

Factoring Criteria for Firearms with Attached "Stabilizing Braces,"
88 Fed. Reg. 6,478 (Jan. 31, 2023).......................................... passim

## INTRODUCTION AND NEED FOR EXPEDITED CONSIDERATION

The defendants (collectively, the "Department") issued a final rule that rewrites statutes and transforms pistols with stabilizing braces into short-barreled rifles that must be registered. *See Factoring Criteria for Firearms with Attached "Stabilizing Braces,"* 88 Fed. Reg. 6,478 (Jan. 31, 2023 (the "Rule"). The Rule effectively turns millions of law-abiding Americans who possess unregistered pistols with stabilizing braces into criminals guilty of a felony that is punishable by 10 years in prison. This violates both the Second Amendment and the structural limits in the Constitution. Moreover, the Rule exceeds the Department's statutory authority.

Appellant Blake Watterson ("Watterson") is irreparably harmed by this lawlessness. Under the Rule, he cannot attach his forearm stabilizing brace to his pistol and thereby possess a braced pistol for self-defense without risking prosecution. Although Watterson received partial, limited relief from the district court in the form of a narrow injunction, that injunction elapsed when this Court issued the mandate in *Mock v. Garland*. Despite being fully briefed on Watterson's motion for a stay or preliminary injunction since March 3, 2023 (and despite the

summary-judgment motion being ripe for resolution since March 31st), the district court has refused to protect Watterson from irreparable harm—effectively denying his preliminary-injunction motion and his motion to modify the now-terminated injunction.

Watterson therefore requests that the Court stay the Rule as quickly as is practicable to mitigate his irreparable harm. Watterson also requests that the Department be preliminarily enjoined from enforcing the federal firearm statutes against him in accordance with the Department's erroneous interpretation of those statutes.

## BACKGROUND

The Rule redefines "rifle" (and thus "short-barreled rifle") in the National Firearms Act and Gun Control Act to include pistols with stabilizing braces. *See id.* at 6,480, 6,574-75. This is contrary to the Bureau of Alcohol, Tobacco, Firearms, and Explosives' ("ATF's") previous acknowledgements that pistols with stabilizing braces are not short-barreled rifles because they are not intended to be fired from the shoulder. *See* Ex. 2 at MSJ_009-20. Accordingly, the Rule "overrul[es] ATF's previous classification letters." Rule, 88 Fed. Reg. at 6,480.

The Rule has significant criminal consequences for millions of Americans who have purchased stabilizing braces or pistols with stabilizing braces attached. *See id.* at 6,573; Ex. 2 at MSJ_033. Possessing an unregistered short-barreled rifle is punishable by 10 years in prison and a $250,000 fine, and there are severe criminal penalties for non-compliance with statutory restrictions on their transfer and transportation. 26 U.S.C. §§ 5845, 5861, 5871, 5872; 18 U.S.C. §§ 921, 922(a)(1), (4), (b)(4); 3571.

The Rule provided options for persons who possessed an unregistered pistol with an attached stabilizing brace on the Rule's publication date (January 31, 2023), so they could comply with the statutory requirements (as modified by the Rule) and avoid prosecution. *See id.* at 6,480-81, 6,570-71. But the compliance period has ended and never applied to anyone who did not possess a pistol with an attached brace on January 31, 2023. *See id.* at 6,478, 6,480-81; Ex. 2 at MSJ_041.

Watterson is one of the millions injured by the Rule. *See* Ex. 2, Watterson Decl., at ¶¶ 4-15, 25-31. If he attaches his stabilizing brace to his pistol as he desires to do, he risks prosecution and a 10-year prison sentence for possessing an unregistered short-barreled rifle under the

Rule—even though ATF previously acknowledged his precise brace does not transform a pistol into a rifle. *Id.* at ¶¶ 18-27. He would also risk state prosecution. *See* Tex. Pen. Code § 46.05(a)(1)(C); Texas Amicus Br., *Mock v. Garland*, No. 23-10319, ECF No. 37 (5th Cir. May 19, 2023) at 6-7. To attach his stabilizing brace under the Rule and thereby have a braced pistol for self-defense, Watterson would need to file an application, wait several months to a year for approval, pay $200, and comply with additional requirements (such as obtaining photographs and fingerprinting). *See* Ex. 2 at MSJ_025-31, 39, Watterson Decl. at ¶ 27. What is more, he would then face ongoing restrictions on his ability to travel with or transfer his pistol. *See id.* at ¶¶ 27-28.

