No. 23-40556

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————————

BLAKE J. WATTERSON,

Plaintiff-Appellant,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; STEVEN
DETTELBACH, in his official capacity as Director of the Bureau of Alcohol, Tobacco,
Firearms and Explosives; UNITED STATES DEPARTMENT OF JUSTICE; MERRICK
GARLAND, U.S. Attorney General; and UNITED STATES OF AMERICA

Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the Eastern District of Texas

———————————

## MOTION TO DISMISS AND OPPOSITION TO MOTION FOR A STAY
## OR INJUNCTION PENDING APPEAL

———————————

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

DAMIEN DIGGS
*United States Attorney*

ABBY C. WRIGHT
SEAN R. JANDA
BEN LEWIS
*Attorneys, Appellate Staff
Civil Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530
202-514-2494*

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................ 1

STATEMENT .................................................................................................. 2

ARGUMENT .................................................................................................. 6

I.      Threshold Grounds Bar Plaintiff's Requested Relief ........................... 6

      A.      This Court Does Not Have Appellate Jurisdiction and This
Appeal Should Be Dismissed ...................................................... 6

      B.      Plaintiff Failed to Comply with Federal Rule of Appellate
Procedure 8(a)(2) ....................................................................... 9

II.     Regardless, Plaintiff Has Not Demonstrated Entitlement to an
Injunction Pending Appeal ............................................................... 10

      A.      The Rule Is Lawful .................................................................... 10

      B.      Plaintiff Has Not Established That the Equitable Factors Support
an Injunction ............................................................................ 19

CONCLUSION .............................................................................................. 22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# INTRODUCTION

Congress regulated short-barreled rifles under the National Firearms Act (NFA) as especially dangerous weapons. A short-barreled "rifle" is a firearm "designed," "made," and "intended" to be "fired from the shoulder," with a barrel shorter than 16 inches. 26 U.S.C. §§ 5841, 5845. Recently, some manufacturers have sold firearms with rearward attachments marketed as "stabilizing braces." Though these manufacturers claim that the attachments are designed to rest against a shooter's forearm to assist with one-handed firing and thus the firearms are not rifles, many braces are virtually indistinguishable from shoulder stocks and are actually designed to facilitate shoulder firing.

In response, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) issued the Rule. *See* Factoring Criteria for Firearms With Attached "Stabilizing Braces," 88 Fed. Reg. 6478 (Jan. 31, 2023) (Rule). The Rule clarifies that the statutory design-and-intent standard does not turn only on the manufacturer's stated intent; instead, the standard also focuses on the weapon's design and other objective evidence. The Rule then sets forth evidence ATF will consider when determining whether any particular braced firearm is designed and intended to be shoulder-fired.

Plaintiff challenged the Rule and sought preliminary injunctive relief. Before the district court decided that motion, plaintiff filed this appeal and moved for an injunction.

1

At the outset, this Court should dismiss this appeal. Because the district court did not resolve plaintiff's preliminary-injunction motion, this Court lacks jurisdiction over the appeal. Moreover, plaintiff failed to request an injunction pending appeal from the district court before moving in this Court, which is sufficient reason to deny his motion. In any event, nothing in plaintiff's motion justifies his request. The Rule is lawful, and the public interest in clarifying statutory requirements for weapons that Congress deemed particularly dangerous outweighs any minimal harms plaintiff asserts.

## STATEMENT

1. The NFA, 26 U.S.C. § 5801 *et seq.*, regulates "dangerous weapons," H.R. Rep. No. 73-1780, at 1 (1934), that can "be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395 (1954); *see United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 516-17 (1992) (plurality opinion). One such firearm is a short-barreled rifle. 26 U.S.C. § 5845(a)(3), (4). As relevant here, a "rifle" is defined as a firearm "designed or redesigned, made or remade, and intended to be fired from the shoulder." *Id.* § 5845(c).

