No. 23-40556

# In the United States Court of Appeals
# For the Fifth Circuit

BLAKE J. WATTERSON,

*Plaintiff-Appellant,*

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; STEVEN DETTELBACH, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; UNITED STATES DEPARTMENT OF JUSTICE; MERRICK GARLAND, U.S. Attorney General; UNITED STATES OF AMERICA,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Texas

## APPELLANT'S BRIEF

ROBERT HENNEKE
CHANCE WELDON
AUTUMN HAMIT PATTERSON
CLAYTON WAY CALVIN
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone: (512) 472-2700
Facsimile: (512) 472-2728

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF INTERESTED PERSONS

No. 23-40556; *Watterson v. BATFE*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Plaintiff-Appellant and Counsel | Defendants-Appellants and Counsel |
|---|---|
| <ul><li>Blake J. Watterson</li><li>Robert Henneke</li><li>Chance Weldon</li><li>Autumn Hamit Patterson</li><li>Clayton Way Calvin</li><li>Texas Public Policy Foundation</li></ul> | <ul><li>Bureau of Alcohol, Tobacco, Firearms and Explosives</li><li>Steven Dettelbach</li><li>United States Department of Justice</li><li>Merrick Garland</li><li>United States of America</li><li>Faith E. Lowry</li><li>Michael Drezner</li><li>Jody D. Lowenstein</li><li>Taylor Pitz</li><li>Sean R. Janda</li></ul> |

| | • Abby C. Wright |
| | • Benjamin R. Lewis |



*/s/ Autumn Hamit Patterson*
AUTUMN HAMIT PATTERSON
*Attorney of Record for Plaintiff-*
*Appellant*

### STATEMENT REGARDING ORAL ARGUMENT

This case involves important questions about statutory interpretation and constitutional rights, including whether unelected bureaucrats can make millions of ordinary Americans guilty of a felony that carries a 10-year prison sentence with a stroke of a pen. Appellant believes that oral argument would materially help the Court in resolving these questions.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .......................................................ii

STATEMENT REGARDING ORAL ARGUMENT.................................................iv

TABLE OF AUTHORITIES.......................................................................... vii

INTRODUCTION .......................................................................................... 1

JURISDICTIONAL STATEMENT ..................................................................... 2

ISSUE PRESENTED ...................................................................................... 3

STATEMENT OF THE CASE ........................................................................... 4

    A. For Years, the Department Did Not Impose Additional Restrictions on Pistols with Stabilizing Braces that Facilitate Safer Shooting.. 4

    B. The Department Issued a Rule Deciding that Possession of an Unregistered Braced Pistol Is a Felony that is Punishable by a 10-Year Prison Sentence. ................................................................... 7

    C. Millions of Americans, Including Plaintiff-Appellant, Are Injured by the Rule.................................................................................. 9

    D. Wanting to Exercise His Rights Without Fear of Prosecution, Plaintiff-Appellant Immediately Challenged the Rule and Diligently Sought Relief. ............................................................. 10

    E. Despite Recognizing that Watterson Is Likely to Succeed, the District Court Refused to Grant a Stay or Injunction Pending Resolution of the Merits. ........................................................... 13

SUMMARY OF THE ARGUMENT .................................................................. 15

ARGUMENT.............................................................................................. 18

    I. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS. .......................... 19

    A. The Rule (and the Statutes if the Rule Properly Interprets them) Violates the Second Amendment. ............................................... 20

        1. The Rule implicates the Second Amendment, including by hindering the right to possess bearable arms and the right to self-defense. ........................................................................ 22

*2. The Department cannot show the Rule's restrictions are consistent with history and tradition.* ........................................24

B. The Department Lacked Constitutional and Statutory Authority to Issue the Rule..............................................................................31

*1. The Rule rewrites the statutes.* .................................................31

*2. The Rule is an unconstitutional exercise of legislative powers that violates the Constitution's structural provisions.* ...............37

    a. The Rule is an unlawful exercise of legislative power under the original meaning of the Constitution .............................37

    b. The Rule is an unconstitutional exercise of core, exclusively legislative power under current precedent............................40

    c. The Rule is also unconstitutional under current precedent because Congress failed to provide an intelligible principle.44

*3. The Rule exceeds the Department's statutory authority.*.............46

    a. No clear congressional delegation authorizes the Rule.........47

    b.  The Department lacks the statutory authority to expand definitions and create new felonies.......................................49

II. PLAINTIFF WILL SUFFER IRREPARABLE HARM WITHOUT PRELIMINARY RELIEF. ............................................................................................51

III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN FAVOR OF GRANTING PRELIMINARY RELIEF...........................................57

IV. THE COURT SHOULD INSTRUCT THE DISTRICT COURT TO STAY THE RULE AND ISSUE A PRELIMINARY INJUNCTION................................62

CONCLUSION ...........................................................................................66

CERTIFICATE OF SERVICE ........................................................................68

CERTIFICATE OF COMPLIANCE .................................................................68

vi

# TABLE OF AUTHORITIES

## *Cases*

*All. for Hippocratic Med. v. FDA*, 78 F.4th 210
(5th Cir. 2023) ............................................................ 18, 57, 59, 63

*Aposhian v. Wilkinson*, 989 F.3d 890 (10th Cir. 2021) (en banc)........... 42

*Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023)..............................28

*Baird v. Bonta*, No. 23-15016, 2023 U.S. App. LEXIS 23760
(9th Cir. Sept. 7, 2023) ......................................................... *passim*

*Baldwin v. New York*, 399 U.S. 66 (1970)..............................................27

*Barnett v. Raoul*, No. 3:23-cv-00209-SPM, 2023 U.S. Dist. LEXIS
74756 (S.D. Ill. Apr. 28, 2023)............................................ 24, 60, 61

*Britto v. BATFE*, No. 2:23-CV-019-Z, 2023 U.S. Dist. LEXIS 200933
(N.D. Tex. Nov. 8, 2023) ............................................... 30, 55, 60, 65

*BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604 (5th Cir. 2021) ....... *passim*

*Bevis v. City of Naperville*, Nos. 23-1353, 23-1793, 23-1825, 2023
U.S. App. LEXIS 29332 (7th Cir. Nov. 3, 2023) ...........................28

*Caetano v. Massachusetts*, 577 U.S. 411 (2016)....................................29

*Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) (en banc).............. 16, 42

*Clarke v. CFTC*, 74 F.4th 627 (5th Cir. 2023) ............................... *passim*

*Collins v. Yellen*, 141 S. Ct. 1761 (2021).............................. 32, 38, 51, 56

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...............................22

*Doe ex rel. Doe v. Vermilion Par. Sch. Bd.*, 421 F. App'x 366
(5th Cir. 2011) ..............................................................................66

*DOT v. Ass'n of Am. R.R.*, 575 U.S. 43 (2015) ..................................38, 39

*Duncan v. Bonta*, 83 F.4th 803 (9th Cir. 2023) ...................................... 60

*Elrod v. Burns*, 427 U.S. 347 (1976) ....................................................... 53

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011).......... 17, 23, 53, 58

*Feds for Med. Freedom v. Biden*, 63 F.4th 366 (5th Cir. 2023) .............. 65

*Forrest Gen. Hosp. v. Azar*, 926 F.3d 221 (5th Cir. 2019)...................... 37

*Frein v. Pa. State Police*, 47 F.4th 247 (3d Cir. 2022) ........................... 21

*Friedman v. City of Highland Park*, 577 U.S. 1039 (2015) ................... 29

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) .................................. 58

*Guedes v. ATF*, 66 F.4th 1019 (D.C. Cir. 2023) ..................................... 43

*Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890
    (6th Cir. 2021) (en banc) ....................................................... *passim*

*Gundy v. United States*, 139 S. Ct. 2116 (2019) ......................... 39, 40, 44

*Hardaway v. Nigrelli*, 639 F. Supp. 3d 422 (W.D.N.Y. 2022) ................ 62

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)........ 26, 27

*Indus. Union Dep't, AFL-CIO v. API*, 448 U.S. 607 (1980) ................... 41

*INS v. Chadha*, 462 U.S. 919 (1983)....................................................... 45

*Jackson v. City & County of San Francisco*, 746 F.3d 953
    (9th Cir. 2014) ................................................................................. 24

*Jackson Women's Health Org. v. Currier*, 760 F.3d 448
    (5th Cir. 2014) ......................................................................... 18, 58

*Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022) ............................. 16, 45, 46

*Kent v. Dulles*, 357 U.S. 116 (1958)....................................................... 47

*Koons v. Reynolds*, No. 22-7464 (RMB/EAP), 2023 U.S. Dist. LEXIS
    3293 (D.N.J. Jan. 9, 2023) .............................................................. 53

*Louisiana v. Biden*, 55 F.4th 1017 (5th Cir. 2022) ................................ 59

*Loving v. United States*, 517 U.S. 748 (1996) ........................................ 44

*Luis v. United States*, 578 U.S. 5 (2016) ................................................ 23

*Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023) .............................. *passim*

*Mock v. Garland*, No. 4:23-cv-00095-O, 2023 U.S. Dist. LEXIS
    178809 (N.D. Tex. Oct. 2, 2023) ............................................. *passim*

*Netchoice, L.L.C. v. Paxton*, 49 F.4th 739 (5th Cir. 2022) ..................... 40

*New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111
    (2022) ................................................................................... *passim*

*Nken v. Holder*, 556 U.S. 418 (2009) ............................................. 19, 57

*Opulent Life Church v. City of Holly Springs*, 697 F.3d 279
    (5th Cir. 2012) ................................................................... 17, 53

*Panama Ref. Co. v. Ryan*, 293 U.S. 388 (1935) .............................. 16, 38

*Paul v. United States*, 140 S. Ct. 342 (2019) ........................................ 41

*R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182 (5th Cir. 2023) .. 18, 59, 60

*Rest. Law Ctr. v. Dep't of Labor*, 66 F.4th 593 (5th Cir. 2023) ............... 55

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) .................................... 43, 46

*Spencer v. Nigrelli*, No. 22-CV-6486 (JLS), 2022 U.S. Dist. LEXIS
    233341 (W.D.N.Y. Dec. 29, 2022) ................................................... 59

*State v. Biden*, 10 F.4th 538 (5th Cir. 2021) .................................... 18, 58

*Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023) .................................. 22, 28

*Texas v. BATFE*, No. 6:23-CV-00013, 2023 U.S. Dist. LEXIS 193593 (S.D. Tex. Oct. 27, 2023).....................................................55, 60, 61

*Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016)...........................................19

*Texas v. Rettig*, 993 F.3d 408 (5th Cir. 2021) ........................................40

*Trans World Airlines v. Mattox*, 897 F.2d 773 (5th Cir. 1990)... 19, 56, 57

*United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023) ........ 20, 21, 23, 26

*United States v. Davis*, 139 S. Ct. 2319 (2019) .................................43, 46

*United States v. George*, 228 U.S. 14 (1913) ..........................................42

*United States v. Kuzma*, 967 F.3d 959 (9th Cir. 2020)...........................50

*United States v. Lopez*, 514 U.S. 549 (1995) ..........................................48

*United States v. Standard Brewery, Inc.*, 251 U.S. 210 (1920) .............42

*Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014) ..........................36

*Vanderstok v. Garland*, 625 F. Supp. 3d 570 (N.D. Tex. 2022).............50

*Vanderstok v. Garland*, No. 23-10718, 2023 U.S. App. LEXIS 29956 (5th Cir. Nov. 9, 2023)...........................................................*passim*

*Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130 (5th Cir. 2021) ................................................................................63