Watterson diligently tried to minimize his irreparable harm. The day the Rule was published (January 31, 2023), he sued the Department and filed a summary-judgment motion—becoming the first party challenging the Rule to brief the merits. *See* Exs. 1-2. Two days later (after the required meet-and-confer), Watterson filed a motion for relief under 5 U.S.C. § 705 or, alternatively, for a preliminary injunction ("§ 705 Motion") and an emergency motion for expedited consideration.

*See* Exs. 3-4. The district court stated it would "issue an order" on Watterson's § 705 Motion "on or before March 24, 2023." Ex. 5.

The district court, however, did not do so. 75 days after its self-imposed deadline, the district court had still not acted. In the meantime, plaintiffs in other lawsuits challenging the Rule sought preliminary relief, and a different district court denied a preliminary-injunction motion in *Mock v. Garland.* *See* Opinion, ECF No. 40, No. 4:23-cv-00095 (N.D. Tex. Mar. 30, 2023). On May 23rd, this Court enjoined enforcement of the Rule against the *Mock* plaintiffs pending appeal of the district court's order in that case. *See* Ex. 9, attached order.

Immediately, several other district courts hearing similar claims temporarily enjoined enforcement of the Rule against plaintiffs in their cases due to this Court's decision in *Mock.* The district court here initially did nothing, triggering further briefing. *See* Exs. 9-12. Finally, on June 7th, the district court issued a 3-page order. *See* Ex. 13 ("June 7th Order"). Relying on this Court's preliminary-injunction ruling and other courts' practices, the district court granted Watterson's § 705 Motion "in part." *Id.* Specifically, it enjoined the Department "from enforcing the rule against Watterson pending [this Court's] decision" in *Mock.* *Id.* at 2.

On August 1st, this Court issued its decision in *Mock*. That decision determined the *Mock* plaintiffs were likely to succeed on the merits and remanded the case. *See Mock v. Garland*, 75 F.4th 563, 566-67 (5th Cir. 2023). Importantly, however, this Court was clear that its decision was limited to the parties in that case (along with family members and organizational members). *See id.* at 588; Ex. 12 at 2.

Watterson promptly filed a notice of supplemental authority in the district court the same day. *See* Ex. 16. He informed the district court that the *Mock* decision did not "provide *any* relief to Watterson," and would end the district court's injunction, which had been tied to the issuance of that decision. *Id.* at 3. Watterson therefore, once again, urged the district court to rule on his motions that had been fully briefed for months. *Id.* at 4; *see, e.g.*, Ex. 14.

Out of an abundance of caution, Watterson also requested an extension of time to file a notice of appeal of the June 7th Order. *See* Ex. 17. Watterson explained that he wanted to ensure his right to appeal the June 7th Order, which would be a refusal to issue a preliminary injunction once the injunction elapsed. *See id.* at 3, 6.

On August 9th, Watterson filed a motion to reconsider and modify the June 7th Order, requesting broader and longer lasting relief. *See* Ex. 18. The same day, Watterson filed an emergency motion for expedited consideration of that motion or, in the alternative, of the summary-judgment motion that had been ripe for resolution since March 31st. *See* Ex. 19 at 5. Watterson explained the June 7th Order's narrow relief had either already terminated or would terminate soon when the *Mock* mandate issued.

The district court granted the emergency motion, acknowledged Watterson had established a likelihood of success, and requested supplemental briefing. *See* Ex. 20. It also clarified that its injunction would remain in place until this Court issued the mandate in *Mock*. *Id.*

Watterson completed the supplemental briefing on August 30th, *see* Ex. 23, and the *Mock* mandate issued on September 25th, Ex. 24, attached mandate. Watterson immediately informed the district court that the *Mock* mandate had issued, thereby terminating its injunction. *See* Ex. 24. Once again, the district court failed to act, subjecting Watterson to further irreparable harm and making further motions in

the district court "impracticable." *See* Fed. R. App. P. 8(a)(2)(A)(i).

Watterson therefore seeks relief from this Court.