As with other weapons regulated by the NFA, short-barreled rifles must be registered in the National Firearms Registration and Transfer Record, and a person wishing to make or transfer a short-barreled rifle generally must pay a $200 tax and receive approval from the Attorney General. 26 U.S.C. §§ 5801-5802, 5811-5812,

5821-5822, 5852, 5861-5871, 5871-5872. To enforce the NFA, ATF must therefore determine which firearms constitute short-barreled rifles.

Over the last decade, ATF has received an increasing number of requests to determine whether firearms are "rifles" in circumstances where they are configured with a "stabilizing brace." *See* 88 Fed. Reg. at 6482-84. In general, manufacturers design these devices to attach to the rear of a heavy pistol—such as a variant of an AR-type rifle—and some manufacturers claim that they are meant to attach to or rest against a shooter's forearm to provide additional stability. *See id.* at 6518. But frequently, these braces replicate characteristics of a shoulder stock and are frequently marketed and used as devices to enable a shooter to shoulder the firearm. *See id.* at 6479, 6527-29, 6544-47. Indeed, as the below photographs demonstrate, a pistol variant equipped with a stabilizing brace may be virtually indistinguishable from similar models sold as rifles.



*See* Dkt.29-1, at 5 (top item equipped with "brace" and bottom equipped with stock).

In "the majority" of cases before the Rule, ATF classified braced firearms as short-barreled rifles, but the results of ATF's classifications were "mixed." 88 Fed.

Reg. at 6482. Over time, the agency became concerned that its classifications did not always apply the same criteria—and, in some instances, applied a framework inconsistent with the NFA—to determine whether the weapon was a rifle. Those inconsistences created confusion among manufacturers and purchasers. *See generally id.* at 6479-505 (describing this history).

Thus, ATF issued the Rule "to provide clarity to the firearm industry and public on how ATF evaluates firearms equipped with a 'stabilizing brace.'" *See* 88 Fed. Reg. at 6494. The Rule primarily clarifies that, in determining whether a particular braced firearm is designed and intended to be fired from the shoulder, ATF will not only consider a manufacturer's assertions about how the firearm is designed to be used but will also examine its objective design features and other evidence.

The Rule further elaborates that the statutory definition of "rifle" encompasses a firearm equipped with a stabilizing brace "that provides surface area that allows the weapon to be fired from the shoulder, provided that other" evidence "indicate[s] that the weapon is designed, made, and intended to be fired from the shoulder." 88 Fed. Reg. at 6569. The Rule then identifies evidence that ATF will consider in determining whether any particular firearm is designed and intended to be shoulder-fired. This includes (i) the weapon's "weight or length"; (ii) its "length of pull"; (iii) the existence of "sights or a scope" that require shouldering to use; (iv) the extent to which the rear surface area comes from an "attachment that is necessary for the cycle of operations"; (v) "marketing and promotional materials"; and (vi) the "likely use of the weapon in

the general community." *Id.* at 6569-70. Because not all previous classification letters had properly followed this approach, the Rule also clarifies that those letters are no longer valid and that firearms must be reexamined. *Id.* at 6480.

2. Plaintiff Blake Watterson challenged the Rule, asserting that the rule violates the Administrative Procedure Act (APA) because it "expand[s] the definition" of "rifle" beyond the NFA and violates the Second Amendment by subjecting "pistols with stabilizing braces" to the NFA. *See* Dkt.1 ¶¶ 121-38.

Plaintiff moved for preliminary relief, Dkt.7, and the district court ordered expedited briefing, Dkt.18. Before the court resolved the motion, this Court granted an injunction pending appeal in a different case challenging the Rule. *See* Order, *Mock v. Garland*, No. 23-10319 (5th Cir. May 26, 2023). The district court then enjoined the government from enforcing the Rule against plaintiff pending this Court's decision in *Mock. See* Dkt.37.