*Wayman* v. *Southard*, 23 U.S. (10 Wheat.) 1 (1825).........................16, 40

*Weiss v. United States*, 510 U.S. 163 (1994) ..........................................41

*West Virginia v. EPA*, 142 S. Ct. 2587 (2022).............................16, 47, 48

### *Constitutional Provisions and Statutes*

5 U.S.C. § 701 ............................................................................................2

5 U.S.C. § 705 ..........................................................................................63

18 U.S.C. § 921 ........................................................................... *passim*

18 U.S.C. § 922 .............................................................. 5, 6, 17, 50

18 U.S.C. § 923 ..................................................................... 50

18 U.S.C. § 926 ............................................................ 17, 45, 49

18 U.S.C. § 3282 .................................................................... 64

18 U.S.C. § 3571 ..................................................................... 6

26 U.S.C. § 5681 ..................................................................... 6

26 U.S.C. § 5845 ............................................................... *passim*

26 U.S.C. § 5861 ..................................................................... 5

26 U.S.C. § 5871 ..................................................................... 6

26 U.S.C. § 5872 ..................................................................... 6

26 U.S.C. § 6351 .................................................................... 64

26 U.S.C. § 7801 ............................................................ 17, 45, 49

28 U.S.C. § 1331 ..................................................................... 2

28 U.S.C. § 2202 ..................................................................... 2

Tex. Pen. Code § 46.05 ....................................................... 9, 64

U.S. Const. art. I ................................................................... 37

## Other Authorities

1 Blackstone's Commentaries: With Notes of Reference, to the
   Constitution and Laws, of the Federal Government of
   the United States; and of the Commonwealth of Virginia,
   app. 300 (St. George Tucker ed., 1803) .......................................... 20

ATF, *Final Reg. Impact Analysis* (Jan. 2023),
https://tinyurl.com/2zdw3rmn ....................................................... 35

David B. Kopel, *The Second Amendment in the Tenth Circuit: Three Decades of (Mostly) Harmless Error*, 86 DENV. U.L. REV. 901 (2009) ....................................................................................... 31

Emily Saladino, *How to Open a Wine Bottle Without a Corkscrew*, WINE ENTHUSIAST (Aug. 8, 2022),
https://www.winemag.com/2022/08/08/how-to-open-a-wine-bottle-without-a-cork screw/ ....................................................... 35

Ilan Wurman, *Nondelegation at the Founding*, 130 YALE L.J. 1490 (2021) ....................................................................................... 41

Jamie G. McWilliam, *The Unconstitutionality of Unfinished Receiver Bans*, 2022 HARV. J.L. & PUB. POL'Y PER CURIAM 9 (Spring 2022) .......................................................................... 25

Jed Handelsman Shugerman, *Vesting*, 74 STANFORD L. REV. 1479 (2022) ....................................................................................... 38

Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J. 35, 45, 61-65, 71-78 (2023) .............................. 25

Nick Gerhardt, *10 Ways to Open a Bottle Without a Corkscrew*, Family Handyman (Feb. 24, 2022),
https://www.familyhandyman.com /list/10-ways-to-open-wine-without-a-corkscrew/ ................................................................ 35

Philip Hamburger, *Nondelegation Blues*, 92 GEO. WASH. L. REV. 1083 (2023) .......................................................................... 38, 39

Ronald A. Cass, *Delegation Reconsidered: A Delegation Doctrine for the Modern Administrative State*, 40 HARV. J.L. & PUB. POL'Y 147 (2017) ....................................................................................... 39

Silver Oak, *How to Open a Wine Bottle Without a Corkscrew*,
    YouTube (Aug. 7, 2018),
    https://www.youtube.com/watch?v=_4C3WZYuU0A.....................35

Stephen P. Halbrook, Firearms Law Deskbook (Oct. 2022 Update) .....50

WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1934, 1948)..........34

### Rules

*Factoring Criteria for Firearms with Attached "Stabilizing Braces,"*
    88 Fed. Reg. 6,478 (Jan. 31, 2023) ........................................ *passim*

## INTRODUCTION

The appellees-defendants (collectively, the "Department") issued a final rule that rewrites statutes and transforms pistols with forearm stabilizing braces into short-barreled rifles. *See Factoring Criteria for Firearms with Attached "Stabilizing Braces,"* 88 Fed. Reg. 6,478 (Jan. 31, 2023) (the "Rule"). The Rule effectively turns millions of ordinary, law-abiding Americans who possess unregistered pistols with forearm stabilizing braces into criminals guilty of a felony that is punishable by 10 years in prison. To possess a braced pistol and avoid prosecution under the Rule, persons would need to pay $200, wait for approval, and comply with unlawful restrictions on their right to make, possess, transfer, and travel with braced pistols. Americans are thus currently being deprived of their right to possess braced pistols for self-defense in their homes.

This violates the Second Amendment's unqualified command that the right to keep and bear arms "shall not be infringed." It also violates the structural provisions in the Constitution that vest Congress—not unelected bureaucrats—with the authority to rewrite the law and create crimes with 10-year prison sentences. The Rule additionally exceeds the

1

Department's statutory authority.

Appellant-plaintiff Blake Watterson ("Watterson"), like millions of others, is grievously harmed by the Department's lawlessness. He is being unlawfully regulated and is being deprived of his right to make and possess a braced pistol for self-defense. This constitutes irreparable harm that justifies granting preliminary relief that would serve the public interest.

The district court therefore erred by refusing to grant Watterson preliminary relief pending resolution of the case on the merits. This Court should rectify this injustice and mitigate the irreparable harm being suffered.

## JURISDICTIONAL STATEMENT

Because this case involves claims under the Constitution and Administrative Procedural Act, the district court had jurisdiction and authority to grant the requested relief under 28 U.S.C. §§ 1331, 2202, and 5 U.S.C. § 701 *et seq*. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1), because the district court refused to issue an order modifying an injunction and issued an order that had the practical effect of denying an injunction. *See* Opp. to Mot. to Dismiss. Watterson timely

filed his notice of appeal on September 26, 2023.  ROA.1016-20.

**ISSUE PRESENTED**

Whether refusing to stay the Rule and preliminarily enjoin enforcement of the statutes in accordance with the Rule pending resolution of the case on the merits is an abuse of discretion where:

1. Watterson will likely succeed in showing the Rule is unlawful because it:

    a) violates the Second Amendment by requiring persons to pay $200, submit a registration application, and wait several months to a year to make and possess a pistol with a stabilizing brace for self-defense in the home, and then subjects persons to ongoing restrictions;

    b) is an unconstitutional exercise of legislative power that decides what conduct should be a felony punishable by a 10-year prison sentence; and

    c) exceeds the Department's statutory authority.

2. Watterson suffers—and will continue to suffer—irreparable harm in the absence of preliminary relief; and

3. Preliminary relief is in the public interest.

<u>STATEMENT OF THE CASE</u>

**A.  For Years, the Department Did Not Impose Additional Restrictions on Pistols with Stabilizing Braces that Facilitate Safer Shooting.**

Stabilizing braces were invented to help disabled veterans shoot large pistols, such as AR-15-style pistols, safely with one hand.  *See* ROA.194, 218-20, 257. As patent applications show, these braces are designed to stabilize a pistol against a shooter's *forearm*, which enables safer and more accurate shooting:[1]



Accordingly, as the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") previously recognized, a pistol equipped with a stabilizing brace is not intended to be fired *from the shoulder*.  ROA.228, 233, 237-38, 241.  ATF thus approved the use of stabilizing braces on

---

[1] ROA.223; *see* ROA.200-01; ROA.217-226 (explaining how forearm stabilizing braces improve accuracy and make pistols safer); *Mock v. Garland*, 75 F.4th 563, 588 (5th Cir. 2023) (Willett, J., concurring) (recognizing that braces "make an otherwise lawful weapon *safer*").

large pistols and stated that a brace did not transform a pistol into a short-barreled rifle: a weapon that is designed and intended to be fired from the shoulder.  ROA.150, 228, 233, 238, 240-41.

This classification is significant because, unlike pistols, short-barreled rifles must be registered and are subject to additional restrictions.  26 U.S.C. § 5861; 18 U.S.C. § 922(a)(1), (a)(4), (b)(4); *see Mock*, 75 F.4th at 569 (recognizing that a person cannot transfer a short-barreled rifle "without the authorization of the Attorney General" and that "ATF's authorization is also required before crossing state lines with [a short-barreled rifle]").  Federal statutes define a rifle (and thus a short-barreled rifle) as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder."  26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7)-(8).[2]  To lawfully make and register a short-barreled rifle, a person must pay a $200 tax and file a registration application with ATF, which requires obtaining a law enforcement certification and expending additional resources, such as time and money for fingerprinting and photographs.  ROA.182, 245, 248-255.  Then a person must wait for the

---

[2] The National Firearms Act only uses the term "rifle" as opposed to "short-barreled rifle;" however, guns with barrels greater than 16 inches are excluded from the relevant definition.  *See* 26 U.S.C. § 5845(a)(3).

ATF to process the registration application, which can take months to a year, and receive approval before he is allowed to possess the firearm. ROA.179-80, 205-06.

Possession of an unregistered short-barreled rifle is punishable by 10 years in prison and a fine, and there are severe criminal penalties for non-compliance with ongoing statutory restrictions on them. 26 U.S.C. §§ 5861, 5871, 5872; 18 U.S.C. §§ 922(a)(1), (4), (b)(4), 3559, 3571. What is more, there is generally "no mechanism for a possessor to register an unregistered [National Firearm Act] firearm already possessed by the person," ROA.260; *see* ROA.247 ("Firearms not lawfully registered as required by the [National Firearms Act] may not be registered and legitimized by their possessors. They are contraband and unlawful to possess.").

Over the past decade, millions of law-abiding Americans have purchased stabilizing braces or pistols with attached stabilizing braces and enjoyed the ability to shoot more safely and accurately. *See* ROA.195 ("between 3 million and 7 million 'stabilizing braces' between the years of 2013 to 2020"), 258 ("between 10 and 40 million stabilizing braces"). Indeed, Watterson bought a stabilizing brace after learning that it would

allow him to shoot his pistol more safely and accurately, which would make it more effective for self-defense. ROA.199-201.

Even with the prevalence of stabilizing braces (3 million to 40 million) and the lack of restrictions on them for nearly a decade, ROA.195, 258, the Rule cites only two shootings where stabilizing braces were used and 272 investigations involving braces, ROA.149. The millions of other braced pistols have been used for lawful purposes such as self-defense and feral hog hunting. ROA.184-85.

## B. The Department Issued a Rule Deciding that Unregistered Possession of a Braced Pistol Is a Felony that is Punishable by a 10-Year Prison Sentence.

Nevertheless, the Department published a final rule amending the definition of short-barreled rifles in the National Firearms Act and the Gun Control Act to include pistols with stabilizing braces. ROA.146. The Rule expressly "overrul[es] ATF's previous classification letters" and warns that even "possessors of firearms equipped with 'stabilizing braces' that were at issue in those letters" likely possess unregistered short-barreled rifles in violation of federal law. ROA.146, *see* ROA.186.

More specifically, the Rule amends the definition of rifle to include a multi-factor test and deems all pistols with stabilizing braces—or at least, 99% of them—to be short-barreled rifles. ROA.146, 160, 479; *see*

*Mock*, 75 F.4th at 574.    Countless Americans therefore unlawfully possess unregistered short-barreled rifles and are guilty of a felony that carries a 10-year sentence under the Rule.  ROA.146, 148, 182, 258; *see* ROA.35-37.