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 28 U.S.C. §1292(a)(1), because

the district court refused to modify the injunction and the June 7th Order

has the practical effect of denying injunctive relief. *See Clarke v. CFTC*,

74 F.4th 627, 635 (5th Cir. 2023); Ex. 25.

## LEGAL STANDARD

5 U.S.C. § 705 authorizes courts to "issue all necessary and

appropriate process … to preserve status or rights pending conclusion of

the review proceedings." 5 U.S.C. § 705. This includes the power to stay

final agency actions. *See Wages & White Lion Invs., L.L.C. v. FDA*, 16

F.4th 1130, 1144 (5th Cir. 2021); *All. for Hippocratic Med. v. FDA*, 78

F.4th 210, 255-56 (5th Cir. 2023). The Court also has authority to grant

an injunction pending appeal under Federal Rule of Appellate Procedure

8.

When deciding whether to grant a motion under § 705 or grant a

preliminary injunction, this Court largely applies the four-factor test

from *Nken v. Holder*, 556 U.S. 418 (2009). *See Texas v. EPA*, 829 F.3d

405, 424-36 (5th Cir. 2016); *Voting for Am., Inc. v. Andrade*, 488 F. App'x

890, 893 (5th Cir. 2012) (per curiam). Under that test, it considers: (1) whether the movant "has made a strong showing that he is likely to succeed on the merits; (2) whether [he] will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434 (quotation omitted). The final factors "merge" and are considered together if "the Government is the opposing party." *Id.* at 435.

## ARGUMENT

### I. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS.

Watterson satisfies the first factor as explained below and in district court briefing. *See* Ex. 2-3, 7, 14, 18, 21, 23. The Rule infringes Watterson's Second Amendment rights, violates separation-of-powers provisions, and exceeds statutory authority.

### A. The Rule Violates the Second Amendment.

Watterson will likely succeed on his claim that the Rule—and the National Firearms Act and Gun Control Act to the extent the Rule properly interprets them—violates the Second Amendment.

Pistols with forearm stabilizing braces fall within the Second Amendment's scope, because they are "bearable arms" and "modern

instruments that facilitate armed self-defense." *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2132 (2022).[1]  In any event, the Second Amendment's protections also extend to encompass corresponding rights to *effective* self-defense. *See, e.g., Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011); *Jackson v. City & County of San Francisco*, 746 F.3d 953, 967-68 (9th Cir. 2014).

That means "the   Constitution presumptively protects" the possession of pistols with stabilizing braces for self-defense, and the Department has the burden of "justifying [its] regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 143 S. Ct. at 2130; *see Frein v. Pa. State Police*, 47 4th 247, 254 (3d Cir. 2022) (reasoning that "infringe[]" includes "lesser violat[ions] that hinder a person's ability to hold on to his guns" and courts must "closely scrutinize *all* gun restrictions for a historically grounded justification" (quotations omitted)).  The Department failed to carry this burden, which means the Rule violates "the Second

---

[1] *See, e.g.*, Rule, 88 Fed. Reg. at 6,566 (can be used for "personal defense"); Ex. 2, Watterson Decl. at ¶¶ 4, 6-15 (braced pistols are effective for self-defense).

Amendment's unqualified command." *Bruen*, 143 S. Ct. at 2127, 2130 (quotation omitted).

Because there is no historical tradition justifying the Rule's restrictions on the making (*i.e.*, attaching a brace to a pistol) or simple possession of braced pistols for self-defense, the Department cannot point to historical analogues.[2] Instead, it cites dissimilar statutes, such as ones mandating inspection of militia members' arms to ensure proper function or assessing racially motivated taxes. *See* Ex. 14, Table Describing Historical Statutes. Moreover, most of its cited laws are additionally irrelevant because they date long after the Second Amendment's ratification and the Department offers no evidence they were enforced, much less enforced with penalties as severe as 10 years' imprisonment. *See Bruen*, 142 S. Ct. at 2136-37; *District of Columbia v. Heller*, 554 U.S. 570, 633-34 (2008); *United States v. Rahimi*, 61 F.4th 443, 456 (5th Cir. 2023).