Plaintiff renewed his preliminary-injunction motion after this Court decided *Mock*. At that point, the district court clarified that the injunction remained in effect until the mandate issued in *Mock. See* Dkt.44. The court summarily stated that plaintiff had established a likelihood of success on the merits and set an expedited briefing schedule for consideration of the equitable factors bearing on plaintiff's motion, with briefing completed on September 5. *See id.*

This Court issued the mandate in *Mock* on September 25. *See* Dkt.49. The next day, plaintiff filed an interlocutory notice of appeal, asserting that the district court

had effectively denied his preliminary-injunction motion. *See* Dkt.51. Before doing so, plaintiff did not renew his request for relief in district court, request a decision from that court by a specific date, or ask the district court to enter an injunction pending a potential appeal.

## ARGUMENT

This appeal should be dismissed for lack of appellate jurisdiction. And if the appeal is not dismissed, plaintiff's motion for an injunction pending appeal should be denied. To obtain that relief, a plaintiff must move first in district court or show that doing so "would be impracticable." Fed. R. App. P. 8(a). After meeting that requirement, a plaintiff "must show (1) a strong likelihood of success on the merits; (2) irreparable injury in the absence of an injunction; (3) that the balance of hardships weighs in their favor if injunctive relief is granted; and (4) that the public interest favors such relief." *Whole Woman's Health v. Jackson*, 13 F.4th 434, 441 (5th Cir. 2021) (per curiam). Plaintiff has satisfied none of these requirements.

## I.    Threshold Grounds Bar Plaintiff's Requested Relief

### A.    This Court Does Not Have Appellate Jurisdiction and This Appeal Should Be Dismissed

This Court should dismiss this appeal for lack of jurisdiction—or, at the least, deny preliminary relief.

As relevant here, this Court has jurisdiction over appeals from interlocutory orders "refusing" injunctions. 28 U.S.C. § 1292(a)(1). As explained, the district court

has not refused plaintiff's preliminary-injunction motion; to the contrary, the court granted preliminary relief pending *Mock* and then ordered expedited briefing—which ended only three weeks before plaintiff filed his notice of appeal—on plaintiff's motion following that decision.

Plaintiff fails to advance his claim by contending (at 7-8) that the district court effectively denied his preliminary-injunction motion because that motion remained pending the day after the *Mock* mandate issued. "[M]ere inaction" standing alone "is not an order refusing injunctive relief, and is not appealable." *Overton v. City of Austin*, 748 F.2d 941, 951 (5th Cir. 1984). Deciding a motion may "require time for a study of the record and the applicable law." *NAACP v. Thompson*, 321 F.2d 199, 202-03 (5th Cir. 1963). Here, there is no indication that the "district court will [not] rule on [plaintiff's] motion in due course," so an appeal is improper. *General Land Office v. Biden*, No. 22-40110, 2022 WL 3010699, at *1 (5th Cir. July 29, 2022) (per curiam).

In arguing otherwise, plaintiff relies on *United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962), where this Court determined that a district court's failure to grant a preliminary injunction was an appealable order. But "it does not follow [from *Lynd*] that every failure of a trial court to grant a temporary injunction is tantamount to a 'refusal' of such injunctive relief." *Overton*, 748 F.2d at 951-52 (alteration in original) (quotation omitted). In *Lynd*, the court's inaction "den[ied] or render[ed] impractical the granting of the injunctive relief plaintiffs sought." *Id.* There, the United States sought "injunctive relief against local voter registration officials to prevent their

continued racial discrimination against black voter registration applicants" before an election. *Id.* But despite the "immediate pendency of termination of registration proceedings prior to an early election," the district court took no action for eight months; granted questionable "dilatory pleas and motions by defendants"; and finally granted a "thirty-day recess" after the government put on its case at the motions hearing "to permit defendants to prepare to put on their defensive case," effectively permitting the termination of voters' registration. *Id.* (quotation omitted). That is a far cry from this case, where the district court initially granted relief and ordered additional expedited briefing on plaintiff's request for a preliminary injunction.