The Rule also sets forth an "enforcement discretion" scheme that provides five options that allow persons to avoid prosecution if they acquiesce to the infringement of their rights.  ROA.146-47, *see* ROA.37-39, 152, 174, 187-88.    For example, a person who possessed an unregistered pistol with an attached stabilizing brace on the day the Rule was published could have filed a registration application within 120 days after the Rule's publication.  ROA.146-47.  If that option was chosen and registration applications were filed before May 31, 2023, the Rule deemed those persons "in compliance with the statutory requirements between the date on which a person's application is filed and the date" of ATF's decision.  ROA.146-47, 174, 188.  But the Rule warned that anyone who transfers or "newly makes" a pistol with a stabilizing brace (e.g., attaching a stabilizing brace to a pistol) after the publication date is subject to prosecution.  ROA.147, 269.

## C. Millions of Americans, Including Plaintiff-Appellant, Are Injured by the Rule.

The Rule thus regulates and injures everyone who possesses or wants to possess a pistol equipped with a stabilizing brace, including Watterson. ROA.207. Along with millions of others, he is injured by the Rule because it infringes on his right to make and possess a pistol with a stabilizing brace for lawful purposes. *See* ROA.199-207.

The Rule currently prevents Watterson from using a braced pistol for self-defense in his home. ROA.205-07. Although Watterson owns a stabilizing brace, it was not attached to his pistol on January 31, 2023. ROA.201. He therefore cannot attach it to his pistol without risking prosecution for possessing an unregistered short-barreled rifle under the Rule. ROA.202-05. If Watterson attaches his stabilizing brace to his pistol as he desires to do, he could be prosecuted under the Rule and be sentenced to 10 years in prison—even though ATF previously acknowledged his precise forearm stabilizing brace does not transform a pistol into a rifle. ROA.200-05. He also would risk state prosecution, because Texas law makes it a crime to possess "a short-barrel firearm" unless it "is registered" or "not otherwise subject to that registration requirement" under federal law. TEX. PEN. CODE § 46.05(a)(1)(C); *see*

Texas Amicus Br. in Support of Inj. Pending Appeal, *Mock v. Garland*, No. 23-10319, ECF No. 37 (5th Cir. May 19, 2023) at 6 (explaining the Rule "has a distortive effect on Texas's penal law").

Even if Watterson complied with the Rule, he could not currently possess a braced pistol for self-defense. ROA.205. Indeed, to be able to lawfully attach his stabilizing brace under the Rule and thereby have a braced pistol, Watterson would need to wait several months to a year for approval of his registration application, incur costs related to the registration application, and pay a $200 tax. ROA.179-80, 182, 205-06, 266. What is more, he would then face additional restrictions on his ability to travel with or transfer his pistol. ROA.206-07; *see Mock*, 75 F.4th at 569. He would face similar burdens and even greater costs if he bought another stabilizing brace or bought a pistol already equipped with a stabilizing brace. ROA.206-07.

### D. Wanting to Exercise His Rights Without Fear of Prosecution, Plaintiff-Appellant Immediately Challenged the Rule and Diligently Sought Relief.

The day the Rule was published—January 31, 2023—Watterson sued the Department for declaratory and injunctive relief in a detailed complaint. ROA.10-90. Watterson alleged that (1) the Rule is an unconstitutional exercise of legislative power in violation of Article I of

the Constitution and separation-of-powers principles, (2) the Rule exceeds the Department's statutory authority, and (3) the Rule (and the statutes to the extent the Rule properly interprets them) violates the Second Amendment.  ROA.45-51.

He also filed a motion for summary judgment the same day. ROA.100-271.  Two days later (after complying with local meet-and-confer requirements), Watterson filed a motion for relief under 5 U.S.C. § 705 or, alternatively, for a preliminary injunction ("§ 705 Motion") and an emergency motion for expedited consideration of the § 705 Motion. ROA.272-307.

The district court granted, in part, the motion for expedited consideration.  ROA.369.  It concluded that Watterson "has shown his motion should be considered on an expedited basis" and that it could give "proper consideration to this matter" by "March 24, 2023."  ROA.369-70. Accordingly, the order stated that the district court would issue "issue an order" on Watterson's § 705 Motion "on or before March 24, 2023." ROA.371.

It did not do so.  ROA.6-7.  Subsequently, the district court issued a limited injunction on June 7, 2023, that only enjoined the Department

from enforcing the Rule against Watterson pending this Court's decision
in *Mock*.  ROA.721.  It additionally requested briefing on whether the
proceedings should be stayed pending *Mock*.  ROA.722.

Watterson urged the district court not to stay the proceedings.
ROA.723-91.  He explained that no factor weighed in favor of staying the
case and provided additional reasons why his claims are meritorious.
ROA.728, 731-86.  Additionally, he emphasized that he continued to
suffer irreparable harm and the risk of prosecution despite the limited
injunction.  ROA.735-36.  Watterson pressed the district court to grant
his summary-judgment motion expeditiously.  ROA.728, 740-41.

When the district court still did not act and this Court issued its
*Mock* decision, Watterson "renew[ed] his request that [the district court]
grant his § 705 Motion."  ROA.803.  He urged the Court to grant that
motion and his "summary-judgment motion as soon as possible to prevent
additional irreparable harm."  ROA.805.

The district court did not do so.  ROA.8.  Watterson then filed a
motion to reconsider and modify the limited injunction ("Motion to
Modify").  ROA.880-94.  In it, he reiterated that the limited injunction
was inadequate and his Second Amendment rights continued to be

chilled. ROA.889-90. He also highlighted how the injunction had either terminated with the publication of the *Mock* decision or would terminate soon when the *Mock* mandate issued. ROA.887-88. Finally, Watterson contemporaneously requested that the district court expedite consideration of his Motion to Modify or his summary-judgment motion. ROA.898-04.

### E. Despite Recognizing that Watterson Is Likely to Succeed, the District Court Refused to Grant a Stay or Injunction Pending Resolution of the Merits.

Five days later, the district court issued an order stating that the motion to expedite "should be granted" and stating that the limited injunction "remain[ed] in effect until the Fifth Circuit's mandate issues in *Mock*." ROA.908-09. The district court also found that Watterson "established a likelihood of success on the merits in this case on his claim under the Administrative Procedure Act,"[3] and it directed the parties to submit supplemental briefing on the irreparable-harm, balance-of-equities, and public-interest factors pertaining to [Watterson's] motion for a preliminary injunction." ROA.908.

---

[3] Watterson asserted all three of his claims under the Administrative Procedure Act, ROA.47, and additionally asserted his constitutional claims under the *Larson* doctrine, ROA.117-18.

13

The parties completed the requested briefing, ROA.910-20, 926-35, 940-47, and the Department requested clarification regarding the district court's conclusion that Watterson had established a likelihood of success, ROA.935-37.

Even though the supplemental briefing was completed early, the district court did not act as the date of the mandate's issuance in *Mock* drew nearer. ROA.8-9, 908, 949. Nor did the district court act when the *Mock* mandate issued on September 25th—even after Watterson informed the district court that the mandate had issued. ROA.8-9, 950-52.

Therefore, despite its order setting the limited injunction to end with the *Mock* mandate and its acknowledgement that Watterson was likely to succeed, ROA.908-09, the district court refused to modify the injunction or grant effective relief pending its merits decision, ROA.8-9. Watterson therefore appealed the district court's refusal to grant a stay or injunction pending the resolution of the case on the merits. ROA.1016-20. He now asks this Court to reverse and remand with instructions that the district court enter a stay and preliminary injunction pending resolution of this case on the merits.

## SUMMARY OF THE ARGUMENT

Because Watterson easily satisfied each factor to warrant preliminary relief, the district court erred by permitting irreparable harm and constitutional deprivation to continue since February.

*First*, Watterson showed that he was likely to succeed on every one of his claims. The Rule, and the statutes if the Rule properly interprets them, violates the Second Amendment. Because the restrictions on the making and possession of braced pistols implicate the Second Amendment, the Department bears the burden to show the restrictions are consistent with this country's history and tradition. *See New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111, 2126-27 (2022). The Department failed to do so. It cannot point to any relevant historical analogues to justify the restrictions, which is unsurprising given the long history of at-home gunsmithing and the use of similar firearms for lawful purposes. *See Vanderstok v. Garland*, No. 23-10718, 2023 U.S. App. LEXIS 29956, at *9-10 (5th Cir. Nov. 9, 2023)*; Mock v. Garland*, No. 4:23-cv-00095-O, 2023 U.S. Dist. LEXIS 178809, at *31-32 & n.18 (N.D. Tex. Oct. 2, 2023).

What is more, the Department lacked constitutional authority to

issue the Rule. The Rule rewrites the statutes to turn millions of ordinary, law-abiding Americans into criminals guilty of a felony that is punishable by 10 years imprisonment. Yet the Constitution vests all legislative powers—and certainly core, exclusively legislative power to decide what constitutes a serious felony—in Congress. *See Wayman* v. *Southard*, 23 U.S. (10 Wheat.) 1, 42-43 (1825); *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 421 (1935); *Cargill v. Garland*, 57 F.4th 447, 451 (5th Cir. 2023) (en banc), *cert. granted*, 2023 U.S. LEXIS 4370 (Nov. 3, 2023); *Vanderstok*, 2023 U.S. App. LEXIS 29956, at *3-4, *32. The Department thus lacked the constitutional authority to issue the Rule and expand criminal liability. And that is especially true because Congress failed to provide an intelligible principle. *See Jarkesy v. SEC*, 34 F.4th 446, 461-62 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 2688 (June 30, 2023).

The Department likewise lacked statutory authority to issue the Rule. It had no clear congressional authorization to issue regulations embodying such consequential policy decisions that infringe on individual liberties. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2610, 2616 (2022); *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 918-19 (6th Cir. 2021) (en banc) (Murphy, J., dissenting). To the contrary, the

statutes did not authorize the Department to expand the definition of short-barreled rifle, 18 U.S.C. §§ 921(a), 926(a); 26 U.S.C. §§ 5845(a), 7801(a)(2)(A), nor did they authorize the Department to make violations of regulations a crime in this context (as it did elsewhere, *see* 18 U.S.C. § 922(m)).

*Second*, Watterson faces ongoing, irreparable harm in the absence of preliminary relief under well-established precedent. That is because the Department is depriving him of his Second Amendment rights on a daily basis and regulating him contrary to statutory and separation-of-powers provisions. *See, e.g.*, *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 617-18 (5th Cir. 2021); *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 296 (5th Cir. 2012); *Ezell v. City of Chicago*, 651 F.3d 684, 698-99 (7th Cir. 2011).

*Third*, preliminary relief will not substantially harm other parties and will serve the public interest. After all, it is always in the public interest to stop the infringement of constitutional rights, to maintain our constitutional structure, and to have unelected bureaucrats follow the law. *See BST Holdings*, 17 F.4th at 618-19; *State v. Biden*, 10 F.4th 538, 559-60 (5th Cir. 2021); *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 195

(5th Cir. 2023); *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014).

Therefore, the Court should reverse and instruct the district court to stay the Rule and grant an injunction to mitigate Watterson's irreparable harm. *See Clarke v. CFTC*, 74 F.4th 627, 644 (5th Cir. 2023).

<u>ARGUMENT</u>

When reviewing a district court's denial or effective denial of preliminary relief pending resolution on the merits, this Court asks "whether the district court abused its discretion." *Id.* at 640. Legal conclusions, however, are reviewed "*de novo.*" *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 241 (5th Cir. 2023).