---

[2] Americans have enjoyed the right to make, modify, and possess guns for self-defense, including the right to attach accessories to their guns, for centuries. *See* Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J. 35, 45, 61-65, 71-78 (2023); *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1024 (S.D. Cal. 2021), *vacated*, 2022 U.S. App. LEXIS 21172 (9th Cir. Aug. 1, 2022).

Although the Department argues the Rule is justified by historical prohibitions on dangerous and unusual weapons, Rule, 88 Fed. Reg. at 6,548, it has not cited historical statutes evincing such prohibitions. Regardless, they would not be relevant analogues. That is because the Department cannot show that braced pistols are "*both* dangerous *and* unusual*" as it would need to do. *See Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring). They are in common use, can be used for lawful purposes, and can be possessed in 46 states. *See* Ex. 2 at MSJ_033 (between 10 and 40 million braces); Rule, 88 Fed. Reg. at 6560 (3 million braces), 6,565-66 (acknowledging that braced pistols can be used for "personal defense" and could be helpful in controlling the feral hog population); *Caetano*, 577 U.S. at 420 (Alito, J., concurring) (concluding that 200,000 stun guns, which could be possessed in 45 states, constituted common use); *see also* Ex. 7 at 3. Furthermore, the Department cannot show that pistols with stabilizing braces are unusually dangerous, because braces make pistols "*safer.*" *See Mock*, 75 F.4th at 588 (Willett, J., concurring).

Nor can the Department show pistols with stabilizing braces are dangerous and unusual even if it is correct—which it is not—that they

should be considered short-barreled rifles. That would simply mean they are even more common. *See* Rule, 88 Fed. Reg. at 6,550 (over 641,000 registered short-barreled rifles). Moreover, short-barreled rifles were not "a particular criminal problem," and were "commonly used by hunters, trappers, ranchers, and horseback riders" before the National Firearms Act was passed. *See* David B. Kopel, *The Second Amendment in the Tenth Circuit: Three Decades of (Mostly) Harmless Error*, 86 DENV. U.L. REV. 901, 911 & n. 38 (2009). Watterson's Second Amendment claim will therefore likely succeed.

## B. The Department Lacked Authority to Issue the Rule.

### 1. *The Rule rewrites the statutes.*

Because the Department lacks the constitutional and statutory authority to change the statutory definitions and scheme, it pretends it does not do so. The Court should reject this pretense, especially since it correctly determined the Rule is legislative. *See Mock*, 75 F.4th at 582-83.

The Rule redefines "rifle" in the federal firearm statutes to create new crimes. Congress defined rifle, in relevant part, based on whether the weapon is "designed or redesigned, made or remade, and intended to

13

be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). This language contrasts with other provisions defining a weapon based on its design *or capabilities*. *See* 26 U.S.C. § 5845(b). The text accordingly shows that, to be a rifle, a weapon must be *designed* and *intended* to be fired from the shoulder—capacity for shoulder fire is insufficient. *See Collins v. Yellen*, 141 S. Ct. 1761, 1782 (2021) (presuming that "the disparate inclusion or exclusion" of statutory language is intentional (quotation omitted)).

This means that pistols with stabilizing braces generally do not qualify as rifles because most are designed, made, and intended to be used to stabilize the pistol against shooters' *forearms*, not their shoulders. *See* Ex. 2 at MSJ_001-8. Indeed, forearm stabilizing braces would be designed differently if they were intended to be used as shoulder stocks. *See id.* at 26*, id.* Watterson Decl. at ¶ 19.

Nevertheless, the Department decided that pistols with forearm stabilizing braces should be further regulated based on their *potential* to be shoulder fired, so it rewrote the statutes with a multi-factor test. Rule, 88 Fed. Reg. at 6,574-75. Those factors go towards whether a gun *could* be fired from the shoulder, not whether it was *designed and intended* to

14

be.  *See Design*, WEBSTER'S NEW INTERNATIONAL DICTIONARY 708 (2d ed. 1934, 1948) ("to intend;" "aim; intention"); *id.* at 1291 (defining "intend" as "[t]o have in mind as a design or purpose").  As such, the Rule ignores the meaning of "designed" and "intended" in the statutory definitions, including by considering it irrelevant when a pistol's features facilitate non-shoulder fire or serve non-shoulder-firing purposes like ease of carry.  *See* Ex. 2 at 26-27; Rule, 88 Fed. Reg. at 6,503, 6,532.