Finally, even if the district court's inaction had the "practical effect" of refusing an injunction, to sustain an appeal, plaintiff would need to show that inaction caused serious consequences that "may be effectively addressed only by an immediate appeal." *Sherri A.D. v. Kirby*, 975 F.2d 193, 203-04 (5th Cir. 1992) . That high standard prevents parties seeking injunctive relief from "automatically treat[ing] as a denial" the "inevitable delay" caused by the need to consider a preliminary-injunction motion "in an orderly fashion." *IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524, 526 (7th Cir. 1996). Plaintiff cannot show that the district court's inaction will cause any such serious harms, *see infra* pp. 19-20, much less that any harms will accrue between now and the time when the district court is likely to rule on his motion.

### B.     Plaintiff Failed to Comply with Federal Rule of Appellate Procedure 8(a)(2)

Separately, plaintiff's motion is improper because plaintiff has not complied with Federal Rule of Appellate Procedure 8(a)(2), which required plaintiff to seek an injunction pending appeal in district court before moving in this Court or, in the alternative, to show that doing so was "impracticable." Plaintiff did not seek relief in the district court and has not shown such a motion would be impracticable. The district court granted plaintiff relief pending this Court's decision in *Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023); has since indicated that plaintiff has a likelihood of success on the merits; and was actively considering the remaining preliminary-injunction factors when plaintiff appealed.

Plaintiff suggests (at 7-8) that a district-court motion is impracticable because the court "failed to act" on his preliminary-injunction motion. As explained, that is not true, and it would not, regardless, excuse his noncompliance. The district court "should have the opportunity to rule" first unless such an opportunity would clearly be "pointless." *Ruiz v. Estelle*, 650 F.2d 555, 567 (5th Cir. 1981) (per curiam). Even when the court has refused earlier requests for relief, it is not pointless to move for an injunction pending appeal in the district court. *See Whole Woman's Health v. Paxton*, 972 F.3d 649, 653-54 (5th Cir. 2020). That is particularly true here, where the court has previously granted relief and has not yet denied the underlying preliminary-injunction

9

motion. Thus, plaintiff's "failure to show the impracticability of moving first in the district court is sufficient grounds to deny its motion." *Id.* at 654 (collecting cases).

## II.     Regardless, Plaintiff Has Not Demonstrated Entitlement to an Injunction Pending Appeal

### A.     The Rule Is Lawful[1]

The Rule reflects the best interpretation of the statute and comports with the Second Amendment.

1.a. A weapon is a "rifle" if it is "designed," "made," and "intended to be fired from the shoulder." 26 U.S.C. § 5845(c). The challenged provisions of the Rule primarily clarify two aspects of ATF's interpretation of the statute: First, whether a braced firearm is designed to be shoulder-fired is not determined solely by reference to a manufacturer's claimed intent but is also determined by evaluating other evidence. *See* 88 Fed. Reg. at 6495. Second, the Rule identifies evidence that ATF considers probative of whether a particular braced firearm is intended to be fired from the shoulder. *See id.* at 6569-70. Both features of the Rule are consistent with the statute.

First, the NFA does not require ATF to uncritically accept a manufacturer's statements about whether its product is designed to be fired from the shoulder. To

---

[1] In *Mock*, this Court concluded that the Rule was not a logical outgrowth of the notice of proposed rulemaking. Neither plaintiff's complaint nor his motion in this Court contends that the Rule is invalid for that reason, and he has thus forfeited any claim to relief on that basis.

the contrary, it is a "very familiar [approach] in the law" to use "objective" evidence to "ferret[] out a party's" true intent, notwithstanding the party's claimed intentions. *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 601-02 (1st Cir. 2016) (collecting cases). Multiple courts of appeals have therefore held that a product's intended use may be determined by reference to evidence beyond the manufacturer's stated intent, such as design features. *See id.* at 600, 602; *see also United States v. Syverson*, 90 F.3d 227 (7th Cir. 1996) (affirming conviction for possession of an unregistered silencer, in violation of the NFA, based on evidence that the product in question was intended as a silencer).