To obtain preliminary relief (in the form of a stay or injunction), an "[a]ppellant[] must show" four things:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm if the injunction [or stay] does not issue, (3) that the threatened injury outweighs any harm that will result if the injunction [or stay] is granted, and (4) that granting the injunction [or stay] is in the public interest.

*Clarke*, 74 F.4th at 640-41; *see All. For Hippocratic Med.*, 78 F.4th at 242 (noting the same four factors apply for a § 705 stay); *Texas v. EPA*, 829 F.3d 405, 424 (5th Cir. 2016). The likelihood of success on claims that a

government action violates the Constitution or a federal statute generally "carries with it a determination that the other three requirements" to warrant preliminary relief "have been satisfied." *Trans World Airlines v. Mattox*, 897 F.2d 773, 783 (5th Cir. 1990); *see Baird v. Bonta*, No. 23-15016, 2023 U.S. App. LEXIS 23760, at *10-11 (9th Cir. Sept. 7, 2023). Finally, the third and fourth factor "merge" and are considered together if "the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Because Watterson easily satisfies these factors, the district court abused its discretion by refusing to grant preliminary relief pending resolution of the case on the merits. This Court should reverse the district court's effective denial and remand with instructions to enter a stay and preliminary injunction. *See Clarke*, 74 F.4th at 644.

## I.  Plaintiff is Likely to Succeed on the Merits.

As Watterson demonstrated in his motions for summary judgment and preliminary relief over nine months ago, ROA.100-39, 281-88, and in supplemental filings, ROA.477-80, 661, 731-34, 744-86, 804-05, 891-93, he is likely to succeed on the merits of all three of his claims.

19

## A. The Rule (and the Statutes if the Rule Properly Interprets them) Violates the Second Amendment.

Watterson will likely succeed on his Second Amendment claim, because the Rule flagrantly violates the Second Amendment under the text-and-history test clarified in *Bruen*.[4]

Under that test, the first question is "whether the Second Amendment applies by its terms." *United States v. Daniels*, 77 F.4th 337, 341 (5th Cir. 2023) (citing *Bruen*, 142 S. Ct. 2129-30). Those terms are an "unqualified command": "the right of the people to keep and bear Arms shall not be infringed." *Bruen*, 142 S. Ct. at 2126-27 (quotations omitted); *see* 1 BLACKSTONE'S COMMENTARIES: WITH NOTES OF REFERENCE, TO THE CONSTITUTION AND LAWS, OF THE FEDERAL GOVERNMENT OF THE UNITED STATES; AND OF THE COMMONWEALTH OF VIRGINIA, app. 300 (St. George Tucker ed., 1803) (contrasting the Second Amendment right of self-defense with how the right had been historically confined "within the narrowest limits possible"). Accordingly, "when the Second Amendment's plain text covers an individual's conduct, the Constitution

---

[4] To the extent the Rule is a correct interpretation of the National Firearms Act and Gun Control Act, those statutes violate the Second Amendment for the same reasons the Rule does. ROA.51, 118, 123, 281-82. For the sake of brevity, this section simply refers to the Rule as opposed to the Rule and the statutes if the Rule properly interprets them.

presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126.

If the conduct is presumptively protected under *Bruen*'s first prong, then courts turn to the second question: "whether a given gun restriction is 'consistent with the Nation's historical tradition of firearm regulation.'" *Daniels*, 77 F.4th at 341 (quoting *Bruen*, 142 S. Ct. at 2130). The second prong of the test places the burden of proof on the government. *Id.* at 341. "To justify its regulation, the government may not simply posit that the regulation promotes an important interest" but "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2126-27.

Therefore, when the Second Amendment right is hindered at all, the government must carry its burden under *Bruen*'s second prong to show "the law does not tread on the historical scope of the right." *Daniels*, 77 F.4th at 341; *see Frein v. Pa. State Police*, 47 F.4th 247, 254 (3d Cir. 2022) ("[T]he Supreme Court recently instructed us to closely scrutinize *all* gun restrictions for a historically grounded approach."); *Baird*, 2023 U.S. App. LEXIS 23760, at *7 (courts "should not try to help the government carry its burden").

The Rule's restrictions fail this test. The Rule runs afoul of the plain text of the Second Amendment, and the Department cannot carry its burden of proving that the Rule's restrictions are justified by history and tradition.

### 1. *The Rule implicates the Second Amendment, including by hindering the right to possess bearable arms and the right to self-defense.*

The Rule infringes presumptively constitutional conduct under the *Bruen* text-and-history test: It interferes with a person's ability to make or possess a pistol with a stabilizing brace for lawful purposes, including self-defense.

The Second Amendment's plain text "guarantee[s] the individual right to possess and carry weapons in case of confrontation" and "extends, prima facie to all instruments that constitute bearable arms." *District of Columbia v. Heller*, 554 U.S. 570, 582, 592 (2008). Accordingly, "the Constitution presumptively protects" the uninfringed possession of bearable weapons that can be used for self-defense under *Bruen*'s first prong. 142 S. Ct. at 2130; *see Teter v. Lopez*, 76 F.4th 938, 948-50 (9th Cir. 2023) (explaining butterfly knives are presumptively protected under the Second Amendment because they are "arms," so the burden shifts to the government under *Bruen*'s second prong).

22

The Rule thus hinders conduct protected by the plain text of the Second Amendment: it restricts the making and possession of braced pistols for any purpose, including for self-defense in the home. *See supra* pp. 4-10. Indeed, the Rule's title even acknowledges that the Rule regulates "arms"—"Firearms With Attached 'Stabilizing Braces,'" 88 Fed. Reg. at 6,478—demonstrating "the Second Amendment applies by its terms," *Daniels*, 77 F.4th at 341. The Court should therefore reject the Department's nonsensical insistence the Rule does not implicate the Second Amendment, because it regulates braces and not bearable arms, *see* ROA.437-39.

In any event, even assuming pistols with stabilizing braces are not bearable arms, the Second Amendment's protections extend beyond arms to encompass corresponding rights. *See Luis v. United States*, 578 U.S. 5, 26-27 (2016) (Thomas, J., concurring) ("Constitutional rights … implicitly protect those closely related acts necessary to their exercise."). That means the Second Amendment also protects the right to *effective* self-defense. *See, e.g.*, *Ezell*, 651 F.3d at 704 ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much

23

without the training and practice that make it effective."); *Jackson v. City & County of San Francisco*, 746 F.3d 953, 967-68 (9th Cir. 2014) (ammunition restrictions fall within Second Amendment's scope); *Barnett v. Raoul*, No. 3:23-cv-00209-SPM, 2023 U.S. Dist. LEXIS 74756, at *29-30 (S.D. Ill. Apr. 28, 2023) ("[B]ecause the 'meaningful exercise' of the right to armed self-defense is wholly dependent on the ability of citizens to utilize their arms and hit their intended target, items that aid in accuracy may be considered 'arms' and are presumptively protected by the Second Amendment."), *vacated sub nom. Bevis v. City of Naperville*, Nos. 23-1353, 23-1793, 23-1825, 2023 U.S. App. LEXIS 29332 (7th Cir. Nov. 3, 2023). Because stabilizing braces are necessary for more effective self-defense, ROA.198-201, 217-26, this provides yet another reason to conclude the Rule presumptively violates the Second Amendment.

### 2. *The Department cannot show the Rule's restrictions are consistent with history and tradition.*

The Department seeks to evade its burden to prove the Rule "is consistent with the Nation's historical tradition of firearm regulation" because it cannot meet it. *See Bruen*, 142 S. Ct. at 2130. Americans have enjoyed the right to make, modify, and possess guns for centuries, including the right to attach accessories to their guns. *See Joseph G.S.*

*Greenlee, The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J. 35, 45, 61-65, 71-78 (2023); Jamie G. McWilliam, *The Unconstitutionality of Unfinished Receiver Bans*, 2022 HARV. J.L. & PUB. POL'Y PER CURIAM 9, 12-13, 15-16 (Spring 2022). "Founding Era gunsmithing involved modifying lawfully bearable pistols with extended grips and rearward stocks to facilitate greater stability, control, and accuracy in single-handed self-defense fire," *Mock*, 2023 U.S. Dist. LEXIS 178809, at *31, and there was a "tradition of at-home gun-making" that "extend[ed] through the revolution" to "modern times," *Vanderstok*, 2023 U.S. App. LEXIS 29956, at *9. Yet "there were *no* restrictions on the manufacture of arms for personal use in America during the seventeenth, eighteenth, or nineteenth centuries." *Id.* (quoting *Greenlee*, 54 St. Mary's L.J. at 78).

Because there is no historical tradition justifying the Rule's restrictions on the making (*i.e.*, attaching a brace to a pistol) or simple possession of braced pistols for self-defense, the Department cannot point to relevant historical analogues. *See Mock*, 75 F.4th at 588 (Willett, J., concurring) ("ATF has not identified any historical tradition of requiring ordinary citizens to endure a lengthy, costly, and discretionary approval process just to use accessories that make an otherwise lawful weapon

*safer*.").  It does not cite any statute from a relevant time period that hinders the right to make arms for self-defense or to possess arms for self-defense "to a comparable degree, with a comparable severity, and with a comparable blanket enforcement." *Baird*, 2023 U.S. App. LEXIS 23760, at *24; *see Bruen*, 142 S. Ct. at 2133, 2136, 2149.

Instead, the Department cites dissimilar statutes, such as ones mandating inspection of militia members' arms to ensure proper function, assessing racially motivated taxes, requiring licenses to hunt, or imposing commercial restrictions.  *See* ROA.744-86; *Heller v. District of Columbia*, 670 F.3d 1244, 1291-92 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (distinguishing between licensing requirements and registration requirements and between requirements imposed on "gun *sellers*" and "gun *owners*"); *id.* at 1293 (rejecting the argument that "early militia laws [that] required militiamen to submit arms for inspection" are comparable to a registration requirement).  And many of the cited laws are insufficient to prove a historical tradition for additional reasons, such as being from Hawaii before it was even a U.S. territory, ROA.778-79, or dating many decades after the Second Amendment's ratification, ROA.768-86.  *See Daniels*, 77 F.4th at 348.

What is more, the Department adduced no evidence that the laws were enforced, much less enforced with penalties as severe as 10 years' imprisonment and all the severe "collateral consequences attaching to a felony conviction." *Baldwin v. New York*, 399 U.S. 66, 69 (1970).[5] This is yet another reason why the Department has failed to show its cited regulations are sufficiently comparable to the Rule. *See Heller*, 554 U.S. at 633-34 (explaining fines or short stays in local jails "are akin to modern penalties for minor public-safety infractions like speeding or jaywalking" and are not like a law that "threatens citizens with a year in prison (five years for a second violation) for even obtaining a gun in the first place"); *Bruen*, 142 S. Ct. at 2149 & n.25 (noting burdens imposed by historical laws were dissimilar to the challenged law's penalties and "consider[ing] the barren record of enforcement [of surety laws] to be simply one additional reason to discount their relevance"). The Department falls woefully short of "affirmatively prov[ing] that [the] firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

---

[5] *See United States v. Nesbeth*, 188 F. Supp. 3d 179, 185 (E.D.N.Y. 2016) (noting the "vast array of restrictions" that apply to felons and noting "federal law imposes nearly 1,200 collateral consequences" for felony convictions).

The Department also argues the Rule does not run afoul of the Second Amendment because pistols with stabilizing braces are dangerous and unusual weapons. 88 Fed. Reg. at 6,548. But the Department fails to point to any historical statute that requires registration to possess dangerous and unusual weapons or prohibits possession for self-defense, much less a statute with as severe penalties as the Rule. ROA.744-86.