The Rule also treats the fact that certain blogs have promoted using braces to shoulder fire a pistol as evidence that shoulder fire is the designed and intended way of shooting them.  *Id.* at 6,506, 6,544-46.  This is a non sequitur.  Elsewhere the Department even concedes a weapon's "classification does not change even if [it] can be used in more than one manner by a particular shooter."  *Id.* at 6,531.  The contrary conclusion would be akin to defining a corkscrew to include hangers, keys, or shoes, because websites demonstrate those items can be used to open a bottle of wine.[3]  Yet that is the Rule's logic.  It categorically recharacterizes pistols

---

[3] *See* Silver Oak, *How to Open a Wine Bottle Without a Corkscrew*, YOUTUBE (Aug. 7, 2018), https://www.youtube.com/watch?v=_4C3WZYuU0A; Emily Saladino, *How to Open a Wine Bottle Without a Corkscrew*, WINE ENTHUSIAST (Aug. 8, 2022), https://www.winemag.com/2022/08/08/how-to-open-a-wine-bottle-without-a-corkscrew/; Nick Gerhardt, *10 Ways to Open a Bottle Without a Corkscrew*, FAMILY

with forearm stabilizing braces as short-barreled rifles—or, at the very least, recharacterizes 99% of them—because they have the *potential* to be shoulder fired. *See* ATF, *Final Reg. Analysis* (Jan. 21), https://tinyurl.com/2zdw3rmn, at 21; Rule, 88 Fed. Reg. at 6,480.

In any event, even ignoring the definition revisions, the Rule rewrites the statute with compliance options and exemptions. *See Mock*, 75 F.4th at 581 (discussing compliance scheme); *compare* Rule, 88 Fed. Reg. at 6,480-81, 6,507, 6,549, 6,570-71 (allowing belated registration), *with* Ex. 2 at MSJ_034 ("there is no mechanism for a possessor to register an unregistered [National Firearm Act] firearm already possessed by the person"). This further demonstrates that the Rule rewrites the statutes, *see Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 328 (2014), which the Department has no authority to do.

## 2. *The Department lacked constitutional authority.*

The Department lacks constitutional authority to rewrite the statutes as the Rule does. The Constitution vests "[a]ll legislative Powers" in Congress, U.S. Const. art. I, § 1, and Congress cannot

---

HANDYMAN (Mar. 28, 2023), https://www.familyhandyman.com/list/10-ways-to-open-wine-without-a-corkscrew/.

"abdicate" or "transfer" "the essential legislative functions with which it is thus vested," *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 421 (1935). Although some delegations are constitutionally permissible, *Jarkesy v. SEC*, 34 F.4th 446, 460-61 (5th Cir. 2022), the prohibition on the transfer of "powers which are *strictly* and *exclusively* legislative" remains, *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality op.) (quotation omitted and emphases added); *see Panama Ref.*, 293 U.S. at 421 (explaining it is Congress's role to "lay[] down policies and establish[] standards"); *Indus. Union Dep't, AFL-CIO v. API*, 448 U.S. 607, 687 (1980) (Rehnquist, J., concurring) ("critical policy decisions" and "hard choices" are "the very essence of legislative authority").

Policy decisions about whether to expand statutory definitions to subject millions to criminal liability and a possible 10-year prison sentence is that sort of essential legislative power. After all, "[o]nly the people's elected representatives in Congress have the power to write new federal criminal laws." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019); *see Cargill v. Garland*, 57 F.4th 447, 470 (5th Cir. 2023) (en banc) (suggesting that it would be problematic "[i]f ATF could change the scope of criminal liability by issuing a regulation," because then "the Executive

17

could wield power that our Constitution reserves to the Legislature"); *cf.*
*United States v. Standard Brewery, Inc.*, 251 U.S. 210, 220 (1920)
("Administrative rulings cannot add to the terms of an act of Congress
and make conduct criminal which such laws leave untouched.").