Second, ATF also properly identified evidence that will be probative of whether a particular braced firearm is designed to be fired from the shoulder. In the Rule, ATF identified both evidence related to the design features of the weapon—such as whether the weapon includes features useful for shoulder-firing but not useful for one-handed firing—and more direct evidence, including the way the weapon is actually marketed and used. And the Rule explains, for each identified category, why that evidence is probative. *See* 88 Fed. Reg. at 6510-43.

b. In nevertheless contending that the Rule is contrary to the statute, plaintiff primarily argues (at 13-15) that the factors identified in the Rule improperly look at whether a particular firearm "could be fired from the shoulder" rather than at whether the weapon is "designed and intended to be" fired from the shoulder. But that misunderstands the Rule. As explained, a firearm may be classified as a rifle only if the relevant evidence "indicate[s] that the weapon is designed, made, and intended to be

fired from the shoulder," 88 Fed. Reg. at 6569—just as the statute requires. Although the Rule identifies evidence related to the weapon's capabilities as relevant to that question, nowhere does plaintiff meaningfully contest that such evidence may be probative of how the product is designed to be used. *See supra* pp. 4-5.

Plaintiff also has no basis to complain (at 15-16) that the Rule improperly references websites that show individuals shoulder-firing braced firearms. For one, although plaintiff suggests that the Rule treats these websites "as evidence" that such firearms are generally intended to be shoulder-fired, the relevant discussion simply provides context for ATF's understanding—unchallenged by plaintiff—that these firearms are often marketed and used as rifles. *See* 88 Fed. Reg. at 6506.

In any event, to the extent plaintiff intends to suggest that it is improper for ATF to consider, when determining whether any specific braced firearm is designed to be shoulder-fired, promotional materials and the "likely use" of that weapon in the community, *see* 88 Fed. Reg. at 6479, that suggestion fails. ATF may consider the way in which a product is actually used as evidence of the manufacturer's intent. *See id.* at 6544-48. Indeed, the Supreme Court has recognized that Congress may identify "factors [that] generally focus on the actual use of the item in the community" as relevant evidence of whether a product is "primarily intended" for a particular use. *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 519-20 (1994) (quotation omitted). And plaintiff's suggestion (at 15-16) that similar logic would lead to the conclusion that keys are designed to open bottles of wine fails to account for the framework

12

reflected in the Rule, which reflects a holistic inquiry to determine a braced weapon's intended use. A similar inquiry in the context of keys would, of course, reflect that keys are designed to open locks, not wine.

Finally, plaintiff briefly suggests (at 16) that the Rule violates the statute because it includes options for individuals who previously possessed unregistered short-barreled rifles to come into compliance with the statute. But plaintiff does not—and could not—challenge those compliance options, which do not injure him. Regardless, the compliance options reflect the Department's exercise of its enforcement discretion, *see* 88 Fed. Reg. at 6480-81; *see also Heckler v. Chaney*, 470 U.S. 821, 831 (1985); nowhere does plaintiff contend that the NFA circumscribes that discretion to require the Department to enforce the statue against all violators.

2. Plaintiff also contends (at 16-21) that the Rule exceeds the Department's authority. In each instance, however, plaintiff's argument turns on the premise that the Rule does not reflect the best interpretation of the NFA. *See, e.g.*, Mot. 16 (no "constitutional authority to rewrite the" NFA); Mot. 17 (no authority to "expand statutory definitions" or "write new federal criminal laws"); Mot. 20 ("no authority to redefine 'rifle' and create new crimes"). Thus, each of those arguments simply repackages plaintiff's erroneous argument that the Rule is not the best interpretation of the NFA.