Regardless, this justification for the Rule also fails because the Department cannot carry its burden to prove braced pistols are "dangerous and unusual." *See Teter*, 76 F.4th at 950 (the government "bears the burden" to show a weapon is "dangerous and unusual"); *Bevis*, 2023 U.S. App. LEXIS 29332, at *67-69, *80 (Brennan, J., dissenting) (similar); *cf. Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023) (concluding that Supreme Court dicta about certain laws being "presumptively lawful" does not allow courts "to sidestep *Bruen* in the way the government invites," but rather courts "must undertake the text-and-history inquiry the [Supreme] Court so plainly announced and expounded upon at great length"). That is because the Department does not show that braced pistols are "*both* dangerous *and* unusual" as it

would need to do. *See Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring) ("this is a conjunctive test").

*First*, they are in common use because between 3 million and 40 million of them have been sold, ROA.195, 258; they can be used for lawful purposes, such as self-defense and controlling the feral hog population, ROA.184-85; and they can be possessed in 46 states, *see* ROA.444 (arguing that, if braced pistols are considered short-barreled rifles, they are banned in 4 states). Pistols with stabilizing braces are thus more commonly possessed for lawful purposes than stun guns, which were considered commonly used in *Caetano*. *See* 577 U.S. at 420 (Alito, J., concurring) (concluding "stun guns are commonly possessed by law-abiding citizens for lawful purposes *today*" where "approximately 200,000 civilians owned stun guns" and stun guns could be "lawfully possess[ed]" in 45 states); *see also Friedman v. City of Highland Park*, 577 U.S. 1039, 1042 (2015) (Thomas, J., dissenting) (explaining that AR-style rifles were in common use where they were possess by about 5 million Americans "for lawful purposes, including self-defense and target shooting"); *Mock*, 2023 U.S. Dist. LEXIS 178809, at *28 (concluding braced pistols "are commonly used by law-abiding citizens for lawful purposes"); *Britto v.*

29

*BATFE*, No. 2:23-CV-019-Z, 2023 U.S. Dist. LEXIS 200933, at *10 (N.D. Tex. Nov. 8, 2023) (noting the plaintiff uses a braced pistol for "recreational target shooting, hunting, and personal defense").

*Second*, the Department cannot show that pistols with stabilizing braces are unusually dangerous, because braces make pistols "*safer*." *See Mock*, 75 F.4th at 588 (Willett, J., concurring). Nor has the Department shown that the 3 million to 40 million pistols with stabilizing braces are used more frequently by criminals than law-abiding citizens. ROA.195, 258. After all, even though there are over 17,000 gun homicides annually, *Mock*, 75 F.4th at 573 n.22, the Rule points to only two crimes resulting in deaths and less than 300 investigations involving braced pistols over the past decade, 88 Fed. Reg. at 6,499.

What is more, even assuming braced pistols are short-barreled rifles (which they are not), the Department cannot prove short-barreled rifles are particularly dangerous and unusual. That would simply mean the weapon is even more common as there would be over 641,000 more of them. *See* 88 Fed. Reg. at 6,550. And short-barreled rifles are not unusually dangerous or "a particular criminal problem." *See* David B. Kopel, *The Second Amendment in the Tenth Circuit: Three Decades of*

*(Mostly) Harmless Error*, 86 DENV. U.L. REV. 901, 911 & n. 38 (2009) (explaining short-barreled rifles "were commonly used by hunters, trappers, ranchers, and horseback riders" before the National Firearms Act was passed). Watterson's Second Amendment claim will therefore likely succeed.

## B. The Department Lacked Constitutional and Statutory Authority to Issue the Rule.

### 1. The Rule rewrites the statutes.

Because the Department lacks the constitutional and statutory authority to create new felonies and change the statutory scheme, it pretends the Rule simply "reflects the best interpretation of the statute." Stay Opp. at 10. The Court should reject this pretense, especially since it has correctly determined that the Rule is a legislative one. *See Mock*, 75 F.4th at 582-83.

The Rule redefines "rifle" (and thus short-barreled rifle) in the National Firearms Act and Gun Control Act to create new crimes. Congress defined rifle based on whether the weapon is "designed or redesigned, made or remade, *and* intended to be fired from the shoulder." 26 U.S.C. § 5845(c) (emphasis added); 18 U.S.C. § 921(a)(7). Notably, this statutory language contrasts with other provisions that define a weapon

based on its design *or capabilities*. *See* 26 U.S.C. § 5845(b) (defining machinegun as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot"). The statutory text accordingly shows that, to be a rifle, a weapon must be designed, made, and intended to be fired from the shoulder—capacity for shoulder fire is insufficient. *See Collins v. Yellen*, 141 S. Ct. 1761, 1782 (2021) ("when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed" that "the disparate inclusion or exclusion" is intentional (citation omitted)).

This means that pistols with stabilizing braces generally do not qualify as rifles under the statutes because most are designed, made, and intended to be used to stabilize the pistol against shooters' *forearms*, not their shoulders. ROA.217-28. Indeed, forearm stabilizing braces would be designed differently if they were intended to be used as shoulder stocks. For example, the back surface area would be larger and have features specifically for shoulder-fire. *See* ROA.203 (contrasting a forearm stabilizing brace that has no "features that would make it particularly useful for shoulder fire" with a shoulder stock that would

have "a large surface area and a rubber buttstock pad"); ROA.233 (indicating a forearm stabilizing brace would have raised ridges removed "so as to preclude its usefulness to be shouldered").

Nevertheless, the Department decided that pistols with forearm stabilizing braces should be further regulated based on their *potential* to be shoulder fired, so it rewrote the statutes. The Rule revises the statutory definitions of rifle to include weapons "equipped with … a 'stabilizing brace'" that (1) have *any* surface area that could be used for shoulder firing, and (2) fail a prong of a multi-factor test. 88 Fed. Reg. at 6,574-75. Rather than determining the design and intent of a weapon, the factors focus on whether the weapon *could* be fired from the shoulder. ROA.31-35, 200-05.

For example, a pistol's heavy weight shows that a brace would be helpful if used as intended—to stabilize the pistol against the shooter's forearm, ROA.200, 217-26—but the Rule treats a pistol's weight as indicating that "shoulder firing the weapon" would be "beneficial," 88 Fed. Reg. at 6,514. The Rule similarly assumes that accessories that serve a useful purpose unrelated to shoulder fire, such as a folding adapter that makes a pistol easier to store in a gun safe, ROA.201,

33

transform a pistol into rifle because those accessories might also be helpful if a person chooses to shoulder fire the pistol, 88 Fed. Reg. at 6,540-41. By focusing on a weapon's capacity for shoulder fire rather than its designed and intended use, the Rule ignores the meaning of "designed" and "intended" in the statutory definitions. *See* WEBSTER'S NEW INTERNATIONAL DICTIONARY 707 (2d ed. 1934, 1948) (defining "design" as "[t]o assign, or set apart, as for a purpose or end"); *id.* at 1291 (defining "intend" as "[t]o have in mind as a design or purpose").

Likewise, the Rule wrongly treats the fact that there are videos or pictures of individuals using stabilizing braces to shoulder fire a pistol as evidence that shoulder fire is the designed and intended way of shooting that weapon. 88 Fed. Reg. at 6506, 6,546. This is a non sequitur. Elsewhere the Department even concedes that a weapon's "classification does not change even if [it] can be used in more than one manner by a particular shooter." *Id.* at 6,531. The contrary conclusion would be akin to defining a corkscrew to include hangers, keys, or shoes, because videos and articles demonstrate those items can be used to open a bottle of

wine.[6]

Yet that is precisely what the Rule does. It rewrites the law to define all pistols with attached stabilizing braces—or at least 99% of them—as short-barreled rifles based their *potential* to be shoulder fired. *See Mock*, 75 F.4th at 582 (concluding the government's "claim that the stabilizing braces were always unlawful" is "flatly unpersuasive"), *id.* at 583-84 (recognizing the Rule treats "an estimated 99% of stabilizing braces on the market" as short-barreled rifles); ATF, *Final Reg. Impact Analysis* 21 (Jan. 2023), https://tinyurl.com/2zdw3rmn (explaining "there may be approximately 1 percent of 'stabilizing braces' that, when attached to the firearm, would not result in a firearm that is designed and intended to be fired from the shoulder"); 88 Fed. Reg. at 6,529 (acknowledging the "majority" of weapons with stabilizing braces will be considered short-barreled rifles, but suggesting "it is possible" that a brace could "be designed without including a surface area that allows

---

[6] *See* Silver Oak, *How to Open a Wine Bottle Without a Corkscrew*, YOUTUBE (Aug. 7, 2018), https://www.youtube.com/watch?v=_4C3WZYuU0A; Emily Saladino, *How to Open a Wine Bottle Without a Corkscrew*, WINE ENTHUSIAST (Aug. 8, 2022), https://www.winemag.com/2022/08/08/how-to-open-a-wine-bottle-without-a-corkscrew/; Nick Gerhardt, *10 Ways to Open a Bottle Without a Corkscrew*, FAMILY HANDYMAN (Mar. 28, 2023), https://www.familyhandyman.com/list/10-ways-to-open-wine-without-a-corkscrew/.

shouldering," such as "an elastic strap that wraps around the shooter's wrist"). The Rule therefore constitutes a statutory revision, rather than an interpretation, and redefines a rifle based on how a weapon *could* be used or misused by individuals.

What is more, the Rule rewrites the statute with compliance options and exemptions. *See Mock*, 75 F.4th at 581 (discussing compliance scheme). Indeed, the Rule allows belated registration of firearms in a person's possession, 88 Fed. Reg. at 6,480-81, 6,507, 6,570-71, even though the Department interprets the statutes as not allowing weapons that are "not lawfully registered" to be subsequently "registered and legitimized by their possessors," *see* ROA.247 ("They are contraband and unlawful to possess."); ROA.260 (similar). These aspects of the Rule further demonstrate that the Rule goes far beyond merely interpreting statutory provisions and rewrites the statutes. *See Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 328 (2014) ("Agencies are not free to adopt … unreasonable interpretations of statutory provisions and then edit other statutory provisions to mitigate the unreasonableness." (quotation omitted)).

36

## 2. The Rule is an unconstitutional exercise of legislative powers that violates the Constitution's structural provisions.

The Department lacks constitutional authority to rewrite the statutes as the Rule does. A decision about whether to make possession of pistols with stabilizing braces—which millions of law-abiding Americans own—a serious felony is a paradigmatic example of a core legislative power that cannot be delegated. And even if the power to create new felonies could be delegated, Congress would need to provide an intelligible principle to guide the Department's discretion. Because the Rule is an exercise of essential legislative power and Congress failed to provide an intelligible principle, Watterson's claim that the Rule violates the Constitution's structural allocation of powers will likely be successful.

### a. The Rule is an unlawful exercise of legislative power under the original meaning of the Constitution.

The Constitution vests "[a]ll legislative Powers" in Congress. U.S. Const. art. I, § 1; *see, e.g.*, *Forrest Gen. Hosp. v. Azar*, 926 F.3d 221, 228 (5th Cir. 2019) ("The Constitution, after all, vests lawmaking power in Congress. How much lawmaking power? 'All,' declares the Constitution's first substantive word."); Philip Hamburger,

*Nondelegation Blues*, 92 GEO. WASH. L. REV. 1083, 1141-42 (2023) (noting "all" is "significant in signaling that the legislative powers are exclusively in Congress—not only vis-à-vis other branches but also vis-à-vis subordinate bodies"); Jed Handelsman Shugerman, *Vesting*, 74 STANFORD L. REV. 1479, 1506, 1550-51 (2022) (explaining "'all' reinforces the formalist separation of enumerated legislative powers" and seems "constitutionally significant" as "pointing … against Congress's flexibility to delegate legislative power"). The Founders separated the powers between three separate branches "to preserve the liberty of all the people." *Collins*, 141 S. Ct. at 1780. They recognized that vesting the "right both of *making* and of *enforcing* the laws" in one entity was the definition of "a tyrannical government." *DOT v. Ass'n of Am. R.R.*, 575 U.S. 43, 72-74 (2015) (Thomas, J., concurring).