Although there is no "absolute rule" that Congress cannot delegate
"authority to define criminal punishments," *Loving v. United States*, 517
U.S. 748, 768 (1996), Supreme Court cases approving delegations in the
criminal context are distinguishable.[4]    The Rule thus embodies
significant policy decisions with severe criminal consequences that
cannot be delegated to unelected officials.  *See Cargill*, 57 F.4th at 451
(allowing ATF "to set forth the scope of criminal prohibitions" would
violate the principle that "[i]t is the legislature … which is to define a
crime, and ordain its punishment" (quotation omitted)).

Even ignoring the prohibition on delegating core legislative power,
the Rule would still be unconstitutional because there is no intelligible
principle to cabin the Department's discretion.  *See Jarkesy*, 34 F.4th at
461-62.  Congress did not set forth specific findings that must be made to

---

[4] *See, e.g.*, *id.* at 753-54 (Thomas, J., concurring) (noting the unique context of
military prosecutions).

expand the statutory definitions. *See* 18 U.S.C. § 926(a); 26 U.S.C. § 7801(a)(2)(A). This "total absence of guidance is impermissible under the Constitution." *Jarkesy*, 34 F.4th at 462.

### 3. *The Department lacked statutory authority.*

Watterson will also likely succeed because the Department lacks statutory authority to rewrite statutes. Congress needed to speak clearly here, because "this is a major questions case." *West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022). The Rule embodies policy decisions that infringe on individual liberties, turn millions of Americans into criminals, and fundamentally change the statute with an "enforcement discretion" scheme. *See* Rule, 88 Fed. Reg. at 6,480-81, 6,563, 6,570-71. The Rule also has economic significance, is novel, and intrudes on an area of state regulation: the police power. *See* Final Reg. Analysis at 63, 67 (cost estimate); *United States v. Lopez*, 514 U.S. 549, 561 n.3 (1995). Because the Rule is a decision of "magnitude and consequence," the decision belongs to Congress or, at the very least, with "an agency acting pursuant to a clear delegation from that representative body." *West Virginia*, 142 S. Ct. at 2616. That means the Department "must point to clear congressional authorization" for the Rule. *See id.* at 2609 (quotation

omitted).

It cannot do so. Congress did not speak clearly to give the Department the power it claims, 26 U.S.C. § 7801(a)(2)(A); 18 U.S.C. § 926(a), and that is fatal under the major questions doctrine, *see Gun Owners of Am. Inc. v. Garland*, 19 F.4th 890, 919 (6th Cir. 2021) (en banc) (Murphy, J., dissenting) (concluding the grants of general rulemaking power "do not satisfy the clear-statement rule" to permit the Department to create new crimes).

Regardless, even apart from that doctrine, the Department lacks authority for the Rule. It has no authority to redefine "rifle" and create new crimes (and compliance options) by expanding definitions. *See United States v. Kuzma*, 967 F.3d 959, 971 (9th Cir. 2020) (explaining, in relation to the definition of machinegun, "[t]his is not a situation in which an agency has been delegated authority to promulgate underlying *regulatory* prohibitions, which are then enforced by a criminal statute prohibiting willful violations of those regulations"); Stephen P. Halbrook, FIREARMS LAW DESKBOOK, § 7:7 (Oct. 2022 Update). Nor does the Department have authority to regulate braces which, unlike other gun parts, are not swept within the definition of firearm. *See* 26 U.S.C.

§ 5845(a)(7); 18 U.S.C. § 921(a)(3)(B)-(C).

The statutes define "rifle" and do not authorize the Department to pass regulations to expand those definitions. *See* 18 U.S.C. § 921; 26 U.S.C. § 5845. In contrast, the National Firearms Act specifically authorizes the Department to *omit* weapons from the definition of "firearm" if it makes specific findings. *See* 26 U.S.C. § 5845(a). This further shows Congress did not delegate authority to expand the meaning of "rifle." *See Gun Owners*, 19 F.4th at 919 (Murphy, J., dissenting).

## II. PLAINTIFF WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF RELIEF.

Watterson also satisfies the second factor, because he is suffering— and will continue to suffer—irreparable harm in the absence of relief.

Watterson cannot currently attach his brace to his pistol without risking a 10-year federal prison sentence and a state sentence. *See* Ex. 2, Watterson Decl. at ¶¶ 18-26; *supra* p. 4. The Rule revoked the classification letter that recognized Watterson's brace would *not* transform a pistol into a short-barreled rifle, and the Department has since indicated his specific brace transforms a pistol into a short-barreled rifle. *See supra* pp. 2-4. The Rule thus subjects Watterson to a credible prosecution threat, deprives him of Second Amendment rights, and

deprives him of his right to not be regulated contrary to statutory and separation-of-powers provisions.