3. The Rule also does not violate the Second Amendment. To establish a Second Amendment violation, plaintiff must first show that the Rule implicates "the

Second Amendment's plain text." *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022). If plaintiff meets that threshold requirement, the government is then required to "demonstrate that the [Rule] is consistent with this Nation's historical tradition of firearm regulation." *Id.* Plaintiff's claim founders on all levels.

a. The Second Amendment's protection extends only to "instruments that constitute bearable arms" and that are "typically possessed by law-abiding citizens for lawful purposes." *District of Columbia v. Heller*, 554 U.S. 570, 581-82, 625 (2008). Neither stabilizing braces alone nor short-barreled rifles qualify.

Because the Second Amendment covers only bearable arms, laws that regulate firearm accessories or attachments do not implicate its protections. A stabilizing brace is "not a weapon in itself"; regulation of braces thus does not implicate conduct protected by the Amendment's plain text, just as a "silencer is a firearm accessory" and so is not "protected by the Second Amendment." *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018).

Moreover, like other NFA firearms, short-barreled rifles have long been regulated due to their "quasi-suspect character," *Staples v. United States*, 511 U.S. 600, 611-12 (1994), and Congress has found they can "be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395. This reality arises from "their concealability" compared to long-barreled rifles and "their heightened ability to cause damage" compared to handguns. 88 Fed. Reg. at 6499.

14

For similar reasons, the Supreme Court has twice affirmed that short-barreled shotguns are "dangerous and unusual weapons" not protected by the Second Amendment. *See United States v. Miller*, 307 U.S. 174, 178 (1939); *see also Heller*, 554 U.S. at 581, 622-25 (reaffirming *Miller*). As the courts of appeals have repeatedly concluded, that principle applies equally to short-barreled rifles, because there is "no constitutional distinction" between the two. *United States v. Stepp-Zafft*, 733 F. App'x 327, 329 (8th Cir. 2018) (per curiam); *see Cox*, 906 F.3d at 1185; *see United States v. Gilbert*, 286 F. App'x 383, 386 (9th Cir. 2008) (unpublished).

This conclusion is confirmed by application of the approach this Court adopted in *Hollis v. Lynch*, 827 F.3d 436, 448-49 (5th Cir. 2016), for evaluating whether a firearm is unprotected by the Second Amendment. This approach considers the extent to which the firearm is regulated or banned and the absolute and relative number of that firearm in circulation. Short-barreled rifles are substantially regulated—or banned—by jurisdictions across the country. At least 30 States and the District of Columbia generally prohibit possession of short-barreled rifles outright or unless the NFA is followed, *see* Dkt.29-1, at 30; *see also* Ill. Comp. Stat. Ann. § 24-1(a)(7)(ii), § 24-2(c)(7); N.J. Stat. Ann. § 2C:39-3(b), § 2C:39-1(o); N.Y. Penal Law § 265.00(3)(c), (d), § 265.01-b; 11 R.I. Gen. Laws Ann. § 11-47-8(b), which is comparable to the 34 States that impose similar restrictions on machineguns. Nor are short-barreled rifles in common use. *Compare* 88 Fed. Reg. at 6550 (approximately 600,000 short-barreled rifles), *with Hollis*, 827 F.3d at 449-50 (citing other court

decisions—including one later vacated on rehearing en banc—concluding that the possession of "50 million large-capacity magazines" and "8 million AR- and AK-platform semi-automatic rifles" suggested the weapons were in common use (quotation omitted)).

In response, plaintiff primarily argues (at 12) that stabilizing braces are commonly owned and may be lawfully possessed in most states. But neither the Rule nor the statute regulates stabilizing braces on their own; only short-barreled rifles are regulated. And plaintiff does not meaningfully contest that there are relatively few registered short-barreled rifles and that such weapons are heavily regulated.

Finally, plaintiff briefly contends that short-barreled rifles are not "unusually dangerous," because braces and buttstocks assertedly "make pistols safer" and because short-barreled rifles were "commonly used" for lawful purposes before the NFA's enactment. Mot. 12-13 (quotations and alteration omitted). As an initial matter, as is reflected in the NFA and in 30 States' laws, Congress and State legislatures have properly determined that short-barreled rifles are particularly dangerous and require additional regulation. And, as explained, that legislative judgment is correct, as short-barreled rifles combine lethality and concealability in a particularly dangerous way, *see* 88 Fed. Reg. at 6499; *Mock*, 75 F.4th at 596 (Higginson, J., dissenting); are associated with criminality, *see United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) (plurality opinion); and are not commonly used.