Thus, "Congress manifestly is not permitted to abdicate, or to transfer to others, the essential legislative functions with which it is thus vested." *Panama Ref.*, 293 U.S. at 421. Congress must itself "lay[] down policies and establish[] standards." *Id.*; *see Vanderstok*, 2023 U.S. App. LEXIS 29956, at *3 ("[L]aw-making power—the ability to transform policy into real-world obligations—lies solely with the legislative

branch.").

Despite the fact "the Constitution categorically forbids Congress to delegate its legislative power to any other body," the Supreme Court's more recent precedent has permitted Congress to delegate some legislative power as long as "the authorizing statute sets out 'an intelligible principle' to guide the rulemaker's discretion." *Ass'n of Am. R.R.*, 575 U.S. at 77 (Thomas, J., concurring). This precedent conflicts with "the original meaning of the Constitution"—under which Congress must be making the "policy judgment" as it relates to "generally applicable rules governing private conduct"—and should be reconsidered. *Id.* at 86; *see, e.g.*, *id.* at 77-87; *Gundy v. United States*, 139 S. Ct. 2116, 2135-42 (2019) (Gorsuch, J., dissenting); Ronald A. Cass, *Delegation Reconsidered: A Delegation Doctrine for the Modern Administrative State*, 40 HARV. J.L. & PUB. POL'Y 147, 148-51, 176-99 (2017); *see generally* Hamburger, *Nondelegation Blues*, 92 GEO. WASH. L. REV. 1084.

This Court must follow Supreme Court precedent, but—without running afoul of binding precedent—the Court can, and should, conclude the Rule is an unconstitutional exercise of legislative power. *See infra* subparts b-c. Nevertheless, it is still useful to "start with the original

public meaning of the Constitution's text." *Netchoice, L.L.C. v. Paxton*, 49 F.4th 739, 452-53 (5th Cir. 2022), *cert. granted*, 2023 U.S. LEXIS 2953 (Sept. 29, 2023). Not only does doing so preserve the argument that precedent has gone astray, but it also provides a necessary anchor for the constitutional analysis. After all, courts are not required to extend "precedent in direct conflict with the Constitution." *Texas v. Rettig*, 993 F.3d 408, 409, 417 (5th Cir. 2021) (Ho, J., dissenting from denial of rehearing en banc). They should instead "decide every case faithful to the text and original understanding of the Constitution, to the maximum extent permitted by a faithful reading of binding precedent." *Id.*

b. <u>The Rule is an unconstitutional exercise of core, exclusively legislative power under current precedent.</u>

Even under current precedent that allows the delegation of some legislative power, the Rule is unconstitutional. The Supreme Court currently maintains that Congress "may not transfer to another branch 'powers which are strictly and exclusively legislative.'" *Gundy*, 139 S. Ct. at 2123 (plurality op.) (quoting *Wayman*, 23 U.S. (10 Wheat.) at 42-43). At the very least, that means core, essential legislative powers—such as significant policy decisions that affect individual liberty—cannot be delegated. *See Wayman*, 23 U.S. (10 Wheat.) at 43 (recognizing that there

are "important subjects, which must be entirely regulated by the legislature itself"); *Indus. Union Dep't, AFL-CIO v. API*, 448 U.S. 607, 687 (1980) (Rehnquist, J., concurring) (explaining that "the critical policy decisions" and "hard choices" are "the very essence of legislative authority under our system" and "must be made by the elected representatives of the people"); *Paul v. United States*, 140 S. Ct. 342, 342 (2019) (Kavanaugh, J., statement regarding denial of certiorari) (indicating "congressional delegations … to decide major policy questions" may be impermissible); *see also* Ilan Wurman, *Nondelegation at the Founding*, 130 YALE L.J. 1490, 1502-03, 1538, 1554 (2021). And, despite the underenforcement of separation-of-powers provisions, "[t]he [Supreme] Court has unanimously invalidated legislation in which Congress delegated to others the *essential* legislative functions with which it is … vested, and it has read other statutes narrowly to avoid annulling them as excessive abdications of constitutional responsibility." *Weiss v. United States*, 510 U.S. 163, 189 n.5 (1994) (Souter, J., concurring) (emphasis added) (quotations omitted).

If anything falls into the category of an important policy decision that is exclusively legislative and cannot be delegated, it is the Rule: a

policy decision about what constitutes a crime and can be punished with 10 years' imprisonment.  The Department cannot "enlarge … statute[s] at will," because "[s]uch power is not regulation; it is legislation." *United States v. George*, 228 U.S. 14, 22 (1913) (quotation omitted); *see Cargill*, 57 F.4th at 470 ("If ATF could change the scope of criminal liability by issuing a regulation—free from the taxing obligations of bicameralism and presentment—the Executive could wield power that our Constitution reserves to the Legislature."); *cf. United States v. Standard Brewery, Inc.*, 251 U.S. 210, 220 (1920) ("Administrative rulings cannot add to the terms of an act of Congress and make conduct criminal which such laws leave untouched.").  And it is "a bedrock legal principle that our government cannot criminalize conduct and send people to prison except through democratically passed laws that have made it through both Houses of Congress and been signed by the President." *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 910 (6th Cir. 2021) (en banc) (Murphy, J., dissenting); *see Cargill*, 57 F.4th at 451 (allowing ATF "rather than Congress … to set forth the scope of criminal prohibitions" would violate the principle that "[i]t is the legislature … which is to define a crime, and ordain its punishment" (quotation omitted)); *Aposhian v. Wilkinson*, 989

F.3d 890, 900 (10th Cir. 2021) (en banc) (Tymkovich, C.J., dissenting) ("ATF has no authority to substitute its moral judgment concerning what conduct is worthy of punishment for that of Congress.").

Defining federal crimes is a job for Congress, and it is meant to be a difficult one; not one that can be pawned off on agencies. *See United States v. Davis*, 139 S. Ct. 2319, 2325 (2019) ("Only the people's elected representatives in the legislature are authorized to make an act a crime." (quotation omitted)); *Sessions v. Dimaya*, 138 S. Ct. 1204, 1228 (2018) (Gorsuch, J., concurring) ("Under the Constitution, the adoption of new laws restricting liberty is supposed to be a hard business, the product of an open and public debate among a large and diverse number of elected representatives."); *Guedes v. ATF*, 66 F.4th 1019, 1024 (D.C. Cir. 2023) (Walker, J., dissenting from denial of rehearing en banc). In other words, "[o]nly Congress can actually criminalize behavior." *Vanderstok*, 2023 U.S. App. LEXIS 29956, at *32. Congress therefore cannot delegate the power to expand statutory definitions to subject millions to criminal liability as the Rule does.

To be sure, the Supreme Court has not established an "absolute rule" that Congress cannot delegate "authority to define criminal

punishments." *Loving v. United States*, 517 U.S. 748, 768 (1996). And the Supreme Court has sometimes blessed delegations that allow agencies to make actions a crime. *See Gun Owners*, 19 F.4th at 916 (Murphy, J., dissenting) (collecting cases). But those cases are distinguishable and did not delegate the same type of core, essential legislative power that is at issue here. *See, e.g.*, *Loving*, 517 U.S. at 777-79 (Thomas, J., concurring) (noting the unique context of military prosecutions); *Gundy*, 139 S. Ct. at 2123-25 (plurality op.) (explaining that the statute did not delegate the policy decision of whether a sex-offender registration requirement should apply to pre-act offenders, but instead delegated authority to determine when it was feasible to apply the requirement to pre-act offenders). These cases thus do not preclude the Court from concluding that the Rule, which would make over a million citizens guilty of a serious felony, is an unconstitutional exercise of core legislative power by the Department.

    c. <u>The Rule is also unconstitutional under current precedent because Congress failed to provide an intelligible principle.</u>

Under the intelligible-principle framework, if (1) Congress delegated a power "that would be legislative … but-for an intelligible principle to guide its use," the delegation is constitutional only if

(2) Congress "provided an intelligible principle such that the agency exercises only executive power." *Jarkesy*, 34 F.4th at 461. Because "[g]overnment actions are 'legislative' if they have 'the purpose and effect of altering the legal rights, duties and relations of persons … outside the legislative branch,'" the Rule is legislative. *See id.* (quoting *INS v. Chadha*, 462 U.S. 919, 952 (1983)). After all, it changes statutory definitions to expand criminal liability to ordinary Americans and revises the statutory scheme with new compliance options. *See supra* Part I.B.1. And, as this Court has already concluded, the Rule is a "legislative rule" that has "the force and effect of law." *See Mock*, 75 F.4th at 579-83.

Congress therefore had to provide an intelligible principle in the statutes so that the Department exercised only executive power in issuing the Rule. *See Jarkesy*, 34 F.4th at 461. But Congress failed to do so. Congress simply tasked the Department with "[t]he administration and enforcement" of the National Firearms Act, 26 U.S.C. § 7801(a)(2)(A), and instructed the Department to prescribe "such rules and regulations as are necessary to carry out" the Gun Control Act, 18 U.S.C. § 926(a). There is a "total absence of guidance" that would restrict the Department's ability to rewrite the statutes by expanding definitions and

criminal liability as the Department sees fit, which is "impermissible under the Constitution." *Jarkesy*, 34 F.4th at 462.

Moreover, the Supreme Court requires more specificity and less ambiguity for criminal statutes. *See Davis*, 139 S. Ct. at 2325 (explaining that "[v]ague laws … undermine the Constitution's separation of powers"); *Dimaya*, 138 S. Ct. at 1212 (plurality op.) (discussing how the void-for-vagueness doctrine requires Congress to "define what conduct is sanctionable" and to provide clear "standards to govern the actions of police officers, prosecutors, juries, and judges"); *id.* at 1223-27 (Gorsuch, J., concurring) (discussing the danger of vague laws). It therefore follows that a delegation that involves criminal consequences must provide more specific guidance even if less guidance is acceptable in other contexts. This further demonstrates that there is no true intelligible principle that would allow the Department to create serious felonies without violating the Constitution. And this is yet another reason that Watterson is likely to succeed on the merits.

### 3. The Rule exceeds the Department's statutory authority.

Watterson is also likely to succeed on his claim that the Department lacks statutory authority for the Rule. Even if Congress could delegate

the decision of whether to expand criminal liability under the federal statutes, it did not do so.    First, there is no clear congressional authorization for the Rule, which is required for such a consequential policy decision that infringes on individual liberties.    Second, the Rule exceeds statutory authority even apart from the major questions doctrine.

a. No clear congressional delegation authorizes the Rule.

Because "this is a major questions case," *West Virginia*, 142 S. Ct. at 2610, the Department lacked the authority to issue the Rule without a clear statement from Congress.