These deprivations constitute irreparable harm. After all, "loss of constitutional freedoms for even minimal periods of time … unquestionably constitutes irreparable injury." *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) (quotation omitted); *see Ezell*, 651 F.3d at 698. And even "alleged violations" of constitutional rights can satisfy the irreparable-harm requirement. *See Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012). Likewise, the "[t]hreat of criminal prosecution … constitute[s] irreparable injury." *VanDerStok v. Garland*, 633 F.Supp.3d 847, 857 (N.D. Tex. 2022).

Furthermore, even if Watterson complies with the unlawful Rule and acquiesces to the infringement of his rights, he will still suffer irreparable harm. First, he would still be deprived of his constitutional right to possess a braced pistol for self-defense, which would be irreparable harm, while waiting months to a year for his registration application to be processed. *See supra* p. 4.

Second, he would incur unrecoverable compliance costs (*e.g.*, time and resources expended for fingerprinting, engraving, getting

22

photographs) even assuming a separate suit to recover the $200 tax is possible. *See id.* That qualifies as irreparable harm "because the "key inquiry" is the "irreparability," not the "magnitude" of the harm. *Rest. Law Ctr. v. Dep't of Labor*, 66 F.4th 593, 597, 600 (5th Cir. 2023); *see Texas*, 829 F.3d at 433-34 (similar); *BST Holdings*, 17 F.4th at 618 (similar). What is more, these compliance costs cannot be minimized as de minimis when the purpose behind the tax and registration requirements was to chill constitutional rights. *See Mock*, 75 F.4th at 569; Ex. 2 at MSJ_34.

Third, Watterson would be subject to additional restrictions on his ability to travel with or transfer his weapon—ongoing Second Amendment violations—that cannot be undone. *See Mock*, 75 F.4th at 566, 576 n.29 (recognizing "there is no given process for undoing" the registration of a weapon, which subjects the weapon to "onerous requirements"); Ex. 2, Watterson Decl. at ¶ 27.

Fourth, he would suffer the irreparable harm of acquiescing to the violation of his rights and subjecting himself to unlawful regulations. *Cf. All. for Hippocratic Med.*, 78 F.4th at 251 ("No legal remedy can adequately redress … conscience and mental-distress injuries."); *Trans*

*World Airlines v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990) (subjecting airlines to unlawful state regulations would be irreparable harm). Watterson therefore satisfies the irreparable harm factor several times over.

## III. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH IN FAVOR OF GRANTING RELIEF.

Watterson also satisfies the final factors, because issuing a stay and injunction will serve the public interest and not "substantially injure the other parties." *Nken*, 556 U.S. at 434.

Because "the Constitution is the ultimate expression of the public interest," *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (quotations omitted), "[i]t is always in the public interest to prevent the violation of a party's constitutional rights," *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (quotation omitted). Second Amendment rights are no different; it is in the public interest to stop the violation of Second Amendment rights just like other constitutional rights. *See Bruen*, 142 S. Ct. at 2156 (declaring that the "right to bear arms … is not a second-class right" (quotation omitted)); *Ezell*, 651 F.3d at 710 (concluding the equities favor plaintiffs where there is "a strong likelihood that they are suffering violations of their

Second Amendment rights").

The public likewise has an interest in this Court granting relief, because the public is served when "governmental agencies abide by the federal laws that govern their existence and operations," *State v. Biden*, 10 F.4th 538, 559-60 (5th Cir. 2021) (quotation omitted). Indeed, there is no public "interest in enforcing a regulation that violates federal law." *All. for Hippocratic Med.*, 78 F.4th at 251; *see Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (similar). The public also benefits from the "maint[enance of] our constitutional structure." *See BST Holdings*, 17 F.4th at 618-19.