16

b. Regardless, the NFA's regulatory scheme, which includes registration, approval, and taxation requirements, does not infringe the Second Amendment because it does not prevent individuals from exercising their "right to bear arms in public for self-defense." *Bruen*, 142 S. Ct. at 2156. The Supreme Court has made clear that its decisions do not "cast doubt" on "laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27. And the Court has approved licensing regimes that require applicants to (for example) "undergo a background check or pass a firearms safety course" to ensure that firearms owners are "law-abiding, responsible citizens." *Bruen*, 142 S. Ct. at 2138 n.9 (quotation omitted). The NFA, which permits the possession of short-barreled rifles so long as its relatively modest procedural requirements are met, similarly does not infringe the Second Amendment.

Moreover, the firearms subject to the NFA's requirements are limited to narrow classes that Congress has determined are particularly dangerous and that do not include the most common firearms, such as handguns ("the quintessential self-defense weapon," *Heller*, 554 U.S. at 629) and full-length rifles. And although plaintiff suggests (at 10) that the Second Amendment protects a right "to *effective* self-defense," he nowhere demonstrates that a short-barreled rifle is necessary for him to effectively defend himself.

c. The NFA is also "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Since colonial times, States have regulated the

possession and manufacture of firearms by imposing registration, approval, and taxation requirements analogous to the NFA's.

The colonies routinely imposed requirements that—like the NFA—authorized the keeping of records of firearm ownership. Thus, as early as 1631, Virginia required a regular survey of the arms and munition in the colony, *see* Add.18, and Rhode Island (1667), *see* Add.24, South Carolina (1747), *see* Add.26, and New Jersey (1781), *see* Add.68, similarly authorized door-to-door surveys of firearms.

In addition, many colonies and early States imposed inspection or testing requirements that—like the NFA's scheme—were aimed at ensuring safe firearm possession. Thus, Massachusetts (1775), *see* Add.84, and New York (1778), *see* Add.57, provided for inspections of militia members' firearms, while Massachusetts (1805), *see* Add.84, and Maine (1821), *see* Add.95, required that firearm barrels generally be inspected and marked before sale. Similarly, Massachusetts (1651, 1809), *see* Add.21; Add.87, Connecticut (1775), *see* Add.45, and New Hampshire (1820), *see* Add.91, required licenses or inspection to export or sell gunpowder. And other States— including Mississippi (1844, 1867), *see* Add.97; Add.112, North Carolina (1857), *see* Add.100, Georgia (1866), *see* Add.105, and Alabama (1867), *see* Add.108—also enacted direct taxes on firearms ownership.

Taken together, these laws reflect a historical tradition of regulation "relevantly similar" to the requirements under the NFA. *Bruen*, 142 S. Ct. at 2132. Like these laws, the NFA taxes and regulates (but does not prohibit) firearm ownership to ameliorate

the danger that weapons pose and gather information on firearms. Those restrictions are "comparable" and "comparably justified" to past laws. *Id.* at 2133. And plaintiff fails to rebut this showing, relying instead (at 11) on bald assertions that the many cited laws are "dissimilar" or "irrelevant."

### B.   Plaintiff Has Not Established That the Equitable Factors Support an Injunction

1.a. Plaintiff has not demonstrated that the Rule will cause him irreparable harm. The regulatory requirements associated with transferring and possessing short-barreled rifles come from the underlying statutes—not the Rule—and the Rule does no more than inform regulated entities of ATF's understanding of the scope of those statutes.