Under the major questions doctrine, when an agency makes a decision of "vast economic and political significance," it "must point to clear congressional authorization for the power it claims." *Id.* at 2605, 2609, 2614 (quotation omitted); *cf. Kent v. Dulles*, 357 U.S. 116, 129 (1958) (explaining the Court "will not readily infer" that Congress gave authority over the "exercise by an American citizen of an activity included in constitutional protection").    Likewise, courts will hesitate to conclude an agency has statutory authority when it "seeks to intrud[e] into an area that is the particular domain of state law" and cannot point to clear congressional authorization. *West Virginia*, 142 S. Ct. at 2621

47

(Gorsuch, J., concurring) (quotation omitted).

These factors are satisfied here.  The Rule is novel and embodies policy decisions that infringe on individual liberties, turn millions of Americans into criminals, and fundamentally change a statutory scheme. *See supra* pp. 4-10, 31-36.  As such, it has enormous political significance, not to mention substantial economic impact even assuming the Department's low estimate of three to seven million stabilizing braces is accurate.  *See Mock*, 75 F.4th at 581-82 (noting, even if the estimate of three million braces is used, the Rule's "total cost over ten years is anywhere from $1,874,405,737 to $2,095,312,630").  What is more, it intrudes on an area of state regulation: the police power.  *See United States v. Lopez*, 514 U.S. 549, 561 n.3 (1995).

Yet despite being "[a] decision of such magnitude and consequence" that "rests with Congress itself," or at the very least, "an agency acting pursuant to a clear delegation," *West Virginia*, 142 S. Ct. at 2616, the Department cannot point to clear congressional authorization.  Congress did not speak clearly to give the Department the power it claims.  *See Vanderstok*, 2023 U.S. App. LEXIS 29956, at *4 (recognizing that "Congress has neither authorized the expansion of firearm regulation nor

permitted the criminalization of previously lawful conduct" in the Gun Control Act). Indeed, the National Firearms Act does not even expressly give the Department general rulemaking authority, 26 U.S.C. § 7801(a)(2)(A), and the Gun Control Act simply authorizes the Attorney General to "prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter," 18 U.S.C. § 926(a). That is fatal under the major questions doctrine. *See Gun Owners of Am.*, 19 F.4th at 918-19 (Murphy, J., dissenting).

b. <u>The Department lacks the statutory authority to expand definitions and create new felonies.</u>

Even apart from the major questions doctrine, the Rule exceeds the Department's statutory authority. The Department has no authority to redefine "rifle" to create new felonies.

Both the National Firearms Act and the Gun Control Act define the statutory terms as used in the relevant chapters of the U.S. Code. *See* 18 U.S.C. § 921(a) (defining terms "[a]s used in this chapter"); 26 U.S.C. § 5845 (defining terms "[f]or the purpose of this chapter"). They do not authorize the Department to pass regulations to expand statutory definitions. *See* Stephen P. Halbrook, Firearms Law Deskbook, § 7:7 (Oct. 2022 Update) ("Congress … delegated no authority to redefine or

expand [the National Firearms Act's] terms and acts by regulation so as to create new crimes."); *United States v. Kuzma*, 967 F.3d 959, 971 (9th Cir. 2020) (noting the National Firearms Act does not delegate the "authority to promulgate underlying *regulatory* prohibitions, which are then enforced by a criminal statute prohibiting willful violations of those regulations"). Nor do they give the Department the authority to regulate stabilizing braces that—unlike other gun parts (silencers, mufflers, frames, or receivers, 26 U.S.C. § 5845(a)(7); 18 U.S.C. § 921(a)(3)(B)-(C))—are not swept within the statutory definition of firearm. *See Vanderstok v. Garland*, 625 F. Supp. 3d 570, 580 (N.D. Tex. 2022) ("ATF has no general authority to regulate weapon parts.").

These omissions of statutory authority are especially telling given the additional regulatory authority the Department is given in other provisions. For example, 18 U.S.C. § 922(m) makes it unlawful to violate recordkeeping requirements in § 923 "or regulations promulgated thereunder." And 26 U.S.C. § 5845(a) specifically gives the Department the ability to *omit* weapons from the definition of "firearm" if it makes specific findings that such weapons are antique firearms that are unlikely to be used as a weapon. These provisions thus further

50

demonstrate that Congress did not delegate authority to the Department to *expand* the scope of the definition of "rifle." *See Collins*, 141 S. Ct. at 1782 (presuming "Congress acts intentionally and purposely in the disparate inclusion or exclusion" of language in statutes); *Gun Owners*, 19 F.4th at 919 (Murphy, J., dissenting) ("[W]e should view the express inclusions and omissions of regulatory authority as intentional legislative choices.").

Accordingly, the Rule exceeds the Department's statutory authority and Watterson will likely succeed in showing the Department exceeded its statutory authority by issuing the Rule and turning millions of Americans into criminals guilty of felonies.

## II. PLAINTIFF WILL SUFFER IRREPARABLE HARM WITHOUT PRELIMINARY RELIEF.

Watterson also satisfies the second factor: "a substantial threat of irreparable harm if the injunction [or stay] does not issue." *Clarke*, 74 F.4th at 640. That is because Watterson is suffering—and will continue to suffer—irreparable harm in the absence of a stay and injunction. He suffers the irreparable injuries of being deprived of constitutional rights and being regulated contrary to statutory and separation-of-powers provisions. What is more, even if he acquiesces to the infringement of his

rights by complying with the unlawful Rule, he will still suffer irreparable harm.

Watterson currently cannot attach his brace to his pistol or purchase a pistol with an attached brace without risking a 10-year federal prison sentence and state prosecution. *See supra* pp. 5-10. The Rule revoked the classification letter that recognized the brace that Watterson owns would *not* transform a pistol into a short-barreled rifle. ROA.146, 200-01, 205. Not only does the Rule redefine at least 99% of pistols with braces as short-barreled rifles that must be registered, *Mock*, 75 F.4th at 574; ROA.146, 160, 479, but the Department also indicated that Watterson's specific brace transforms a pistol into a short-barreled rifle under the Rule, ROA.205. The Rule thus subjects Watterson to prosecution risks and daily deprives Watterson of his Second Amendment rights and right to not be regulated contrary to statutory and separation-of-powers provisions. *See supra* Part I.

These deprivations constitute irreparable harm. After all, "the loss of constitutional freedoms 'for even minimal periods of time … unquestionably constitutes irreparable injury.'" *See, e.g.*, *BST Holdings*, 17 F.4th at 617-18 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))

(concluding constitutional harm was irreparable injury where plaintiffs asserted claims based on the Commerce Clause and separation-of-powers provisions); *Ezell*, 651 F.3d at 698-99 (explaining that, if a law restricting gun rights is unconstitutional, it "violates [plaintiffs'] Second Amendment rights every day it remains on the books" and "is properly regarded as irreparable"); *Koons v. Reynolds*, No. 22-7464 (RMB/EAP), 2023 U.S. Dist. LEXIS 3293, at *63-64 (D.N.J. Jan. 9, 2023) (concluding that, "in the Second Amendment context" like "the First Amendment context," "a deprivation unquestionably constitutes irreparable injury, even if the deprivation is for minimal periods of time" (quotation omitted)); *id.* at *65 (collecting cases). That is why even "alleged violations" of rights can satisfy the irreparable-harm requirement. *See Opulent Life Church*, 697 F.3d at 296 (explaining plaintiff "has alleged violations of its First Amendment and RLUIPA rights and thereby satisfied the irreparable injury requirement"). And that is why a plaintiff who shows he will likely succeed on a claim of a constitutional violation "will almost always demonstrate he is suffering irreparable harm." *Baird*, 2023 U.S. App. LEXIS 23760, at *10.

What is more, there is no way for Watterson to avoid irreparable

harm by complying with the Rule despite the Department's continued fiction that any harm is self-inflicted. *See* Stay Opp. at 20. This is true for four reasons.

First, even if Watterson complies with the unlawful Rule today and acquiesces to the infringement of his rights, he still would be deprived of his right to possess a braced pistol for self-defense. That is because he would need to wait months to a year for his registration application to be approved before he could attach his brace to his pistol or purchase a different braced pistol. ROA.179-80, 205-07. He would thus continue to be deprived of his constitutional rights, which constitutes irreparable harm. *See supra* pp. 52-53; *see also Mock,* 2023 U.S. Dist. LEXIS 178809, at *35-36 (concluding that individuals cannot avoid a deprivation of "at least *some* presumptively protected Second Amendment conduct" by complying with the Rule).

Second, Watterson would incur unrecoverable compliance costs if he submitted to the unlawful Rule. *See id.* at *17 (finding that individuals "are threatened with irreparable injuries" as a result of the Rule because they would "sustain[] permanent and nonrecoverable costs from their compliance with an unlawfully issued regulation"); *Texas v.*

*BATFE*, No. 6:23-CV-00013, 2023 U.S. Dist. LEXIS 193593, at *28-29 (S.D. Tex. Oct. 27, 2023) (similar); *Britto*, 2023 U.S. Dist. LEXIS 200933, at *11-12 (similar).  Even assuming Watterson could recover the $200 tax payment after enduring a separate suit and paying an attorney, he would not be able to recoup the time and resources that must be expended to file a registration application (*e.g.*, fingerprinting, getting photographs). ROA.182, 205-07, 245, 249-55.  Those compliance costs qualify as irreparable harm and do not require "a precise dollar figure," because the "key inquiry" is the "irreparability," not the "magnitude" of the harm. *Rest. Law Ctr. v. Dep't of Labor*, 66 F.4th 593, 597, 600 (5th Cir. 2023); *BST Holdings*, 17 F.4th at 618 (similar). And the compliance costs imposed by the Rule's tax and registration requirements cannot be minimized as de minimis when their very purpose was to chill constitutional rights and the cost of the tax can be higher than the braces themselves.  *See Mock*, 75 F.4th at 569; ROA.200, 213, 260.

Third, Watterson would be subject to additional restrictions on his ability to travel with or transfer his weapon—ongoing Second Amendment violations—that cannot be undone.  ROA.206-07; *see Mock*, 75 F.4th at 566, 576 n.29 (recognizing "there is no given process for

undoing" the registration of a weapon, which subjects the weapon to, "at times, onerous requirements"); *Mock*, 2023 U.S. Dist. LEXIS 178809, at *17 (concluding the Rule's "impairment of [the] fundamental right to keep and bear lawful arms in self-defense" was irreparable harm justifying an injunction). For example, Watterson would need to get authorization from the Attorney General or ATF before he could transfer his braced weapon or travel with it across state lines. *See Mock*, 75 F4th at 569.

Fourth, if Watterson complies with the Rule, he will suffer the irreparable harm of subjecting himself to an unlawful regulation and acquiescing to the violation of his Second Amendment rights and his right to have legislative power exercised by Congress. *See Mock*, 2023 U.S. Dist. LEXIS 178809, at *37 ("[I]t is no answer to say that [Plaintiffs] may avoid the harm by complying with an unlawful agency rule." (quotation omitted) (second alteration in original)); *cf. Collins*, 141 S. Ct. at 1780-81 (explaining that "the separation of powers is designed to preserve the liberty of all people" and is "a right shared by everyone in this country"); *Trans World Airlines*, 897 F.2d at 784 (subjecting a party to unlawful state regulations would be irreparable harm); *All. For Hippocratic Med.*,

56

78 F.4th at 251 (reasoning that "[n]o legal remedy can adequately redress … conscience and mental-distress injuries" of doctors that must treat patients with complications from an abortion-causing drug). Watterson accordingly can more than meet the irreparable harm requirement to merit preliminary relief.

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN FAVOR OF GRANTING PRELIMINARY RELIEF.