What is more, granting the requested relief benefits law-abiding Americans as a practical matter. That is because stabilizing braces improve the accuracy of large pistols and enable citizens to exercise self-defense effectively in their homes. *See Mock*, 75 F.4th at 588 (Willett, J., concurring); Ex. 2, Watterson Decl. at ¶¶ 4-15. And they give citizens "peace of mind" about their ability to defend themselves. *See Spencer v. Nigrelli*, No. 22-CV-6486 (JLS), 2022 U.S. Dist. LEXIS 233341, at *33 (W.D.N.Y. Dec. 29, 2022). These "legitimate purposes that assist law-abiding citizens" weigh in favor of granting relief, especially when there

is no evidence "as to how" the Rule will actually promote public safety pending this case's resolution, *Barnett v. Raoul*, No. 3:23-cv-00209-SPM, 2023 U.S. Dist. LEXIS 74756, at *38-9 (S.D. Ill. 2023), and when citizens wish "to engage in historically lawful conduct," *Vanderstok v. BlackHawk Mfg. Grp., Inc.*, No. 4:22-cv-00691-O, 2022 U.S. Dist. LEXIS 200315, at *15 (N.D. Tex. Nov. 3, 2022).

The Department has no explanation, much less evidence, of how requiring registration applications pending this case's resolution is necessary for public safety, especially when stabilizing braces can be purchased without restriction. Despite millions of pistols with stabilizing braces in circulation by the Department's own estimates, the Department points to only four crimes resulting in deaths and less than 300 investigations involving them over the past decade. *See* Ex. 22 at 9-10; Ex. 23 at 4-5. Considering there are over 17,000 gun homicides annually, *Mock*, 75 F.4th at 573 n.22, the Department's own figures show braced pistols are not a menace to public safety. Moreover, the Rule's 90-day grace period demonstrates that granting a stay pending this case's resolution will not harm the Department or the public. *See Boland v. Bonta*, No. SACV 22-01421-CJC, 2023 U.S. Dist. LEXIS 51031, at *28-29

(C.D. Cal. 2023) (grandfathered guns undercut the argument that such guns posed "unacceptable public safety risks"); *Renna v. Bonta*, No. 20-cv-2190-DMS-DEB, 2023 U.S. Dist. LEXIS 63687, at \*45-46 (S.D. Cal. 2023) (similar).

Watterson thus satisfies the balance-of-equities and public-interest factors.

### CONCLUSION

For the foregoing reasons, the Court should grant this motion.

Dated: September 27, 2023,       Respectfully submitted,

*/s/ Autumn Hamit Patterson*
ROBERT HENNEKE
Texas Bar No. 24046058
rhenneke@texaspolicy.com
CHANCE WELDON
cweldon@texaspolicy.com
Texas Bar No. 24076767
AUTUMN HAMIT PATTERSON
     *Lead Counsel*
Texas Bar No. 24092947
apatterson@texaspolicy.com
CLAYTON WAY CALVIN
Texas Bar No. 24132780
ccalvin@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone: (512) 472-2700
Facsimile: (512) 472-2728

*Counsel for Plaintiff-Appellant*

### CERTIFICATE OF COMPLIANCE

I certify that this document complies with the typeface, type-style, and length requirements in 5th Circuit Rule 27.4 and Federal Rules of Appellate Procedure 27(d)(1)(E), (d)(2)(A) and 32(a)(5), (6) because it is in 14-point Century Schoolbook font and contains 5,195 words, excluding the parts exempted by Federal Rules of Appellate Procedure 32(f).

*/s/ Autumn Hamit Patterson*
Autumn Hamit Patterson

### CERTIFICATE OF CONFERENCE

Pursuant to 5th Circuit Rule 27.4, I certify that, on September 26, 2023, counsel for Plaintiff-Appellant emailed counsel for Defendants-Appellees to inquire (1) whether they opposed the relief requested in this motion, and (2) whether they plan to file an opposition. On September 27, 2023, Defendants-Appellees' counsel responded that "the government would oppose a motion in the Fifth Circuit to stay or enjoin the stabilizing-braces rule during the pendency of an appeal."

*/s/ Autumn Hamit Patterson*
Autumn Hamit Patterson

## CERTIFICATE OF SERVICE

I hereby certify that, on September 27, 2023, a copy of the foregoing document was electronically filed and served via CM-ECF on all counsel who are registered CM/ECF users.


*/s/Autumn Hamit Patterson*
Autumn Hamit Patterson