In any event, plaintiff may continue to transfer and possess any brace-equipped pistols; he simply might—depending on the design—need to comply with the NFA's requirements. And those requirements are not especially onerous: the NFA's tax is $200, and the Department chose not to collect tax for braced pistols that individuals possessed before the Rule and timely registered. Similarly, although the NFA imposes additional minimal regulatory requirements—such as submission of a registration form when an NFA-regulated firearm is transferred—plaintiff does no more than complain (at 22-23) about those requirements generically; nowhere does he demonstrate that any specific requirement imposes more than a *de minimis* (much less

irreparable) cost on him. *Cf. Restaurant Law Ctr. v. U.S. Dep't of Labor*, 66 F.4th 593, 600 (5th Cir. 2023) (*de minimis* harm not sufficient).

b. Attempting to demonstrate irreparable harm, plaintiff claims (at 21-24) a scattershot of injuries, but none persuades. As an initial matter, plaintiff suggests (at 22) that the Rule causes an irreparable Second Amendment injury. But as explained, *supra* pp. 13-19, plaintiff is not likely to succeed on that claim.

Plaintiff also contends (at 21-22) that he is irreparably harmed by the threat of criminal prosecution and by the need to wait for any registration of his firearm to be approved before he may possess it. But plaintiff can alleviate the threat of criminal prosecution by complying with the NFA, and he could have continued to possess any firearm he previously owned during the pendency of his registration if he had submitted a timely application. He simply chose not to do so. Any harm stemming from a choice to violate the NFA or to delay registration past the compliance deadline is self-imposed and thus not irreparable. *See Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (per curiam).

2. Assuming plaintiff had demonstrated some irreparable harm, his minimal asserted harms could not outweigh the countervailing public interest in public safety and in regulatory clarity. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (balance of the equities and public interest "merge" when the government is a party).

First, the Rule benefits public safety. As explained, the NFA reflects Congress's determination that short-barreled rifles pose a specific and unusual risk to public

safety and that regulating them through, for example, registration and taxation requirements is necessary to ameliorate that risk. *See* 88 Fed. Reg. at 6566. The Rule reinforces these controls that Congress determined advance public safety by clarifying the weapons subject to the statute.

Second, the Rule promotes the public interest in regulatory clarity and consistent enforcement of statutory requirements. ATF promulgated the Rule in large part to ameliorate substantial confusion among regulated entities regarding the proper interpretation of the intent standard in the NFA and to ensure that ATF would consistently apply the definition moving forward. An injunction pending appeal would deprive the agency, and the regulated public, of that explanation and risk engendering future confusion and inconsistency in application of the statute.

3. Even if plaintiff had demonstrated an entitlement to relief pending appeal, he would not be entitled to anything more than an injunction prohibiting enforcement of the Rule against him. Plaintiff appears to gesture at obtaining broader relief from this Court, by, for example, denominating his requested relief as seeking a stay and discussing the standards for a stay under 5 U.S.C. § 705. His motion, however, focuses on harm to him and why that harm justifies an injunction pending appeal; plaintiff does not develop any argument for why a broader stay would be justified.

In any event, fundamental constitutional and equitable principles require the Court to limit any injunction to the specific plaintiff whom the Court finds has demonstrated some irreparable injury from the Rule. *See Gill v. Whitford*, 138 S. Ct.

1916, 1929-30 (2018) (Article III); *Califano v. Yamazaki*, 442 U.S. 682, 702 (1979) (equity). Here, plaintiff's allegations of irreparable injury are limited to himself, and he has nowhere argued that an injunction limited to him would fail to redress those injuries. Thus, to the extent that he seeks broader relief, that request is unsupported.

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiff's motion.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

DAMIEN DIGGS
*United States Attorney*

ABBY C. WRIGHT
SEAN R. JANDA

/s/ Ben Lewis
BEN LEWIS
*Attorneys, Appellate Staff*
*Civil Division, Room 7250*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-2494*

October 2023

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5200 words. This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.


*/s/ Ben Lewis*
BEN LEWIS

# CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2023, I electronically filed the foregoing response with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Ben Lewis*
BEN LEWIS