Watterson also satisfies the final factors, because issuing a stay and injunction will serve the public interest and not "substantially injure the other parties." *Nken*, 556 U.S. at 434. Given the nature of his claims, his showing of a likelihood of success on the merits "tips the merged third and fourth factors decisively in his favor." *Baird*, 2023 U.S. App. LEXIS 23760, at *11; *see Trans World Airlines*, 897 F.2d at 783 (noting in certain cases the "likelihood of success carries with it a determination that the other three requirements have been satisfied"). Indeed, staying an unlawful and unconstitutional regulation is in the public interest and will benefit ordinary Americans who wish to exercise their right to keep and bear a braced pistol for self-defense and their communities.

Because "the Constitution is the ultimate expression of the public interest," the "enforcement of an unconstitutional law is always contrary

57

to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (quotations omitted).  Relatedly, "[i]t always in the public interest to prevent the violation of a party's constitutional rights." *See Jackson Women's Health*, 760 F.3d at 458 n.9 (quotation omitted).  Second Amendment rights are no different; it is in the public interest to stop the violation of Second Amendment rights just like other individual constitutional rights.  *See Bruen*, 142 S. Ct. at 2156 (declaring that the "right to bear arms … is not a second-class right" (quotation omitted)); *Ezell*, 651 F.3d at 710 (concluding "[t]he balance of harms favors the plaintiffs" where they "have established a strong likelihood that they are suffering violations of their Second Amendment rights every day the [gun] range ban is in effect").  It likewise is in the public interest to stay regulations that subvert "our constitutional structure."  *See BST Holdings*, 17 F.4th at 618-19.

Similarly, the public has an interest in a stay or injunction, because the public is served when "governmental agencies abide by the federal laws that govern their existence and operations," *State v. Biden*, 10 F.4th at 559-60 (quotation omitted); *R.J. Reynolds Vapor*, 65 F.4th at 195 ("It is of highest public importance that federal agencies follow the law").  The

corollary is also true: there is no public "interest in enforcing a regulation that violates federal law." *All. for Hippocratic Med.*, 78 F.4th at 210; *see Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) ("[T]here is generally no public interest in the perpetuation of unlawful agency action." (quotation omitted)); *Mock*, 2023 U.S. Dist. LEXIS 178809, at *52 (same).

What is more, granting preliminary relief benefits law-abiding Americans and their communities as a practical matter. That is because forearm stabilizing braces improve the accuracy of large pistols and enables citizens to exercise self-defense effectively in their homes. *See Mock*, 2023 U.S. App. LEXIS 19846, at *48 (Willett, J., concurring) (recognizing that stabilizing braces "improve a pistol's stability, and … a user's accuracy," that "[a]ccuracy, in turn promotes safety," and that stabilizing braces thus "make an otherwise lawful weapon *safer*"); *see also Britto*, 2023 U.S. Dist. LEXIS 200933, at *11-12; ROA.199-201, 217-26. It also gives citizens "peace of mind" about their ability to defend themselves. *See Spencer v. Nigrelli*, No. 22-CV-6486 (JLS), 2022 U.S. Dist. LEXIS 233341, at *33 (W.D.N.Y. Dec. 29, 2022). These "legitimate purposes that assist law-abiding citizens in their ability to defend

themselves" weigh in favor of staying the Rule or granting other preliminary relief. *See Barnett*, 2023 U.S. Dist. LEXIS 74756, at *38-39.

The Department will likely counter that relief will threaten public safety, 88 Fed. Reg. at 6,481, but any "interest[] in public safety and the prevention of gun violence ends with the means used to further them violate the Constitution," *Duncan v. Bonta*, 83 F.4th 803 (9th Cir. 2023) (en banc) (Bumatay, J., dissenting). That is because "the Supreme Court has very clearly ended interest balancing when it comes to the Second Amendment" and courts "cannot backdoor interest-balancing through the stay factors." *Id.*; *see R.J. Reynolds Vapor*, 65 F.4th at 195 (rejecting argument that a stay was in the public interest based on "Congress's policy choice" about what would serve "public health" because "our system does not permit agencies to act unlawfully even in pursuit of desirable ends" (quotations omitted)); *Britto*, 2023 U.S. Dist. LEXIS 200933, at *13 ("[P]ublic safety concerns must be addressed in ways that are lawful. This Rule is not.").

In any event, the Department's public safety argument is speculative at best. *See Texas*, 2023 U.S. Dist. LEXIS 193593, at *31 (concluding the Rule's effect on the Department is "administrative and

60

speculative"). Despite millions of pistols with stabilizing braces in circulation by the Department's own estimates, the Rule points to only two crimes resulting in deaths and less than 300 investigations involving them over the past decade, 88 Fed. Reg. at 6,499, and the Department pointed to only two additional shootings with braced pistols below, ROA.935. Considering there are over 17,000 gun homicides annually, *Mock*, 75 F.4th at 573, the Department's own evidence shows that pistols with stabilizing braces are not a menace to public safety but rather are primarily used by law-abiding citizens.

The Department has no explanation, much less evidence, of how the Rule will promote public safety. The Rule imposes zero restrictions on the ability to purchase a stabilizing brace and, while it may stop law-abiding citizens (who are aware of it) from attaching a brace to a pistol, there is no evidence it will stop a criminal intent on shooting others from doing so. *See Texas*, 2023 U.S. Dist. LEXIS 193593, at *31 (finding that the Rule's registration requirement "does not necessarily protect the public" from criminals using braced pistols); *cf. Barnett*, 2023 U.S. Dist. LEXIS 74756, at *39 (noting there is "no evidence as to how" bans on firearm modifiers that "have legitimate purposes that assist law-abiding

citizens in their ability to defend themselves" will enhance public safety); *Hardaway v. Nigrelli*, 639 F. Supp. 3d 422, 445 (W.D.N.Y. 2022) (noting preliminary relief would benefit the public where "the challenged law [prohibiting concealed carry in places of worship] creates a vulnerable population of attendees … left to the whims of potential armed wrongdoers who are uninterested in following the law in any event"). Indeed, the Rule did nothing to prevent the Nashville tragedy that occurred after the Rule was issued and on which the Department strangely relies to argue the Rule's restrictions further public safety. ROA.935, 947. What is more, there is no evidence the shootings the Department cites were more deadly because the perpetrator used a braced pistol instead of another weapon like an AR-15 rifle that does not have a registration requirement.

The final factors therefore also weigh in favor of granting preliminary relief pending resolution of the case on the merits, and the district court erred by refusing to do so. *See Clarke*, 7 F.4th at 640-41, 644.

## IV. THE COURT SHOULD INSTRUCT THE DISTRICT COURT TO STAY THE RULE AND ISSUE A PRELIMINARY INJUNCTION.

Because preliminary relief is merited, this Court should reverse the

district court's effective denial of an injunction and instruct the district court to grant preliminary relief. *See id.* at 644 (reversing the "district court's effective denial of a preliminary injunction" and "remand[ing] with instructions that the district court enter a preliminary injunction pending its consideration of Appellants' claims"). The Court should specifically instruct the district court to (1) stay the Rule under 5 U.S.C. § 705 and (2) preliminarily enjoin the Department from enforcing the federal firearms statutes in accordance with its flawed interpretation of those statutes. This relief is both appropriate and necessary to mitigate Watterson's irreparable harm.

Section 705 specifically authorizes courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Unlike agencies that can only postpone the effective date, courts have the broader power to stay already-effective agency actions. *See Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1144 (5th Cir. 2021) (rejecting argument that the Court lacked "authority to grant a stay that provides interim relief" under § 705); *All. for Hippocratic Med.*, 78 F.4th at 255-56 (concluding the district court did

not abuse its discretion by staying an already effective agency action under § 705).

Furthermore, a stay is necessary to mitigate the chill of Watterson's Second Amendment rights and enable him to avoid further irreparable harm. If the Rule is not stayed, then the Rule's revocation of prior classification letters remains in effect—including the letter pertaining to Watterson's brace—even if there is an injunction in place. *See* Stay Mot. 3-4, 21; 88 Fed. Reg. at 6,480; ROA.200-01, 208-11, 736, 890. This would prevent reliance on those earlier classification letters and increase Watterson's ongoing prosecution risks. ROA.146, 200, 205, 208-11. For example, Watterson would continue to face state prosecution risks while this litigation is pending because the Rule would continue to have "distortive effects" on state law. *See* Texas Amicus Br. in Support of Inj. Pending Appeal, *Mock*, No. 23-10319, ECF No. 37 (5th Cir. May 19, 2023), at 6; TEX. PEN. CODE § 46.05(a)(1)(C); *see also* ROA.444 (collecting state statutes that look to federal registration requirements). He could also face a future federal prosecution for unlawful possession if he attached his brace to his pistol while this litigation was pending and ultimately loses on the merits. *See* 18 U.S.C. § 3282(a); 26 U.S.C. § 6351. The Rule

therefore must be stayed pending resolution of this case on the merits.[7]

An injunction preventing the Department from enforcing the National Firearms Act and Gun Control Act in accordance with the Department's flawed interpretation of those statutes is also necessary. After all, the Department has taken the position that "even if the Rule" is "set aside," "the statutory requirements would still require registration." *See* Defs.' Resp. to Emerg. Prelim. Inj. Mot., *Mock*, No. 23-10319, ECF No. 35 (5th Cir. May 19, 2023), at 21. This means that Watterson could be subject to federal prosecution based on the Department's erroneous interpretation of the statutes without injunctive relief. Therefore, this Court should additionally instruct the district court to issue an injunction. *See Feds for Med. Freedom v. Biden*, 63 F.4th 366, 387-88 (5th Cir. 2023). The district court should also be encouraged to decide this case on the merits quickly so the parties can expeditiously "receive considered plenary review on future appeal," and Watterson can

---

[7] Shortly before this brief was filed, a district court stayed the Rule under § 705 in a different case. *Britto*, 2023 U.S. Dist. LEXIS 200933, at *13. That stay fails to alleviate the chilling of Watterson's Second Amendment rights. After all, the relief could be stayed pending appeal or otherwise terminated without sufficient notice to Watterson. He also still needs injunctive relief given the Department's insistence it could prosecute him under the relevant statutes regardless of the Rule. *See infra* pp. 65-66.

receive complete, final relief. *See Doe ex rel. Doe v. Vermilion Par. Sch. Bd.*, 421 F. App'x 366, 377 (5th Cir. 2011).

## CONCLUSION

For the foregoing reasons, this Court should reverse and remand with instructions that the district court enter a stay and preliminary injunction pending resolution of this case on the merits.

Dated: November 17, 2023,    Respectfully submitted,

*/s/Autumn Hamit Patterson*
ROBERT HENNEKE
Texas Bar No. 24046058
rhenneke@texaspolicy.com
CHANCE WELDON
cweldon@texaspolicy.com
Texas Bar No. 24076767
AUTUMN HAMIT PATTERSON
*Lead Counsel*
Texas Bar No. 24092947
apatterson@texaspolicy.com
CLAYTON WAY CALVIN
Texas Bar No. 24132780
ccalvin@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone: (512) 472-2700
Facsimile: (512) 472-2728

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that, on November 17, 2023, a copy of the foregoing document was electronically filed and served via CM-ECF on all counsel who are registered CM/ECF users.

*/s/ Autumn Hamit Patterson*
Autumn Hamit Patterson

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the typeface, type-style, and length requirements in 5th Circuit Rule 32.1 and Federal Rules of Appellate Procedure 32(a)(5)-(7) because it is in 14-point Century Schoolbook font (except for the footnotes that are in 12-point font) and contains 12,982 words, excluding the parts exempted by Federal Rules of Appellate Procedure 32(f).

*/s/ Autumn Hamit Patterson*
Autumn Hamit Patterson