# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

BLAKE J. WATTERSON,

Plaintiff-Appellant,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; STEVEN DETTELBACH, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; UNITED STATES DEPARTMENT OF JUSTICE; MERRICK GARLAND, U.S. Attorney General; UNITED STATES OF AMERICA,

Defendants-Appellees.

On Appeal from the United States District Court
for the Eastern District of Texas

## BRIEF FOR APPELLEES

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

DAMIEN DIGGS
  *United States Attorney*

ABBY C. WRIGHT
SEAN R. JANDA
BEN LEWIS
  *Attorneys, Appellate Staff*
  *Civil Division, Rm. 7250*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2494*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellees are all governmental parties. 5th Cir. R. 28.2.1.

# STATEMENT REGARDING ORAL ARGUMENT

Plaintiff in this case seeks preliminary relief prohibiting the enforcement of a Rule issued by the Bureau of Alcohol, Tobacco, Firearms, and Explosives. The Rule clarifies that the National Firearms Act's public-safety scheme applies to short-barreled rifles constructed from so-called "stabilizing braces," and provides guidance for determining whether any particular braced firearm is a short-barreled rifle. Given the public safety and regulatory clarity goals furthered by the challenged Rule, the government respectfully requests that the Court hold oral argument in this appeal.

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................ 1

STATEMENT OF JURISDICTION ........................................................... 2

STATEMENT OF THE ISSUES ................................................................ 2

STATEMENT OF THE CASE .................................................................... 3

    A.    Legal Background ...................................................................... 3

    B.    Procedural History .................................................................... 8

SUMMARY OF ARGUMENT .................................................................. 12

STANDARD OF REVIEW ....................................................................... 15

ARGUMENT .............................................................................................. 16

I.    This Court Should Dismiss This Appeal for Lack of Jurisdiction ..................... 16

II.    Plaintiff Is Not Likely to Succeed on the Merits ................................. 19

    A.    The Rule Comports with the Statute ....................................... 19

    B.    Plaintiff's Concerns About the NFA's Delegation of Authority to the Agency Are Unavailing ......................................................... 25

    C.    The Rule Complies with the Second Amendment .................................. 32

III.    The Equitable Factors Do Not Support Preliminary Relief ............................... 39

    A.    Plaintiff Has Not Demonstrated Irreparable Harm .................................. 40

    B.    The Balance of the Equities Favor the Government .............................. 45

IV.    Any Preliminary Relief Must be Tailored to the Plaintiff ..................................... 48

CONCLUSION ........................................................................................... 52

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*A.L.A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935) ............................................................................... 26

*Alliance for Hippocratic Med. v. U.S. FDA*,
78 F.4th 210 (5th Cir. 2023) .................................................................. 46

*Anibowei v. Morgan*,
70 F.4th 898 (5th Cir. 2023) .................................................................. 40

*Arizona v. Biden*,
40 F.4th 375 (6th Cir. 2022) .................................................................. 50

*Bezet v. United States*:
276 F. Supp. 3d 576 (E.D. La.), *aff'd*,
714 F. App'x 336 (5th Cir. 2017) .................................................... 3, 48
714 F. App'x 336 (5th Cir. 2017) .................................................... 43

*Big Time Vapes, Inc. v. FDA*,
963 F.3d 436 (5th Cir. 2020) ................................................................. 26

*Bob Jones Univ. v. Simon*,
416 U.S. 725 (1974) ............................................................................... 43

*Britto v. ATF*,
No. 23-CV-19, 2023 WL 7418291 (N.D. Tex. Nov. 8, 2023) ........................ 11, 40

*Caetano v. Massachusetts*,
577 U.S. 411 (2016) ............................................................................... 37

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ............................................................................... 49

*Calmaquip Eng'g W. Hemisphere Corp. v. West Coast Carriers Ltd.*,
650 F.2d 633 (5th Cir. Unit B 1981) .......................................................... 18

*Dakotans for Health v. Noem*,
52 F.4th 381 (8th Cir. 2022) ................................................................... 43

*Dennis Melancon, Inc. v. City of New Orleans*,
703 F.3d 262 (5th Cir. 2012) .................................................................. 44

*Department of Homeland Sec. v. New York*,
140 S. Ct. 599 (2020) ............................................................................ 50

v

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ........................................................ 11, 13, 33, 35, 36, 39

*eBay, Inc. v. MercExchange, LLC,*
547 U.S. 388 (2006) ........................................................ 47

*Elrod v. Burns,*
427 U.S. 347 (1976) ........................................................ 41

*FDA v. Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000) ........................................................ 30

*Gill v. Whitford,*
138 S. Ct. 1916 (2018) ........................................................ 49

*Gonzales v. Oregon,*
546 U.S. 243 (2006) ........................................................ 28

*Google, Inc. v. Hood,*
822 F.3d 212 (5th Cir. 2016) ........................................................ 41

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,*
527 U.S. 308 (1999) ........................................................ 49

*Hollis v. Lynch,*
827 F.3d 436 (5th Cir. 2016) ........................................................ 33, 34, 35, 38

*International Women's Day March Planning Comm. v. City of San Antonio,*
619 F.3d 346 (5th Cir. 2010) ........................................................ 36

*Jarkesy v. SEC,*
34 F.4th 446 (5th Cir. 2022), *cert. granted,*
143 S. Ct. 2688 (2023) ........................................................ 30

*Jean v. Nelson,*
472 U.S. 846 (1985) ........................................................ 32

*Maryland v. King,*
567 U.S. 1301 (2012) ........................................................ 47

*MediNatura, Inc. v. FDA,*
998 F.3d 931 (D.C. Cir. 2021) ........................................................ 45

*Mistretta v. United States,*
488 U.S. 361 (1989) ........................................................ 25, 26

*Mock v. Garland,*
   75 F.4th 563 (5th Cir. 2023) ........................................................ 1, 9, 38, 46

*Morehouse Enters., LLC v. ATF,*
   78 F.4th 1011 (8th Cir. 2023) ................................................................. 43

*National Broad. Co. v. United States,*
   319 U.S. 190 (1943) ................................................................................. 26

*National Shipping Co. of Saudi Arabia v. Valero Mktg. & Supply Co.,*
   963 F.3d 479 (5th Cir. 2020) .................................................................. 15

*New York State Rifle & Pistol Ass'n v. Bruen,*
   597 U.S. 1 (2022) ..................................................................... 32, 35, 36, 39

*Opulent Life Church v. City of Holly Springs,*
   697 F.3d 279 (5th Cir. 2012) .................................................................. 42

*Overton v. City of Austin,*
   748 F.2d 941 (5th Cir. 1984) .................................................................. 16

*Panama Refining Co. v. Ryan,*
   293 U.S. 388 (1935) ................................................................................. 26

*Posters 'N' Things, Ltd. v. United States,*
   511 U.S. 513 (1994) ............................................................................ 22, 24

*Restaurant Law Ctr. v. Department of Labor,*
   66 F.4th 593 (5th Cir. 2023) .................................................................. 42

*SEC v. Hallam,*
   42 F.4th 316 (5th Cir. 2022) .................................................................. 19

*Sig Sauer, Inc. v. Brandon,*
   826 F.3d 598 (1st Cir. 2016) .............................................................. 20, 21

*Staples v. United States,*
   511 U.S. 600 (1994) ............................................................................ 32, 48

*Texas v. Biden,*
   10 F.4th 538 (5th Cir. 2021) .................................................................. 45

*Thomas v. Pohlmann,*
   681 F. App'x 401 (5th Cir. 2017) ...................................................... 17, 18

*Town of Chester v. Laroe Estates, Inc.*,
    581 U.S. 433 (2017) ................................................. 49

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ............................................ 49

*United States v. Cox*,
    906 F.3d 1170 (10th Cir. 2018) ............................ 33

*United States v. Davis*,
    139 S. Ct. 2319 (2019) ............................................ 28

*United States v. Freed*,
    401 U.S. 601 (1971) ................................................. 3

*United States v. Gilbert*,
    286 F. App'x 383 (9th Cir. 2008) ........................ 33

*United States v. Jennings*,
    195 F.3d 795 (5th Cir. 1999) ................................ 34

*United States v. Miller*,
    307 U.S. 174 (1939) ........................................ 13, 33

*United States v. Serna*,
    309 F.3d 859 (5th Cir. 2002) ................................ 34

*United States v. Stepp-Zafft*,
    733 F. App'x 327 (8th Cir. 2018) ........................ 33

*United States v. Syverson*,
    90 F.3d 227 (7th Cir. 1996) .................................. 21

*United States v. Texas*,
    599 U.S. 670 (2023) ........................................ 25, 50

*United States v. Thompson/Center Arms Co.*,
    504 U.S. 505 (1992) ................................... 3, 11, 34

*Usery v. Pilgrim Equip. Co.*,
    527 F.2d 1308 (5th Cir. 1976) .............................. 43

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ................................................ 36

*Watterson v. ATF,*
No. 4:23cv80, 2024 WL 897595, (E.D. Tex. Mar. 1, 2024) .......... 2, 10, 11, 16-17, 32

*Wayman v. Southard,*
23 U.S. (10 Wheat) 1 (1825) .................................................................. 25

*West Virginia v. EPA,*
597 U.S. 697 (2022) .................................................................... 30, 31

*Whitman v. American Trucking Ass'ns,*
531 U.S. 457 (2001) ........................................................................ 26

*Winter v. NRDC,*
555 U.S. 7 (2008) .................................................................. 15, 40, 46, 47

*Women's Med. Ctr. of Nw. Hous. v. Bell,*
248 F.3d 411 (5th Cir. 2001) ............................................................ 16

*Yakus v. United States,*
321 U.S. 414 (1944) ........................................................................ 26

**Statutes:**

Administrative Procedure Act (APA):
5 U.S.C. § 702(1) ........................................................................... 50
5 U.S.C. § 705 ........................................................................... 11, 49

National Firearms Act (NFA):
26 U.S.C. § 5801 *et seq.* ................................................................... 3
26 U.S.C. §§ 5811-5812 .............................................................. 4, 27
26 U.S.C. §§ 5821-5822 .............................................................. 3, 27
26 U.S.C. § 5841 ........................................................................... 27
26 U.S.C. § 5845(a) ...................................................................... 27
26 U.S.C. § 5845(a)(3) ................................................................... 4
26 U.S.C. § 5845(c) .......................................................... 4, 12, 20, 27

26 U.S.C. § 6511 ........................................................................... 4

26 U.S.C. § 7422 ........................................................................ 4, 43

26 U.S.C. § 7801 ........................................................................... 4

26 U.S.C. § 7805(a) .......................................................... 27, 29, 31

28 U.S.C. § 1292(a)(1) .................................................................... 2, 12, 16

28 U.S.C. § 1331 .................................................................................... 2

Ala. Code § 13A-11-63(a) ................................................................... 34

Alaska Stat. Ann. § 11.61.200(a)(3) (West) ...................................... 34

Alaska Stat. Ann. § 11.61.200(c) (West) ........................................... 34

Alaska Stat. Ann. § 11.61.200(h)(1)(D) (West) ................................ 34

Ariz. Rev. Stat. Ann. § 13-3101(A)(8)(iv) ........................................ 34

Ariz. Rev. Stat. Ann. § 13-3101(B) ................................................... 34

Cal. Penal Code § 16590(s) (West) ................................................... 34

Cal. Penal Code § 33215 (West) ........................................................ 34

Colo. Rev. Stat. Ann. § 18-12-102(1) (West) ................................... 34

Colo. Rev. Stat. Ann. § 18-12-102(3) (West) ................................... 34

Colo. Rev. Stat. Ann. § 18-12-102(5) (West) ................................... 34

D.C. Code Ann. § 7-2502.02(a)(3) (West) ....................................... 34

Fla. Stat. Ann. § 790.221 (West) ....................................................... 34

Ga. Code Ann. §§ 16-11-121(4) (West) ............................................ 34

Ga. Code Ann. §§ 16-11-122 (West) ................................................. 34

Haw. Rev. Stat. Ann. § 134-8(a) (West) ........................................... 34

Haw. Rev. Stat. Ann. § 134-8(d) (West) ........................................... 34

720 Ill. Comp. Stat. Ann. 5/24-1(a)(7)(ii) (West) ........................... 34

720 Ill. Comp. Stat. Ann. 5/24-2(c)(7) (West) ................................ 34

Iowa Code Ann. § 724.1C (West) ...................................................... 34

La. Stat. Ann. § 40:1785 ..................................................................... 34

Md. Code Ann., Pub. Safety § 5-203(a)(2) (West) .......................................................... 34

Md. Code Ann., Pub. Safety § 5-203(c) (West) .............................................................. 34

Mich. Comp. Laws Ann. § 750.224b(1)-(3) (West) ........................................................ 34

Mo. Ann. Stat. § 571.020(1)(6)(b) (West) ..................................................................... 34

Mont. Code Ann. § 45-8-340(1)(a) West) ...................................................................... 34

Mont. Code Ann. § 45-8-340(3)(f) (West) ..................................................................... 34

Mont. Code Ann. § 45-8-340(4) (West) ......................................................................... 34

Neb. Rev. Stat. Ann. § 28-1203 (West) .......................................................................... 34

Nev. Rev. Stat. Ann. § 202.275(1) (West) ...................................................................... 34

Nev. Rev. Stat. Ann. § 202.275(3)(b) (West) ................................................................. 34

N.J. Stat. Ann. § 2C:39-1(o) .......................................................................................... 34

N.J. Stat. Ann. § 2C:39-3(b) .......................................................................................... 34

N.Y. Penal Law § 265.00(3)(c) (McKinney) .................................................................. 34

N.Y. Penal Law § 265.00(3)(d) (McKinney) ................................................................. 34

N.Y. Penal Law § 265.01-b (McKinney) ........................................................................ 34

N.C. Gen. Stat. Ann. § 14-288.8 (West) ......................................................................... 34

N.D. Cent. Code Ann. § 62.1-02-03 (West) ................................................................... 34

Ohio Rev. Code Ann. § 2923.11(F) (West) .................................................................... 34

Ohio Rev. Code Ann. § 2923.11(K) (West) ................................................................... 34

Ohio Rev. Code Ann. § 2923.17(A) (West) ................................................................... 34

Ohio Rev. Code Ann. § 2923.17(C)(5) West) ................................................................ 34

Okla. Stat. Ann. tit. 21, § 1289.18(B)-(E) (West) ..................................................... 34-35

Or. Rev. Stat. Ann. § 166.272 (West) ............................................................................. 35

11 R.I. Gen. Laws Ann. § 11-47-8(b) (West) ................................................................. 35

S.C. Code Ann. § 16-23-230 ......................................................................................... 35

S.C. Code Ann. § 16-23-250 ......................................................................................... 35

Tex. Penal Code Ann. § 46.01(10) (West) ................................................................... 35

Tex. Penal Code Ann. § 46.05(a)(1)(C) (West) ............................................................ 35

Va. Code Ann. § 18.2-299 (West) ................................................................................. 35

Va. Code Ann. § 18.2-300 (West) ................................................................................. 35

Va. Code Ann. § 18.2-303.1 (West) .............................................................................. 35

Wash. Rev. Code Ann. § 9.41.190(1)(a) (West) ........................................................... 35

Wash. Rev. Code Ann. § 9.41.190(4) (West) ............................................................... 35

Wis. Stat. Ann. § 941.28(2)-(4) (West) ........................................................................ 35

**Rules:**

Fed. R. App. P. 3(c)(1)(B) .................................................................................... 17, 18

Fed. R. App. P. 4(a)(2) ................................................................................................ 18

Fed. R. Civ. P. 23 ........................................................................................................ 50

**Legislative Materials:**

H.R. Rep. No. 73-1780 (1934) ........................................................................................3

H.R. Rep. No. 79-1980 (1946) .................................................................................49-50

H.R. Rep. No. 83-1337 (1954) ................................................................... 3, 32, 45, 48

H.R. Rep. No. 90-1956 (1968) (Conf. Rep.) ...................................................................3

**Other Authorities:**

ATF, *Firearms Question and Answer* (Mar. 23, 2023),
  https://perma.cc/AVG8-ALPA ..................................................................... 44

ATF, P-5390.1, *Firearms Commerce in the United States: Annual
  Statistical Update 2021*, https://perma.cc/5BMN-LW3Y ............................................ 35

ATF, Rev. Rul. 61-45, 1961-1 C.B. 663 .............................................................. 4

ATF, Rev. Rul. 61-203, 1961-2 C.B. 224 ............................................................. 4

Factoring Criteria for Firearms with Attached "Stabilizing Braces,"
  88 Fed. Reg. 6478 (Jan. 31, 2023) ................................................ 2, 4, 5, 6, 7, 8, 20, 22,
                                                                          23, 24, 28, 33, 38, 45

Order, *Mock v. Garland*, No. 23-10319 (5th Cir. May 26, 2023),
  Dkt. No. 78-2 ...................................................................................... 9

## INTRODUCTION

In *Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023), this Court held that a rule issued by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) explaining the circumstances under which a firearm equipped with rearward attachment called a "stabilizing brace" is a short-barreled rifle suffered from a procedural defect under the APA. This Court did not, however, order relief for the *Mock* plaintiffs, nor did it hold that the Rule suffered from any other infirmity.

The district court here properly rejected the request of plaintiff—a single individual who "owns a stabilizing brace," ROA.12—for nationwide preliminary relief following the *Mock* decision. Plaintiff did not raise the logical outgrowth claim accepted in *Mock*, and the district court correctly concluded that plaintiff's other attacks on the Rule were meritless.

That order, although correct, is not properly before this Court. Before the district court could rule on plaintiff's motion, plaintiff appealed, claiming that the court had effectively denied the motion. This Court ordered a limited remand of the case to allow the district court to rule. The district court ruled on plaintiff's motion, and this appeal should therefore be at an end. Plaintiff cannot use his earlier notice of appeal, filed *before* the order issued, to invoke this Court's appellate jurisdiction to review the substance of the district court's order. In any event, were this Court to disagree, it should affirm the district court's denial of plaintiff's motion.

## STATEMENT OF JURISDICTION

Plaintiff invoked the district court's jurisdiction under 28 U.S.C. § 1331. *See* ROA.13. Before the district court entered an order resolving plaintiff's motion for preliminary relief, plaintiff filed a notice of appeal from what he has termed the "effective denial" of that motion. *See* ROA.1016-20. Plaintiff thus invoked this Court's jurisdiction under 28 U.S.C. § 1292(a)(1). As explained below, because the district court had not yet resolved—actually or effectively—plaintiff's motion for preliminary relief when plaintiff filed his notice of appeal, this Court lacks appellate jurisdiction. *See infra* pp. 16-19.

Following a limited remand, the district court denied plaintiff's motion for preliminary relief on March 1, 2024. *See Watterson v. ATF*, No. 4:23-CV-80, 2024 WL 897595 (E.D. Tex. Mar. 1, 2024). Plaintiff did not file a notice of appeal of that interlocutory order.

## STATEMENT OF THE ISSUES

ATF issued a rule explaining the circumstances under which a firearm equipped with a rearward attachment called a "stabilizing brace" is a short-barreled rifle. *See* Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6478 (Jan. 31, 2023) (Rule). Plaintiff claims that the Rule is invalid because it is not consistent with the underlying statute; violates nondelegation principles; and violates the Second Amendment. Plaintiff moved for preliminary relief but appealed before the district court could resolved that motion. Following plaintiff's appeal and a limited

remand, the district court ultimately denied plaintiff's motion. The issues presented are the following:

1. Whether this Court has jurisdiction over plaintiff's appeal; and

2. If jurisdiction exists, whether the district court properly denied plaintiff's motion for preliminary relief.

## STATEMENT OF THE CASE

### A.      Legal Background

**1.** The National Firearms Act (NFA), 26 U.S.C. § 5801 *et seq.*, regulates "dangerous weapons," H.R. Rep. No. 73-1780, at 1 (1934), that can "be used readily and efficiently by criminals or gangsters," H.R. Rep. No. 83-1337, at A395 (1954). These firearms include powerful "concealable weapon[s]," *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992) (plurality opinion), like short-barreled shotguns and, as relevant here, short-barreled rifles. *See* H.R. Rep. No. 90-1956, at 34 (1968) (Conf. Rep.).

For those firearms, the NFA establishes a taxation-and-registration scheme "in the interest of the public safety." *United States v. Freed*, 401 U.S. 601, 609 (1971). This scheme tracks "the flow of [NFA] firearms" to ensure they stay away from criminal, dangerous, or irresponsible individuals. *Bezet v. United States*, 276 F. Supp. 3d 576, 612 (E.D. La.), *aff'd*, 714 F. App'x 336 (5th Cir. 2017). Individuals who are not engaged in a firearms business but who wish to make an NFA-regulated firearm must obtain prior approval. *See* 26 U.S.C. §§ 5821-5822. To that end, they must describe the

firearm; submit identifying information; and pay a $200 tax per firearm. *See id.* To transfer such firearms, a transferor must go through the same process to obtain prior approval—identifying a transferee, registering the firearm to the new owner, and paying a $200 tax. *See id.* §§ 5811-5812.

If the maker of a firearm wishes to challenge the assessment of the NFA's tax against him, the Internal Revenue Code provides a mechanism to do so. The maker may file a claim for a refund or credit with the Attorney General. *See* 26 U.S.C. § 6511. If the maker is dissatisfied with the result of that administrative process, he may bring suit in district court in a civil action for a refund of the tax. *See id.* § 7422.

**2.** ATF is responsible for enforcing the NFA. *See* 26 U.S.C. § 7801. ATF must therefore determine which firearms constitute "short-barreled rifles." Under the NFA, a "rifle" is a firearm that is "designed or redesigned, made or remade, and intended to be fired from the shoulder." *Id.* § 5845(c). A rifle with a barrel under 16 inches is a short-barreled rifle subject to the NFA's requirements. *Id.* § 5845(a)(3).

A short-barreled rifle has, at the front end, a receiver and a short barrel. At the back, it has a "stock," "butt stock," or "shoulder stock," which is pressed against the shoulder when firing. 88 Fed. Reg. at 6522. It has long been the case that the stock, like many firearm components, is often detachable or sold separately. *See, e.g.*, ATF, Rev. Rul. 61-45, 1961-1 C.B. 663; ATF, Rev. Rul. 61-203, 1961-2 C.B. 224.

Over the last decade, ATF has received an increasing number of requests to determine whether short-barreled firearms equipped with so-called "stabilizing

brace[s]"—rather than stocks—constitute "rifles." *See* 88 Fed. Reg. at 6482-84. These braces are also rearward attachments, but they have features—such as an opening or straps—that may be used to fasten the firearm against the forearm. *See, e.g.*, *id.* at 6483. Manufacturers have claimed that braced firearms are not designed to be fired from the shoulder but, instead, that the brace is designed to "assist people with disabilities or limited strength or mobility with firing heavy pistols" with one hand. *Id.* at 6482.

In many cases, however, firearms with stabilizing braces appear nearly identical to those with stocks:



*See* 88 Fed. Reg. at 6527-29 (left item equipped with stock; right items with brace). And as shown in marketing materials and trade magazines, many firearms equipped with braces are designed to be shouldered in the same way as firearms with stocks.



*See id.* at 6527, 6546 (both "arm braces"; gun publication on left; trade magazine on right).

Between 2012 and 2020, ATF reviewed various braced weapons for classification under the NFA, assessing whether each firearm was designed and intended to be fired from the shoulder. ATF made clear that designing a "stabilizing brace for use as a shoulder stock" or "configur[ing] the [brace] device for use as a shoulder-stock" may yield a short-barreled rifle, and ATF classified "the majority" of submitted samples as short-barreled rifles. 88 Fed. Reg. at 6482, 6487, 6492 (quotation omitted). But these classifications, which applied "only to the particular sample[s]" submitted, were not always consistent, either in their methodologies or in their conclusions. *Id.* at 6482, 6484 n.26; *see id.* at 6479 n.9 (collecting examples). The agency's analysis sometimes improperly focused on "whether the 'stabilizing brace' at issue could be used as a 'brace' to support single-handed fire rather than whether the overall configuration of the firearm with the attached 'brace' is designed and intended to be fired from the shoulder." *Id.* at 6501-02. And ATF sometimes "plac[ed] improper weight on the manufacturer's stated intent," *id.* at 6502, even when that stated intent was inconsistent with "the objective design features" of the firearm or how the firearm was "being used in the general community," *id.* at 6479. By 2020, ATF concluded that its case-by-case "classification determinations had led to confusion" and there was "a need to provide clarity to the firearm industry and public on how ATF evaluates firearms equipped with a 'stabilizing brace.'" *Id.* at 6494.

**3.** To provide clarity, the agency issued the Rule, which "inform[s] the public of the best interpretation" of how to apply the NFA's design-and-intent standard to firearms equipped with a "stabilizing brace." 88 Fed. Reg. at 6502. The Rule primarily reiterates that in determining whether such firearms are "rifles"—that is, whether they are designed and intended to be fired from the shoulder—the manufacturer's "stated intent will not necessarily be dispositive." *Id.* at 6479. Instead, the agency will consider whether other evidence, such as the firearm's "objective design features," marketing materials, and the "likely use of the weapon" in the general community, "support[s] or undermine[s] that intent." *Id.*

More specifically, the Rule states that the statutory definition of "rifle" encompasses a firearm equipped with a stabilizing brace "that provides surface area that allows the weapon to be fired from the shoulder, provided that other" evidence "indicate[s] that the weapon is designed, made, and intended to be fired from the shoulder." 88 Fed. Reg. at 6569. The Rule then identifies evidence that ATF believes will generally be probative in determining whether any particular firearm is designed and intended to be shoulder-fired. That evidence includes objective design features: whether the weapon has a "weight or length" and a "length of pull" similar to that of similar model rifles; whether it is equipped with "sights or a scope" that require shouldering to use; and whether the surface area that allows the weapon to be fired from the shoulder is created by a "rearward attachment that is necessary for the cycle of operations." *Id.* It also includes the "manufacturer's direct and indirect marketing

and promotional materials indicating the intended use of the weapon" and information showing "the likely use of the weapon in the general community." *Id.* at 6570.

The Rule estimates that at least "a majority" of existing firearms equipped with braces are likely to be classified as "rifles" or "short-barreled rifles" configured to be fired from the shoulder. 88 Fed. Reg. at 6480. But the Rule also makes clear that it is possible to design a braced weapon that is not a rifle. For example, a braced weapon might not have "a surface area that allows shouldering"—as with "an elastic strap that wraps around the shooter's wrist." *Id.* at 6529-30. Or it might have "a feature intended specifically to prevent shooting the firearm from the shoulder," such as "a permanently attached protrusion" that would prevent comfortable shouldering. *Id.* at 6530.

The Rule also provides compliance options for individuals who possess unregistered brace-equipped rifles, with the Department exercising its enforcement discretion to permit registration by May 31, 2023, without penalty or tax. 88 Fed. Reg. at 6480-81. Finally, because not all previous classification letters had followed a proper approach, the Rule clarifies that those letters are no longer valid. *Id.*

## B. Procedural History

**1.** Plaintiff Blake Watterson—an individual who "owns a stabilizing brace," ROA.12—challenged the Rule and moved for nationwide preliminary relief. *See* ROA.10-90. Plaintiff claimed that the Rule violates the NFA; reflects an

unconstitutional delegation of authority to the agency; and violates the Second Amendment. *See* ROA.272-94. Plaintiff requested that the district court stay the Rule in its entirety or enjoin defendants from enforcing the statute "in accordance with the Rule." ROA.293.

While plaintiff's motion was pending, a district court in a different case challenging the Rule denied a motion for a preliminary injunction, and a motions panel of this Court granted an injunction pending appeal. *See* Order, *Mock v. Garland*, No. 23-10319 (5th Cir. May 26, 2023), Dkt. No. 78-2. Following the entry of that injunction, the district court in this case similarly enjoined the government from enforcing the Rule against plaintiff pending this Court's merits decision in *Mock*. *See* ROA.721.

The merits panel in *Mock* reversed the denial of the preliminary injunction, on the ground that the plaintiffs were likely to succeed on their claim that the Rule violated the APA's notice-and-comment procedures under the logical-outgrowth doctrine. *See Mock v. Garland*, 75 F.4th 563, 567 (5th Cir. 2023). The Court concluded that the rule was a legislative rule. *See id.* at 578-83. Then, the Court held that the agency did not comply with notice-and-comment requirements because the final rule was not a logical outgrowth of the proposed rule. *See id.* at 583-86. The Court therefore remanded for the district court to consider the remaining preliminary-injunction factors, including the scope of any injunction. *See id.* at 586-88.

**2.** Plaintiff in this case renewed his preliminary-injunction motion after this Court decided *Mock*. Before the district court could rule on that motion, plaintiff noticed an appeal from the purported "effective denial" of the motion. *See* ROA.1016-18. After the government moved to dismiss the appeal for lack of appellate jurisdiction, a motions panel of this Court issued a limited remand to the district court to rule on the still-pending motion for preliminary relief. *See* Order (Nov. 29, 2023).

The district court denied plaintiff's motion. *See Watterson v. ATF*, No. 23-CV-80, 2024 WL 897595 (E.D. Tex. Mar. 1, 2024). At the outset, the district court concluded that plaintiff was not likely to succeed on the merits of any claim. The court rejected plaintiff's argument that the Rule "rewrite[s]" the statutory "definition of 'rifle'"; instead, the court explained, the Rule simply "provides a framework to determine whether a particular weapon equipped with a stabilizing brace" falls within the statutory definition. *Id.* at *14 (quotation omitted). The court also rejected plaintiff's argument that the Rule violates nondelegation principles or otherwise exceeds Congress' delegation of rulemaking authority to the agency. The court explained that the agency properly "holds the delegated authority to administer and enforce" the NFA. *Id.* at *12. And, the court concluded, the Rule was appropriately "needful and necessary to enforce the" statutory definition of "rifle" because it "establishes clear criteria that the ATF shall consider when determining whether a" braced firearm meets the statutory definition of "rifle." *Id.* (quotation omitted).

Turning to plaintiff's Second Amendment claim, the district court held that the Rule likely complied with the Second Amendment because the short-barreled rifles regulated by the Rule (and the NFA) "are considered dangerous and unusual weapons not protected by the Second Amendment." *Watterson*, 2024 WL 897595, at *18. The court emphasized that the Supreme Court has held that short-barreled shotguns "fall outside the protection of the Second Amendment" and has similarly "indicated that a short-barreled rifle is likely to be used for criminal purposes rather than lawful purposes." *Id.* (first citing *District of Columbia v. Heller*, 554 U.S. 570, 625 (2008); and then citing *Thompson/Center Arms Co.*, 504 U.S. at 517).

Independently, the district court concluded that preliminary relief was inappropriate because plaintiff had not demonstrated an "imminent and not speculative" irreparable injury. *Watterson*, 2024 WL 897595, at *19. The court explained that a different district court had stayed the Rule "in its entirety" under 5 U.S.C. § 705, *see Britto v. ATF*, No. 23-CV-19, 2023 WL 7418291 (N.D. Tex. Nov. 8, 2023), and that ATF had confirmed that it was "not currently enforcing the Final Rule." *Watterson*, 2024 WL 897595, at *19. Accordingly, plaintiff could not "show irreparable harm stemming from a rule that [the] agency is no longer authorized to enforce." *Id.*

Plaintiff did not notice an appeal from that order. Instead, following the district court's denial of his motion, plaintiff renewed in this appeal his request for a stay and an injunction pending appeal. *See* Appellant's Suppl. Br. (Mar. 13, 2024). A motions

panel of this Court denied that motion, concluding that there was no "need to grant emergency relief to the plaintiff at this time" because the Rule is stayed nationwide and there was no "concern that the Rule could be enforced against him at this time." Order 2 (Mar. 21, 2024). In addition, the motions panel carried the government's motion to dismiss the appeal for lack of jurisdiction with the case. *Id.*

## SUMMARY OF ARGUMENT

**I.** This appeal should be dismissed for lack of appellate jurisdiction. As relevant here, this Court has jurisdiction over appeals from interlocutory orders "refusing" injunctions. 28 U.S.C. § 1292(a)(1). But plaintiff filed his notice of appeal before the district court could rule on his motion for preliminary relief; there was thus no appealable order refusing an injunction at the time that plaintiff appealed. And plaintiff has not filed a notice of appeal from the district court's March 1 order denying his request for preliminary relief.

**II.** Regardless, plaintiff is not likely to succeed on the merits of his claims.

The Rule properly interprets the statute. A weapon constitutes a "rifle" if, as relevant here, it is "designed," "made," and "intended to be fired from the shoulder." 26 U.S.C. § 5845(c). In interpreting that provision, the Rule properly clarifies that ATF need not uncritically accept stated intent but may also consider objective evidence of intent. This approach of using objective evidence to "ferret[] out a party's" true intent is a familiar one in the law and has been approved in the context of the NFA specifically. The Rule also properly identifies evidence that ATF believes

will be probative of whether a particular braced firearm is designed and intended to be shoulder-fired.

Plaintiff's contentions that the Rule misinterprets the statutory standard reflect a misapprehension of the Rule and the statute. Contrary to plaintiff's views, the Rule directly incorporates the statutory standard and applies well-established principles of determining a party's intent to the specific context of braced weapons. Plaintiff's suggestion that the Rule violates nondelegation principles is no more persuasive. The Rule implements the NFA's statutory standard by providing clear notice to the regulated public about how to determine whether particular braced firearms are short-barreled rifles subject to statutory requirements.

The Rule also does not violate the Second Amendment. The Second Amendment extends only to bearable arms that are "typically possessed by law-abiding citizens for lawful purposes." *District of Columbia v. Heller*, 554 U.S. 570, 581, 625 (2008). By contrast, the Supreme Court has twice affirmed that short-barreled shotguns are "dangerous and unusual weapons" not protected by the Second Amendment. *Id.* at 626-27 (quotation omitted); *see also United States v. Miller*, 307 U.S. 174, 178 (1939). That conclusion applies equally to the short-barreled rifles also regulated by the NFA. Congress' determination to impose minor regulatory restrictions on small classes of particularly dangerous weapons like short-barreled rifles—while leaving exempt typical handguns and rifles from that regime—does not infringe the Second Amendment's right to armed self-defense.

**III.** Even if plaintiff were likely to succeed on the merits of some claim, he has not demonstrated an entitlement to preliminary relief because he has not shown irreparable harm and the balance of the equities and public interest counsel against enjoining the Rule.

Plaintiff has not identified any injury stemming from the Rule, because the relevant burdens stem from the underlying statute and he has not identified a particular weapon that the Rule and the statute would classify differently. Thus, an injunction against the Rule could not alleviate any harm, because the NFA continues to require that short-barreled rifles—including those made with braces—be registered and taxed.

Regardless, plaintiff's specific theories of harm are also unpersuasive. Plaintiff's claims of Second Amendment harm are unavailing, both because the Rule comports with the Second Amendment and because plaintiff has not demonstrated any concrete, imminent impairment of his fundamental right to armed self-defense. Moreover, although plaintiff claims that the Rule will cause him to suffer compliance costs or increase the risk of criminal prosecution, that is incorrect. Plaintiff may continue to acquire and possess short-barreled rifles so long as he does so in compliance with the NFA. The statutory registration requirement imposes no more than a de minimis burden, and the statutory tax—which was waived for previous possessors who registered by May 2023—is recoverable in a refund suit and thus not

irreparable. To the extent that plaintiff might nevertheless choose not to comply with the NFA, any resulting harm is self-inflicted and not irreparable.

The balance of the equities and the public interest also weigh against preliminary relief. The Rule serves important public values in promoting regulatory clarity and ensuring the effective implementation of the NFA's public-safety controls. Plaintiff barely contests those important interests. Instead, he primarily urges that those interests should be disregarded entirely if the Court concludes that the Rule is likely unlawful. But that position disregards the tentative nature of preliminary merits conclusions, and it is flatly inconsistent with binding Supreme Court precedent— including, for example, the Court's decision in *Winter v. NRDC*, 555 U.S. 7 (2008), where the Court assumed the challenged agency action was unlawful but nevertheless reversed a preliminary injunction against it on the basis of equitable balancing.

**IV.** At a minimum, this Court should reject plaintiff's request for universal relief as overbroad. Constitutional and equitable principles require a court to limit equitable relief to redressing the injuries of specific plaintiffs before the court. Here, a tailored injunction or stay is all that is necessary to redress the individual plaintiff's alleged injuries.

## STANDARD OF REVIEW

This Court "has a duty to analyze its own jurisdiction de novo." *National Shipping Co. of Saudi Arabia v. Valero Mktg. & Supply Co.*, 963 F.3d 479, 481 (5th Cir. 2020) (quotation omitted). It reviews the denial of a preliminary injunction for abuse

of discretion. *See Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 418-19 (5th Cir. 2001).

## ARGUMENT

### I. This Court Should Dismiss This Appeal for Lack of Jurisdiction

As the government explained in its motion to dismiss, this Court lacks jurisdiction over this appeal because plaintiff prematurely filed his notice of appeal before the district court could resolve his motion for preliminary relief. That defect in this Court's jurisdiction remains notwithstanding the district court's later denial of plaintiff's motion. And this Court does not have jurisdiction to review the merits of the district court's March 1 order because plaintiff never filed a notice of appeal of that interlocutory order.

**1.** As relevant here, this Court has jurisdiction over appeals from interlocutory orders "refusing" injunctions. 28 U.S.C. § 1292(a)(1). But at the time that plaintiff initiated this appeal, the district court had not "refused" his motion for a preliminary injunction; instead, the court had simply not yet resolved the motion. "[M]ere inaction" standing alone "is not an order refusing injunctive relief, and is not appealable." *Overton v. City of Austin*, 748 F.2d 941, 951 (5th Cir. 1984).

In any event, the district court has now resolved the motion, confirming that it had been "evaluating the merits" of plaintiff's request for injunctive relief and had "intended to expeditiously consider" that request when plaintiff divested the court of jurisdiction by filing his notice of appeal. *Watterson v. ATF*, No. 23-CV-80, 2024 WL

897595, at *9 (E.D. Tex. Mar. 1, 2024). Because the district court has now ruled, there can be no question that this appeal—challenging the purported "effective denial" of plaintiff's motion, ROA.1016—should be dismissed.

**2.** Plaintiff cannot bring the merits of the district court's March 1 order before this Court in this appeal.

Plaintiff's suggestion that the district court's later denial of his preliminary injunction somehow cures any defect in this Court's jurisdiction must be rejected. *See* Appellant's Suppl. Br. 2-3, 3 n.1 (Mar. 13, 2024). To the contrary, the district court's actual denial of plaintiff's motion only exacerbates the jurisdictional defects with this appeal.

A notice of appeal is required to "designate the judgment—or the appealable order—from which the appeal is taken." Fed. R. App. P. 3(c)(1)(B). Here, in an attempt to meet that requirement, plaintiff's notice of appeal designated the purported "effective denial" of his motion for preliminary relief as the order from which he was appealing. ROA.1016. As explained, there never was an "effective denial"; but even assuming there were, there is now an actual denial, the merits of which plaintiff wishes this Court to review. But plaintiff has not filed a new notice of appeal designating that order.

Plaintiff has previously relied on this Court's decision in *Thomas v. Pohlmann*, 681 F. App'x 401, 405 (5th Cir. 2017) (per curiam), to suggest that a premature notice of appeal may ripen upon entry of an appealable order. *See* Appellant's Suppl. Br. 3

n.1 (Mar. 13, 2024). That reliance is misplaced. In *Thomas*, this Court stated that it is permissible to exercise jurisdiction over a premature notice of appeal from an order that could have been certified "as a final judgment under Rule 54(b)" so long as the district court subsequently "enter[s] a final judgment." *Thomas*, 681 F. App'x at 405. And that rule seems to parallel a similar situation specifically addressed by the Federal Rules of Appellate Procedure, which contemplate the permissibility of filing a notice of appeal "after the court announces a decision or order" but "before the entry of the judgment or order." Fed. R. App. P. 4(a)(2).

But nothing about that narrow rule helps plaintiff here. For one, plaintiff's initial notice of appeal did not simply prematurely designate an order that later became appealable. Instead, as explained, plaintiff purported to take an appeal from a non-appealable non-order. And that notice of appeal does not designate—and thus provides no basis to review—the since-entered and distinct denial of plaintiff's motion for preliminary relief. *Cf.* Fed. R. App. P. 3(c)(1)(B) (requiring the designation of the specific "appealable order" "from which the appeal is taken"). Moreover, unlike in *Thomas*, the district court in this case has not yet entered a final judgment. Thus, this case is governed by the usual rule: a notice of appeal taken from an order that "is not an appealable order" must be dismissed, even where the district court later enters a related appealable order. *Calmaquip Eng'g W. Hemisphere Corp. v. West Coast Carriers Ltd.*, 650 F.2d 633, 635-36 (5th Cir. Unit B 1981); *cf. id.* at 636 ("[O]nce the

appellant realized that its first notice of appeal might be premature, it wisely chose to perfect another appeal after the entry of final judgment[] . . . .").

Moreover, exercising jurisdiction over plaintiff's premature appeal in this case would generate substantial practical problems. The appellate record, generated when plaintiff filed his appeal before the district court's ruling, is incomplete. And plaintiff's opening brief fails to engage with the district court's reasoning in denying his motion for preliminary relief. Normally, that failure alone would be sufficient to reject plaintiff's arguments as forfeited: "One way that an appellant can forfeit an argument is by failing to adequately brief the argument on appeal," and "[t]o be adequate, a brief must address the district court's analysis and explain how it erred." *SEC v. Hallam*, 42 F.4th 316, 327 (5th Cir. 2022) (quotation omitted).

## II.     Plaintiff Is Not Likely to Succeed on the Merits

### A.     The Rule Comports with the Statute

At the outset, the district court properly concluded that plaintiff is not likely to succeed on his claim that the Rule contravenes the terms of the NFA. The Rule directly incorporates the relevant statutory language and correctly interprets the statutory intent-based standard as requiring an analysis of all relevant evidence—including objective evidence—of intent. Plaintiff's contrary arguments rest on a fundamental misunderstanding of the Rule and the statute.

**1.** The Rule properly interprets the statutory definition of "rifle." Under the NFA, a firearm is a "rifle" if it is "designed," "made," and "intended to be fired from

the shoulder." 26 U.S.C. § 5845(c). The Rule tracks this language: A firearm with a stabilizing brace is a "rifle" when it "provides surface area that allows the weapon to be fired from the shoulder" and other evidence "indicate[s] that the weapon is designed, made, and intended to be fired from the shoulder." 88 Fed. Reg. at 6569. The Rule explains how ATF will apply the statutory definition to a particular context: assessing whether a weapon equipped with a brace is designed and intended to be shoulder-fired.

Beyond this, the Rule primarily clarifies two features of the statutory inquiry. First, the Rule makes clear that whether a braced firearm is designed and intended to be fired from the shoulder cannot be determined solely by reference to a manufacturer's claimed intent but instead is determined by evaluating other objective evidence of intent. *See* 88 Fed. Reg. at 6495. Second, the Rule catalogs the sort of evidence that ATF considers probative of whether a particular braced firearm is designed and intended to be fired from the shoulder. *See id.* at 6569-70. Both features of the Rule are consistent with the statute.

First, the NFA does not require ATF to uncritically accept a manufacturer's statements about whether its product is designed and intended to be fired from the shoulder—a proposition plaintiff does not seem to dispute. To the contrary, it is a "very familiar [approach] in the law" to use "objective" evidence to "ferret[] out a party's" true intent, notwithstanding the party's subjective representations. *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 601-02 (1st Cir. 2016) (collecting cases). That approach

20

makes particular sense in the context of the NFA because "it is hard to believe that Congress intended to invite manufacturers to evade the NFA's carefully constructed regulatory regime simply by asserting an intended use for a part that objective evidence" indicates is not "actually" the intended use. *Id.* at 602.

Multiple courts of appeals have therefore held that a product's intended use may be determined by reference to objective evidence of intent, including evidence of design features. For example, in *Sig Sauer*, the First Circuit upheld ATF's determination that a product was a silencer. Although the manufacturer claimed that the product was "intended for use as a muzzle brake"—that is, a "device that is added to a gun to reduce recoil"—ATF examined the product and determined, based primarily on evidence derived from the design of the product, that it was in fact intended for use only as a silencer. *See Sig Sauer*, 826 F.3d at 600, 602.

Similarly, in *United States v. Syverson*, 90 F.3d 227 (7th Cir. 1996), the Seventh Circuit affirmed a conviction for possession of an unregistered and unmarked silencer, in violation of the NFA, based on objective evidence of intent. Although the defendant in that case testified that "he had designed and manufactured" the item in question "to be a muzzle break," not a silencer, the court explained that there was evidence in the record "casting doubt on his professed intentions." *Id.* at 232. The court thus concluded, based on that evidence, that a jury could reasonably infer that the defendant's "description of the [item] was not credible" and that he had made it "to be a silencer." *Id.*

Second, ATF also properly identified evidence that will be probative of whether a particular braced firearm is designed and intended to be fired from the shoulder. In the Rule, ATF identified as potential evidence both the design features of the weapon—such as whether the weapon includes certain features useful for firing from the shoulder but not useful for one-handed firing—and the way the weapon is marketed and used in the real world. And the Rule's focus on design features and direct evidence is well-supported. As explained, it has long been established— including specifically in the NFA context—that a product's design may be probative of the question how the product is intended to be used. Likewise, it is appropriate for an agency to consider a manufacturer's "marketing materials" and the "likely use of the weapon in the general community" as direct and indirect evidence to test the manufacturer's "stated intent." 88 Fed. Reg. at 6479. "[T]he actual use of the item in the community" may be relevant to whether a product was "primarily intended" for a particular use. *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 519-20 (1994) (quotation omitted).

**2.** Plaintiff does not appear to dispute the Rule's interpretation of the statute as looking beyond stated intent. Indeed, plaintiff nowhere asserts that ATF must uncritically accept a firearm maker's statements about his intent and eschew objective evidence undermining that stated intent.

Instead, plaintiff primarily advances (at 32-34) a belief that the Rule states that a braced firearm is a "rifle" so long as it "could be fired from the shoulder," whereas

the NFA requires that a "rifle" be designed, made, and intended to be fired from the shoulder. But plaintiff misreads the Rule. As explained, under the Rule, for a braced firearm to be classified as a "rifle," the firearm must "provide[] surface area that allows the weapon to be fired from the shoulder" *and* all other relevant evidence taken together must "indicate that the weapon is designed, made, and intended to be fired from the shoulder." 88 Fed. Reg. at 6569. Thus, in relevant part, the Rule implements the statutory language and, like the statute, requires that a firearm be "designed, made, and intended" to be shoulder-fired to be a rifle.

Attempting to advance his erroneous understanding of the Rule, plaintiff also contends (at 33-34) that some of the factors identified by the Rule—such as the braced firearm's weight—"focus on whether the weapon *could* be fired from the shoulder" rather than on whether it is designed to be fired from the shoulder. That is incorrect. As explained, the bottom-line standard outlined in the Rule requires a showing that the firearm in question is designed, made, and intended to be shoulder-fired. And the Rule's discussion of the relevant factors explains at length why the specific characteristics that ATF has identified are relevant to that statutory standard—and not merely to the question of whether a firearm could be fired from the shoulder. *See* 88 Fed. Reg. at 6514-37. Thus, for example, whether a braced firearm has a weight comparable to the weight of a similar-model rifle is clearly relevant to the question whether it is designed and intended to be fired from the shoulder; the similarity of physical characteristics between a firearm made with a brace

and one made with a stock is clearly probative of whether the braced firearm is intended as a circumvention of the NFA's requirements that would unquestionably apply if a stock were used.

Plaintiff's additional argument (at 34) that the Rule cannot properly consider "videos or pictures of individuals using stabilizing braces to shoulder fire" also fails. ATF may consider the way in which a product is actually used as evidence of the manufacturer's intent. *See* 88 Fed. Reg. at 6544-48. Indeed, the Supreme Court has recognized that Congress may identify "factors [that] generally focus on the actual use of the item in the community" as relevant evidence of whether a product is "primarily intended" for a particular use. *Posters 'N' Things*, 511 U.S. at 519-20 quotation omitted). And plaintiff's suggestion (at 34-35) that similar logic would lead to the conclusion that keys are designed to open bottles of wine fails to account for the framework reflected in the Rule, which reflects a holistic inquiry to determine a braced weapon's intended use. A similar inquiry in the context of keys would, of course, reflect that keys are designed to open locks, not wine.

Finally, plaintiff briefly argues (at 36) that the Rule violates the statute because it allows for the belated registration of previously possessed braced short-barreled rifles, even though the statute does not contemplate the registration of firearms that were previously possessed in contravention of the statute. But plaintiff cannot demonstrate standing to challenge the portion of the Rule providing him and other possessors with additional compliance options, even if he thinks those options are not

otherwise authorized by statute. And regardless, the agency possesses enforcement discretion "to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." *United States v. Texas*, 599 U.S. 670, 678 (2023) (quotation omitted). The decision to permit previous possessors to register their firearms and come into compliance with the statute (rather than to take enforcement action against them) fits comfortably within that authority.

## B. Plaintiff's Concerns About the NFA's Delegation of Authority to the Agency Are Unavailing

The district court also properly concluded that plaintiff is not likely to succeed on his claims that the Rule reflects an unconstitutional delegation of authority and otherwise exceeds the agency's delegation of authority from the relevant statutes. The NFA constitutionally delegates power—constrained by intelligible principles—to the agency, and the Rule reflects a proper exercise of that delegated authority.

**1.a.** The Rule complies with nondelegation principles. Since the Founding era, the Supreme Court has held that "Congress may certainly delegate to others[] powers which the legislature may rightfully exercise itself." *Wayman v. Southard*, 23 U.S. (10 Wheat) 1, 43 (1825) (Marshall, C.J.). Delegations are constitutional so long as Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform." *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (second alteration in original) (quotation omitted). It is "constitutionally sufficient if Congress clearly delineates the general

policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Id.* at 372-73 (quotation omitted). These standards "are not demanding." *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 442 (5th Cir. 2020) (quotation omitted). Even though Congress has delegated authority from "the beginning of the government," *id.* (quotation omitted), the Supreme Court "has found only two delegations to be unconstitutional," *id.* at 446. One "provided literally no guidance for the exercise of discretion," and the other "conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 474 (2001) (first citing *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935); and then citing *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)).

In the almost 90 years since those decisions issued, the Supreme Court has consistently upheld "Congress' ability to delegate power under broad standards," *Mistretta*, 488 U.S. at 373, and "ha[s] almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law," *American Trucking*, 531 U.S. at 474-75 (quotation omitted). *See also Mistretta*, 488 U.S. at 374-77 (direction to promulgate the then-binding Sentencing Guidelines); *Yakus v. United States*, 321 U.S. 414, 420 (1944) (direction to fix "fair and equitable" commodities prices (quotation omitted)); *National Broad. Co. v. United States*, 319 U.S. 190, 224-26 (1943) (direction to regulate broadcast licensing as "public interest, convenience or necessity" requires (quotation omitted)).

Against the backdrop of these principles, it is plain that the NFA provides more than sufficient standards to guide agency decisionmaking, both generally and with respect to the definition of "rifle" at issue in this case. As a general matter, the NFA sets forth a clear federal policy: enforcing specific controls for narrow classes of particularly dangerous weapons to curtail their criminal misuse. *See generally* 26 U.S.C. §§ 5811-5812, 5821-5822, 5841, 5845(a). And the statute authorizes the Attorney General to issue "all needful rules and regulations for the enforcement" of those controls. *Id.* § 7805(a). In the context of the NFA's narrow but comprehensive regulatory scheme, that delegation of general rulemaking is more than sufficiently bounded to satisfy the requirements of nondelegation.

Moreover, the authority exercised in this specific case—to define the statutory term "rifle"—is even more closely bounded, as Congress has defined "rifle" to include, as relevant here, "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder," 26 U.S.C. § 5845(c). The agency is required to stay within the bounds of that definition even as it employs rulemaking to expound upon the proper application of the statutory term. It is thus unsurprising that plaintiff does not cite—and the government is not aware of—any case throughout the NFA's 90-year history holding that the statute violates principles of nondelegation.

The Rule also falls well within Congress' grant of authority to the agency. As explained, the NFA authorizes ATF to issue "all needful rules and regulations for the enforcement" of the statute, 26 U.S.C. § 7805(a), and as is well established, an agency

"must interpret the enactments Congress has charged them with enforcing and implementing," *Gonzales v. Oregon*, 546 U.S. 243, 255 (2006). The agency promulgated the Rule to ensure that ATF will consistently use "the proper legal and factual analysis" in applying the NFA's standard to braced firearms. 88 Fed. Reg. at 6502. And that clarity is particularly important here, where (as explained) previous inconsistencies in application led to substantial confusion among the regulated public and so the Rule is required to "ensure the public's awareness of the Department's best interpretation of the relevant statutory provisions." *Id.* at 6559. Having concluded that the Rule reflects the best interpretation of the statute, it is "needful" and "necessary" for the agency to follow that statutory mandate and to inform the regulated public of the agency's interpretation.

**b.** In response, plaintiff initially contends (at 40-44) that because only the legislature is "authorized to make an act a crime," *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019) (quotation omitted), Congress "cannot delegate the power to expand statutory definitions" about "criminal liability"; thus, plaintiff contends, the Rule violates principles of nondelegation because it "[d]efin[es] federal crimes." And similarly, plaintiff contends (at 49-50) that even if Congress could delegate such

authority, the NFA does not in fact given the agency any authority "to expand statutory definitions."[1]

But plaintiff's contentions fail to advance his argument. As explained, *see supra* pp. 19-25, the Rule incorporates the relevant language from the statute and thus defines as "rifles" only those braced firearms that are—in Congress' words— "designed," "made," and "intended" to be fired from the shoulder. The Rule provides guidance to the public regarding how ATF will go about applying that statutory definition to particular braced firearms. And, in providing that guidance, the Rule reflects the best meaning of the statute; ATF has not defended the Rule on any other basis and does not contend that the Rule should survive even if it does not reflect the proper interpretation of the statute. Thus, because the Rule does not go beyond the statutory standard, it does not define any new crimes, and plaintiff's concerns are misplaced.

Regardless, as plaintiff acknowledges, "the Supreme Court has sometimes blessed delegations that allow agencies to make actions a crime." Br. 44. There is thus no basis in precedent to hold that the Rule is unlawful simply on the basis that the underlying statute is criminal. And the NFA's broad grant of authority to the agency to issue "all needful rules and regulations," 26 U.S.C. § 7805(a), provides clear

---

[1] Plaintiff also argues (at 37-40) that, under the original meaning of the Constitution, Congress is forbidden from delegating any legislative power. As plaintiff recognizes, this view is inconsistent with Supreme Court precedent and, of course, "[t]his Court must follow Supreme Court precedent." Br. 39.

authority to the agency to promulgate rules where—as here—those rules are required to ensure the effective implementation of Congress' regulatory scheme. Nothing in the plain terms of that statutory grant of authority limits the agency's regulatory authority to the non-criminal context.

Plaintiff also briefly argues (at 44-46) that the NFA reflects a "total absence of guidance" from Congress on how the agency should exercise its authority. Br. 45 (quoting *Jarkesy v. SEC*, 34 F.4th 446, 462 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 2688 (2023)). But in so asserting, plaintiff entirely fails to grapple with the substantial intelligible principles constraining the agency's discretion, including, most fundamentally, the statutory definition of "rifle," which underlies every aspect of the Rule.

**2.** Plaintiff's further invocation (at 47-49) of the major questions doctrine fails to advance his contention that the Rule exceeds the agency's statutory authority. That doctrine applies only when an agency asserts an "[e]xtraordinary grant[] of regulatory authority." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). It is rooted in a presumption that Congress would speak clearly if it meant to "delegate a decision" of vast "economic and political significance" to an agency. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

This case bears none of the hallmarks of the handful of "extraordinary cases" where the Supreme Court has invoked the major questions doctrine. *West Virginia*, 597 U.S. at 723. Most fundamentally, the Rule is nothing "novel," *id.* at 716. ATF has

for decades implemented and enforced the NFA by providing regulated entities with the agency's views about how particular products—including, since their first invention a decade ago, braced firearms—would be classified under the statute. The Rule fits comfortably within that decades-old practice by articulating a framework for determining whether any particular braced firearm is a short-barreled rifle under the statute.

Indeed, nowhere does plaintiff appear to dispute that ATF has authority to classify products in individual adjudications or to issue regulations to guide those classifications. Nor does plaintiff develop any argument that the Rule is different in kind from the routine classifications and regulations that ATF has issued for decades or that it otherwise implicates any of the concerns identified by the Supreme Court that attend "extraordinary" claims of agency authority. *See West Virginia*, 597 U.S. at 723. Moreover, Congress' delegation of authority to the Attorney General to implement and enforce the NFA's terms is not framed in "cryptic" terms. *Id.* at 721 (quotation omitted). To the contrary, the NFA expressly authorizes the Attorney General to issue "all needful rules and regulations for the enforcement" of the statute. 26 U.S.C. § 7805(a). And plaintiff does not seriously contest that the Rule—which, again, just articulates ATF's approach to implementing the NFA as applied to braced firearms—fits within that grant of authority.

Instead, plaintiff's fundamental argument is simply that the Rule misinterprets the statute, not that the agency did not have authority to issue the Rule. The major

questions doctrine is thus of no moment here, and it provides no basis to hold that the Rule is invalid.

## C.    The Rule Complies with the Second Amendment

The district court also properly concluded that plaintiff was not likely to succeed on a claim that the Rule and the NFA violate the Second Amendment. *See Watterson*, 2024 WL 897595, at *16. To establish that violation, a plaintiff must show that the Rule implicates "the Second Amendment's text, as informed by history." *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 19 (2022). Plaintiff cannot clear that hurdle.

**1.** As the district court correctly held, short-barreled rifles are not protected by the Second Amendment, because they are dangerous and unusual weapons.[2] Like other NFA firearms, they have long been regulated due to their "quasi-suspect character," *Staples v. United States*, 511 U.S. 600, 611-12 (1994), and Congress has found they can "be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395 (1954). This reality arises from "their concealability" compared to long-barreled rifles and "their heightened ability to cause damage" compared to

---

[2] "Prior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision." *Jean v. Nelson*, 472 U.S. 846, 854 (1985) (quotation omitted). Therefore, if this Court reaches plaintiff's constitutional claims, it should do so only after addressing and rejecting plaintiff's statutory claims and, thus, concluding that the firearms regulated by the Rule are properly classified as short-barreled rifles under the NFA. Thus, this section speaks in terms of such short-barreled rifles.

handguns—"a function of the projectile design, caliber, and propellant powder used in the ammunition and the ability to shoulder the firearm for better accuracy." 88 Fed. Reg. at 6499.

For this reason, the Supreme Court has twice affirmed that short-barreled shotguns are dangerous and unusual weapons not protected by the Second Amendment. Shortly after the NFA's enactment, the Supreme Court rejected a Second Amendment challenge to the statute's restrictions on short-barreled shotguns. *United States v. Miller*, 307 U.S. 174, 178 (1939). And in *Heller*, the Court reaffirmed that conclusion, explaining that "short-barreled shotguns" are unprotected because they are not "in common use" for "lawful purposes like self-defense." *Heller*, 554 U.S. at 622-27 (quotation omitted). As the courts of appeals have repeatedly concluded, that principle applies equally to short-barreled rifles because there is "no constitutional distinction" between the two. *United States v. Stepp-Zafft*, 733 F. App'x 327, 329 (8th Cir. 2018) (per curiam); *see United States v. Cox*, 906 F.3d 1170, 1185 (10th Cir. 2018); *United States v. Gilbert*, 286 F. App'x 383, 386 (9th Cir. 2008) (unpublished).

This conclusion is confirmed by application of the approach this Court adopted in *Hollis v. Lynch*, 827 F.3d 436, 448-49 (5th Cir. 2016), for evaluating whether a firearm is dangerous and unusual. This approach considers the extent to which the firearm is regulated or banned and the absolute and relative number of that firearm in circulation.

33

Short-barreled rifles are substantially regulated—or banned—by jurisdictions across the country. Their regulation under the NFA reflects Congress' finding that they are particularly dangerous and "likely" to be "used for criminal purposes." *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) (plurality opinion); *see United States v. Serna*, 309 F.3d 859, 863 (5th Cir. 2002) ("In enacting gun control legislation Congress expressed the view that a short-barreled firearm, or sawed-off shotgun, when unlawfully possessed, is primarily used for violent purposes."); *United States v. Jennings*, 195 F.3d 795, 799 (5th Cir. 1999) ("[T]he primary reason that unregistered possession of [NFA] weapons is a crime is the virtual inevitability that such possession will result in violence."). And at least 30 States and the District of Columbia generally prohibit possession of short-barreled rifles outright or unless the NFA is followed,[3] which is comparable to the 34 States that impose similar restrictions on machineguns, *Hollis*, 827 F.3d at 450.

---

[3] Ala. Code § 13A-11-63(a); Alaska Stat. Ann. § 11.61.200(a)(3), (c), (h)(1)(D) (West); Ariz. Rev. Stat. Ann. § 13-3101(A)(8)(iv), (B); Cal. Penal Code §§ 16590(s), 33215 (West); Colo. Rev. Stat. Ann. § 18-12-102(1), (3), (5) (West); D.C. Code Ann. § 7-2502.02(a)(3) (West); Fla. Stat. Ann. § 790.221 (West); Ga. Code Ann. §§ 16-11-121(4), 16-11-122 (West); Haw. Rev. Stat. Ann. § 134-8(a), (d) (West); 720 Ill. Comp. Stat. Ann. 5/24-1(a)(7)(ii), 5/24-2(c)(7) (West); Iowa Code Ann. § 724.1C (West); La. Stat. Ann. § 40:1785; Md. Code Ann., Pub. Safety § 5-203(a)(2), (c) (West); Mich. Comp. Laws Ann. § 750.224b(1)-(3) (West); Mo. Ann. Stat. § 571.020(1)(6)(b) (West); Mont. Code Ann. § 45-8-340(1)(a), (3)(f), (4) (West); Neb. Rev. Stat. Ann. § 28-1203 (West); Nev. Rev. Stat. Ann. § 202.275(1), (3)(b) (West); N.J. Stat. Ann. §§ 2C:39-1(o), 2C:39-3(b); N.Y. Penal Law §§ 265.00(3)(c), (d), 265.01-b (McKinney); N.C. Gen. Stat. Ann. § 14-288.8 (West); N.D. Cent. Code Ann. § 62.1-02-03 (West); Ohio Rev. Code Ann. §§ 2923.11(F), (K), 2923.17(A), (C)(5) (West); Okla. Stat. Ann. tit. 21,

*Continued on next page.*

Moreover, out of the hundreds of millions of firearms in the United States, there are only approximately 530,000 registered short-barreled rifles. *See* ATF, P-5390.1, *Firearms Commerce in the United States: Annual Statistical Update 2021*, at 15-16.[4] Short-barreled rifles thus constitute a miniscule portion of all firearms and exist in numbers far lower than the benchmark numbers this Court and others have employed to indicate common use. *See Hollis*, 827 F.3d at 449-50 (citing other court decisions—including one later vacated on rehearing en banc—concluding that the possession of "50 million large-capacity magazines" and "8 million AR- and AK-platform semi-automatic rifles" suggested the weapons were in common use (quotation omitted)).

The relatively atypical nature of the short-barreled rifles regulated by the NFA is only underscored by the many firearms that Congress has left unregulated by that statute. In particular, the statute does not reach the most common firearms, including handguns ("the quintessential self-defense weapon," *Heller*, 554 U.S. at 629) and long rifles. Thus, the NFA's restrictions on short-barreled rifles "do not necessarily prevent law-abiding, responsible citizens from exercising their Second Amendment right to public carry." *Bruen*, 597 U.S. at 38 n.9 (quotation omitted).

---

§ 1289.18(B)-(E) (West); Or. Rev. Stat. Ann. § 166.272 (West); 11 R.I. Gen. Laws Ann. § 11-47-8(b) (West); S.C. Code Ann. §§ 16-23-230, 16-23-250; Tex. Penal Code Ann. §§ 46.01(10), 46.05(a)(1)(C) (West); Va. Code Ann. §§ 18.2-299, 18.2-300, 18.2-303.1 (West); Wash. Rev. Code Ann. § 9.41.190(1)(a), (4) (West); Wis. Stat. Ann. § 941.28(2)-(4) (West).

[4] *Available at* https://perma.cc/5BMN-LW3Y.

Congress' ability to regulate more heavily with respect to narrow, atypical classes of firearms it has deemed particularly dangerous—such as short-barreled rifles—is further supported by First Amendment precedent. As *Bruen* explained, "*Heller* repeatedly compared the right to keep and bear arms" to "the freedom of speech in the First Amendment." 597 U.S. at 24. And in that related context, the preservation of "ample alternative channels" of exercising the protected right is indicative of a permissible regulation. *See Ward v. Rock Against Racism*, 491 U.S. 781, 802 (1989); *see also International Women's Day March Planning Comm. v. City of San Antonio*, 619 F.3d 346, 370-71 (5th Cir. 2010) (upholding fees imposed on certain First Amendment processions in part because the regulatory regime provided "sufficient alternatives for expression unburdened by fees"). And here, plaintiff has not (and could not) demonstrate that the ample alternative firearms that they may possess free from the NFA's requirements "are inadequate" avenues of exercising their right to armed self-defense. *Ward*, 491 U.S. at 802. In other words, particularly in comparison to the firearms left unregulated by the NFA—including handguns—short-barreled rifles are not "in common use" (or "typically possessed") "for lawful purposes like self-defense." *Heller*, 554 U.S. at 624-25 (quotation omitted).

**2.** In response, plaintiff nowhere engages with the Supreme Court's analysis in *Miller* and *Heller*, attempts to draw a distinction between short-barreled rifles and the short-barreled shotguns addressed by those cases, or confronts the fact that short-barreled rifles are widely regulated and not commonly owned. Instead, plaintiff argues

(at 29-31) that short-barreled rifles are not, in a colloquial sense, "dangerous" or "unusual." Those arguments are not persuasive.

At the outset, plaintiff argues (at 29-30) that there are there are 3 million or more short-barreled rifles possessed in the United States (including braced firearms), which is more than the 200,000 stun guns Justice Alito's concurring opinion in *Caetano v. Massachusetts*, 577 U.S. 411 (2016) (per curiam), concluded sufficient to show common use. But plaintiff is doubly wrong.

First, the relevant comparator does not include the estimated 3 million stabilizing braces. If those braces have been used to make short-barreled rifles that have not been registered, possession of those weapons is unlawful. A decade of widespread violation of the NFA cannot create a constitutional right. In any event, even counted on plaintiff's terms, the number of short-barreled rifles remains well below the relevant benchmarks.

Second, and regardless, the absolute number of firearms is not dispositive of this inquiry under *Hollis*, which binds this Court and which also considers the extent to which the firearm is regulated and the relative number of that firearm in circulation. As explained above, both of those factors confirm that short-barreled rifles—which are heavily regulated by the federal government and States across the country and which are a small fraction of the total number of firearms owned—are not protected. And indeed, *Hollis* itself rejected a similar absolute-number argument based on the *Caetano* concurrence, explaining that Justice Alito's opinion did not rely on "the

absolute number by itself" but on the number of weapons "paired with the statistic that stun guns may be lawfully possessed in 45 states." 827 F.3d at 450. That additional consideration is particularly important in this context, where short-barreled rifles may be possessed only because Congress chose 90 years ago to regulate—rather than outright ban—their possession. Congress' decision to permit possession only subject to the NFA's controls of short-barreled rifles that were not in common use— and thus not protected by the Second Amendment—at the time of the NFA's enactment cannot be retroactively undermined by the weapons' proliferation subject to the statutory restrictions.

Separately, plaintiff argues (at 30-31) that short-barreled rifles are not dangerous because, in plaintiff's view, braces make pistols more accurate and, thus, less dangerous. But plaintiff's speculation about the dangerousness of short-barreled rifles is misguided. As is reflected in the NFA and in 30 States' laws, Congress and State legislatures have properly determined that short-barreled rifles—including short-barreled rifles made from stabilizing braces—are particularly dangerous and require additional regulation. As explained, that legislative judgment correctly rests on the particularly dangerous combination of concealability and lethality that short-barreled rifles (like short-barreled shotguns) embody. *See* 88 Fed. Reg. at 6499. And although plaintiff says that braced pistols' increased accuracy promotes safety, "accuracy, at least in the hands of killers, is not 'safe'—it is lethal," *Mock v. Garland*, 75 F.4th 563, 596 (5th Cir. 2023) (Higginson, J., dissenting).

Finally, plaintiff briefly asserts (at 28) that the burden in the common-use inquiry is on the government. That is incorrect. *Heller* explained that the Second Amendment "was widely understood to codify a pre-existing right, rather than to fashion a new one." *Heller*, 554 U.S. at 603. Because the Second Amendment "codified venerable, widely understood liberties," *id.* at 605, courts cannot look at the Amendment's text in isolation but must instead consider the text "according to the understandings of those who ratified it," *Bruen*, 597 U.S. at 28. And, as *Heller* explained, the right to bear arms was not understood in 1791 as "a right to keep and carry any weapon whatsoever," *Heller*, 554 U.S. at 626, but only as a right to possess firearms "'in common use at the time,'" *id.* at 627 (quotation nomitted). Because the "common use" inquiry relates to how the "pre-existing right" was understood at the time of the founding, it is part of *Bruen*'s textual inquiry. Regardless, the Court need not address this issue because the burden question is irrelevant here: as explained in this section, Supreme Court and this Court's precedent makes clear that short-barreled rifles are not protected by the Second Amendment.

## III. The Equitable Factors Do Not Support Preliminary Relief

Even assuming that plaintiff is likely to succeed on the merits, he cannot demonstrate that the equitable factors support entry of preliminary relief. As the district court properly concluded, plaintiff cannot demonstrate any irreparable harm. And regardless, any harm is substantially outweighed by the benefits of the Rule.

## A.      Plaintiff Has Not Demonstrated Irreparable Harm

The district court properly concluded that plaintiff had not demonstrated that he would suffer any irreparable harm. To substantiate irreparable harm, a plaintiff must at least show "a significant threat of injury from [an] impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023) (quotation omitted). The mere possibility of injury is not enough; injury must be "likely." *Id.* (emphasis omitted) (quoting *Winter v. NRDC*, 555 U.S. 7, 22 (2008)). As the motions panel in this appeal has already concluded, because the Rule is currently stayed, plaintiff cannot meet that burden. And regardless, plaintiff has not identified any irreparable harm that would be caused by the Rule's taking effect.

**1.** As the district court explained, plaintiff cannot demonstrate any irreparable harm because the Rule has been stayed in its entirety by a different district court. Plaintiff sought to stay the Rule or enforce the government from enforcing the Rule (and the NFA "in accordance with the Rule"). ROA.293. But right now, plaintiff has that relief because a different district court has stayed the Rule in its entirety, *see Britto v. ATF*, No. 23-CV-19, 2023 WL 7418291 (N.D. Tex. Nov. 8, 2023), and ATF is therefore not enforcing the Rule. For this reason, the motions panel in this appeal has already denied plaintiff a stay or injunction pending appeal on the rationale that there is no "need to grant emergency relief to the plaintiff" because the Rule is stayed nationwide, and there is thus no "concern that the Rule could be enforced against him

at this time." Order 2 (Mar. 21, 2024). That same reasoning compels affirmance of the district court below.

**2.** Regardless, the district court's denial of plaintiff's motion for preliminary relief should be affirmed because plaintiff has not demonstrated any irreparable harm attributable to the Rule. Plaintiff attempts to show irreparable harm through constitutional injury, compliance costs, and prosecution risk. None of these showings succeed, and the court may be affirmed on this basis alone.

*Constitutional injury.* Plaintiff's attempt to leverage his Second Amendment claim into the requisite irreparable injury fails at each step. First, as explained, *see supra* pp. 32-39, plaintiff's Second Amendment claim is unlikely to succeed on the merits, undermining any claim to irreparable constitutional injury.

Regardless, this Court's precedents make clear that the mere "invocation" of a constitutional right "cannot substitute for the presence of an imminent, nonspeculative irreparable injury." *Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016). Rather, that showing may only be made where the impairment of a constitutional right inflicts an immediate and significant real-world injury, as with limitations on the freedom of speech or conscience. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976). And here, plaintiff has identified no such injury—as explained, plaintiff may continue to make, possess, and transfer braced short-barreled rifles so long as he complies with the NFA's relatively modest requirements. There is thus no risk of any

immediate and significant injury to his Second Amendment right to keep and bear firearms for self-defense.

In response, plaintiff argues that his allegations of constitutional violations alone—even in the absence of a likelihood of success on the merits of that claim or any real-world impairment of his right—are sufficient to establish irreparable harm. Br. 53 (citing *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295-97 (5th Cir. 2012)). But his reliance on *Opulent Life* is misplaced. There, the plaintiff church developed substantial arguments that the defendant city's zoning ordinance violated its rights under the Religious Land Use and Institutionalized Persons Act, and this Court found that the "record [wa]s replete with evidence of irreparable harm to [the plaintiff's] ability to freely exercise its religion," including substantial evidence that the plaintiff's current (too-small) building was unable to accommodate "programs [the plaintiff] considers essential to its religious mission" and had "already prevented would-be members from joining." 697 F.3d at 296; see also *id.* at 288-94 (addressing the plaintiff's religious liberty arguments on the merits). Nothing in the holding of that case supports the remarkable proposition that any allegation of a constitutional violation—even if meritless—necessarily supports a finding of irreparable harm.

*Compliance costs.* Despite plaintiff's protests (at 54-55), the Rule also does not impose any cognizable compliance cost. To constitute irreparable harm, compliance costs must be "more than de minimis," *Restaurant Law Ctr. v. Department of Labor*, 66 F.4th 593, 600 (5th Cir. 2023) (quotation omitted), and it is plaintiff's burden to

42

substantiate such harm. Plaintiff has not provided any evidence that the Rule—as opposed to the NFA—would impose harm. And even the NFA's requirements are relatively modest: besides the $200 tax, the NFA requires that an individual who wishes to make or transfer a covered firearm must receive approval and register and mark the firearm. Such minor regulatory burdens are "merely 'additional costs and logistical hurdles' that all citizens bear as ancillary to living under a government." *Bezet v. United States*, 714 F. App'x 336, 340 (5th Cir. 2017). Indeed, the only economic harm identified by plaintiff (at 55) associated with compliance stems from the "time and resources" "to file a registration application." But plaintiff fails to quantify those costs, which appear "so nominal as to be de minimis." *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1314 (5th Cir. 1976). In short, the burdens of regulatory compliance are not extraordinary and do not reflect harm so "certain and great and of such imminence that there is a clear and present need for equitable relief." *Morehouse Enters., LLC v. ATF*, 78 F.4th 1011, 1017 (8th Cir. 2023) (quoting *Dakotans for Health v. Noem*, 52 F.4th 381, 392 (8th Cir. 2022)).

Separately, although the NFA requires that the maker or transferor of a covered firearm pay a $200 tax, that tax cannot constitute irreparable harm because it is remediable by a tax refund. An individual who pays the tax but believes the statute does not cover his weapon may request, or sue for, a refund. *See* 26 U.S.C. § 7422. That refund-suit remedy "offer[s a taxpayer] a full, albeit delayed, opportunity to litigate the legality" of a disputed tax. *Bob Jones Univ. v. Simon*, 416 U.S. 725, 746 (1974).

Such a "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irreparable harm." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (alteration in original) (quotation omitted).

Beyond that, plaintiff argues (at 55-56) that he suffers irreparable harm because if he registers his braced weapon, he "would need to get authorization from the Attorney General or ATF before he could transfer his braced weapon or travel with it across state lines."[5] But plaintiff has not explained any concrete intent to transport his short-barreled rifle across state lines or to transfer it to another person. Nor has he explained why he could not receive the relevant approval before choosing to engage in that conduct.

*Prosecution risk.* Although the costs of complying with the NFA are minimal, plaintiff further argues (at 52) that he suffers irreparable harm based on a perceived threat of criminal prosecution if he chooses not to comply with the statute. But it is undisputed that he may continue to make, possess, and transfer short-barreled rifles—with no threat of criminal or civil liability—so long as he complies with the NFA's requirements. Plaintiff cannot manufacture irreparable harm simply by choosing not

---

[5] Plaintiff also suggests that harms associated with registering his short-barreled rifle are irreparable because registration cannot be "undone." Br. 55. But that is not accurate. ATF accepts requests to remove a firearm from the National Firearms Registration and Transfer Record, *see* ATF, *Firearms Question and Answer* (Mar. 23, 2023), https://perma.cc/AVG8-ALPA, and could certainly remove a firearm if directed to do so by a court order.

to take advantage of this penalty-free registration period and not to comply with minimally burdensome statutory requirements. Any such harm would constitute "self-inflicted" injury that "does not qualify as irreparable." *Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (per curiam) (quotation omitted).

## B. The Balance of the Equities Favor the Government

Even assuming plaintiff had demonstrated some irreparable harm, his minimal asserted harms could not outweigh the countervailing public interest in public safety and in regulatory clarity.

**1.** As an initial matter, the Rule promotes regulatory clarity and consistency. ATF's previous case-by-case "classification determinations had led to confusion" about how to evaluate a braced firearm and inconsistent determinations. *See* 88 Fed. Reg. at 6484 n.26, 6494. Thus, the Rule provides an in-depth explanation of the proper approach for the benefit of the agency and the regulated public. Enjoining the Rule would promote confusion and might require ATF to revert to an outdated approach "that no longer reflects its current enforcement thinking," which "is not in the public interest." *MediNatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021).

Second, the NFA, and the Rule clarifying its application, benefit public safety. As explained, Congress has found that short-barreled rifles are powerful concealable weapons that can "be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395, and has established a registration-and-taxation scheme to track such firearms to keep them away from non-law-abiding citizens. The Rule reinforces those

45

controls that Congress deemed necessary for public safety by preventing circumvention of the requirements.

**2.** In response, plaintiff initially attempts to evade the balancing of the equities by arguing (at 57-59) that the countervailing government and public-interest equities should be discounted if plaintiff is likely to succeed on the merits, because there is no public "interest in enforcing a regulation that violates federal law." *Alliance for Hippocratic Med. v. U.S. FDA*, 78 F.4th 210, 251 (5th Cir. 2023).

But that position rests on a fundamental misapplication of the preliminary injunction framework and calls into question this Court's decision in *Mock*, which recognized that to succeed "[t]here must be irreparable harm, and the balance of equities and the public interest must favor injunctive relief." 75 F.4th at 586-87. The Court did not simply direct the district court in *Mock* to enter injunctive relief or to consider only whether there was sufficient irreparable harm.

The Court's direction was consistent not only with the inherently tentative nature of a merits determination at the preliminary relief stage but also with Supreme Court precedent. As *Winter*—a suit against the government—explained, the preliminary injunction framework requires distinct merits and equities showings— and, in all cases, courts are required to "balance the competing claims of injury" and "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." 555 U.S. at 24 (quotation omitted). And indeed, in *Winter* itself, the Supreme Court declined to "address the lower courts' holding that plaintiffs" had

"established a likelihood of success on the merits." *Id.* at 23-24. Nonetheless, the Court ultimately reversed the lower courts' entry of a preliminary injunction, concluding "that the balance of equities and consideration of the overall public interest" weighed in favor of the government—notwithstanding the Court's acceptance of the lower courts' conclusion that the agency action in question was likely unlawful. *Id.* at 26. Similarly, the Supreme Court "has consistently rejected invitations" in the copyright context "to replace traditional equitable considerations with a rule that an injunction automatically follows a determination" that a defendant acted illegally. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 392-93 (2006). And that is true even at final judgment, when a court's conclusion regarding a defendant's illegal action is final rather than—as at the preliminary relief stage—only tentative. *Id.*

At most, a determination that the Rule is likely unlawful may undermine the sovereign harm the government would otherwise experience from its inability to enforce the Rule. *Cf. Maryland v. King*, 567 U.S. 1301, 1302-03 (2012) (Roberts, C.J., in chambers). But Supreme Court precedent does not permit this Court to erase the tangible harms experienced by the regulated community and by victims of gun violence when the government's attempt to ensure consistent and complete implementation of the NFA is thwarted. Those interests must be weighed against plaintiff's alleged harms. And when that balance is properly conducted, it is clear that plaintiff has failed to demonstrate entitlement to preliminary relief.

Separately, plaintiff contends (at 60-61) that the public-safety benefits of the Rule are speculative because—in plaintiff's view—the NFA may not stop criminals from acquiring braced short-barreled rifles and because the Rule points to "only" two mass shootings and "less than 300" criminal investigation tied to braced firearms. But that attempt to second-guess Congress' public-safety determination is unavailing because it is Congress—not plaintiff and not this Court—that is in the best position to determine the necessary controls to enhance public safety. And as the Supreme Court has explained, the NFA reflects Congress' determination that regulated weapons have a "quasi-suspect character," *Staples*, 511 U.S. at 611-12, and can "be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395. And plaintiff's speculation does little to undermine the legislative judgment that the NFA's requirements help track "the flow of [NFA] firearms" to ensure that they stay away from criminals, *Bezet v. United States*, 276 F. Supp. 3d 576, 612 (E.D. La.), *aff'd*, 714 F. App'x 336 (5th Cir. 2017), and enable the prosecution of criminals who evade that scheme. In this way, the Rule furthers the legislative judgment that such firearms should be regulated.

## IV.    Any Preliminary Relief Must be Tailored to the Plaintiff

Even setting aside the merits, plaintiff requests overbroad relief that this Court should decline to grants. At a minimum, any relief should be limited to remedying plaintiff's own asserted irreparable harm and, thus, should not extend to staying (or enjoining enforcement of) the Rule on a universal basis.

**1.** Nationwide relief is never appropriate in a case, such as this one, where a tailored injunction would fully protect the interests of the named plaintiff. Article III "limits the exercise of the judicial power to 'Cases' and 'Controversies.'" *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 438 (2017). Consistent with that limitation, a court may entertain a suit only by a plaintiff who has suffered a concrete injury and may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1929-30 (2018) (quotation omitted).

Principles of equity reinforce that constitutional limitation. A federal court's authority is generally confined to the relief "traditionally accorded by courts of equity" in 1789. *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). And it is a longstanding principle of equity that, at most, injunctive relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Thus, English and early American "courts of equity" typically "did not provide relief beyond the parties to the case." *Trump v. Hawaii*, 138 S. Ct. 2392, 2427 (2018) (Thomas, J., concurring).

Those principles are buttressed here by the text and history of the APA. Section 705 itself permits a court to stay agency action only "to the extent necessary to prevent irreparable injury," 5 U.S.C. § 705, which explicitly incorporates the constitutional and equitable limitations on non-party relief. Indeed, the legislative history of that provision makes clear that Congress intended that § 705 relief would be "equitable" and used only "to prevent irreparable injury." H.R. Rep. No. 79-1980,

at 43 (1946). Thus, consistent with equitable principles, Congress understood that "[s]uch relief would normally, if not always, be limited to the parties complainant." *Id.* And, more generally, the APA makes explicit that its provisions do not affect "the power or duty of the court" to "deny relief on" any "equitable ground." 5 U.S.C. § 702(1). The APA therefore requires courts to decline to enter nationwide relief, however styled, where other remedies would fully redress a plaintiff's injuries.

Nationwide relief—whether styled as an injunction or a stay—also creates well catalogued legal and practical problems. Such relief circumvents the procedural rules governing class actions, which permit relief to absent parties only if rigorous safeguards are satisfied. Fed. R. Civ. P. 23. It enables forum shopping and empowers a single district judge to effectively nullify the decisions of all other lower courts by barring application of a challenged policy in any district nationwide. *Department of Homeland Sec. v. New York*, 140 S. Ct. 599, 601 (2020) (Gorsuch, J., concurring in the grant of stay). And it "short-circuit[s] the decisionmaking benefits of having different courts weigh in on vexing questions of law" and overburdens courts' "emergency dockets." *See Arizona v. Biden*, 40 F.4th 375, 395-98 (6th Cir. 2022) (Sutton, C.J., concurring); *see also Texas*, 599 U.S. at 702-04 (Gorsuch, J., concurring in the judgment).

**2.** In light of these principles, plaintiff's request (at 64-66) for a universal stay of the Rule is improper. Plaintiff has demonstrated no entitlement to relief in any event, but even assuming any relief were proper, a tailored stay or preliminary injunction

would fully alleviate plaintiff's claimed irreparable injury by permitting him to continue to possess his braced firearms without complying with the NFA while this litigation is pending. No broader relief is therefore necessary.

In response, plaintiff hypothesizes various continuing harms that tailored relief may not address, such as the risk of prosecution by the State of Texas (for state-law violations) and the risk that he may be prosecuted if he ultimately loses this case on the merits. But those hypothesized harms provide no basis for universal relief. To the extent that plaintiff is concerned about possible actions by the State of Texas or by the federal government after interim relief is dissolved, nothing about the scope of the interim relief could address those concerns: Neither universal nor targeted relief against the federal defendants can bind the State of Texas, and the difference between those two forms of relief has nothing to do with the question whether the federal government may enforce against plaintiff after final judgment dissolves the interim relief. To the contrary, targeted relief and universal relief will equally redress plaintiff's underlying concern that he could face prosecution as a result of the Rule during this litigation.

Similarly, plaintiff argues (at 64) that he needs a universal stay because otherwise, "the Rule's revocation of prior classification letters remains in effect," so the Rule would continue to "chill" his "Second Amendment rights." As explained, the Rule does not implicate the Second Amendment, *see supra* 32-39, but regardless, a tailored stay or injunction that prevents enforcement against plaintiff would entirely

redress any chilling concerns as relevant to plaintiff during this litigation. Because any broader relief would be more burdensome than necessary, such relief is not appropriate.

## CONCLUSION

For the foregoing reasons, this appeal should be dismissed for lack of jurisdiction, or the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

DAMIEN M. DIGGS
*United States Attorney*

ABBY C. WRIGHT
SEAN R. JANDA

*s/ Ben Lewis*
BEN LEWIS
*Attorneys, Appellate Staff*
*Civil Division, Room 7250*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-2494*

April 2024

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Ben Lewis*
Ben Lewis

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12979 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Ben Lewis*
Ben Lewis

# ADDENDUM

# TABLE OF CONTENTS

The Administrative Procedure Act
    5 U.S.C. § 702 ........................................................................................ A1
    5 U.S.C. § 705 ........................................................................................ A2

The National Firearms Act
    26 U.S.C. § 5811 ................................................................................... A3
    26 U.S.C. § 5812 ................................................................................... A4
    26 U.S.C. § 5821 ................................................................................... A5
    26 U.S.C. § 5822 ................................................................................... A6
    26 U.S.C. § 5841 ................................................................................... A7
    26 U.S.C. § 5845 ................................................................................... A8

Other Provisions of Title 26 of the U.S. Code
    26 U.S.C. § 7801 ................................................................................. A10

# The Administrative Procedure Act

**5 U.S.C. § 702**

## § 702. Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

**5 U.S.C. § 705**

**§ 705. Relief pending review**

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

# The National Firearms Act

**26 U.S.C. § 5811**

## § 5811. Transfer tax

**(a) Rate.**—There shall be levied, collected, and paid on firearms transferred a tax at the rate of $200 for each firearm transferred, except, the transfer tax on any firearm classified as any other weapon under section 5845I shall be at the rate of $5 for each such firearm transferred.

**(b) By whom paid.**—The tax imposed by subsection (a) of this section shall be paid by the transferor.

**(c) Payment.**—The tax imposed by subsection (a) of this section shall be payable by the appropriate stamps prescribed for payment by the Secretary.

**26 U.S.C. § 5812**

**§ 5812. Transfers**

**(a) Application.**—A firearm shall not be transferred unless (1) the transferor of the firearm has filed with the Secretary a written application, in duplicate, for the transfer and registration of the firearm to the transferee on the application form prescribed by the Secretary; (2) any tax payable on the transfer is paid as evidenced by the proper stamp affixed to the original application form; (3) the transferee is identified in the application form in such manner as the Secretary may by regulations prescribe, except that, if such person is an individual, the identification must include his fingerprints and his photograph; (4) the transferor of the firearm is identified in the application form in such manner as the Secretary may by regulations prescribe; (5) the firearm is identified in the application form in such manner as the Secretary may by regulations prescribe; and (6) the application form shows that the Secretary has approved the transfer and the registration of the firearm to the transferee. Applications shall be denied if the transfer, receipt, or possession of the firearm would place the transferee in violation of law.

**(b) Transfer of possession.**—The transferee of a firearm shall not take possession of the firearm unless the Secretary has approved the transfer and registration of the firearm to the transferee as required by subsection (a) of this section.

**5 U.S.C. § 5821**

**§ 5821. Making tax**

**(a) Rate.**—There shall be levied, collected, and paid upon the making of a firearm a tax at the rate of $200 for each firearm made.

**(b) By whom paid.**—The tax imposed by subsection (a) of this section shall be paid by the person making the firearm.

**(c) Payment.**—The tax imposed by subsection (a) of this section shall be payable by the stamp prescribed for payment by the Secretary.

**26 U.S.C. § 5822**

### § 5822. Making

No person shall make a firearm unless he has (a) filed with the Secretary a written application, in duplicate, to make and register the firearm on the form prescribed by the Secretary; (b) paid any tax payable on the making and such payment is evidenced by the proper stamp affixed to the original application form; (c) identified the firearm to be made in the application form in such manner as the Secretary may by regulations prescribe; (d) identified himself in the application form in such manner as the Secretary may by regulations prescribe, except that, if such person is an individual, the identification must include his fingerprints and his photograph; and (e) obtained the approval of the Secretary to make and register the firearm and the application form shows such approval. Applications shall be denied if the making or possession of the firearm would place the person making the firearm in violation of law.

**26 U.S.C. § 5841**

## § 5841. Registration of firearms

**(a) Central registry.**—The Secretary shall maintain a central registry of all firearms in the United States which are not in the possession or under the control of the United States. This registry shall be known as the National Firearms Registration and Transfer Record. The registry shall include—

    **(1)** identification of the firearm;

    **(2)** date of registration; and

    **(3)** identification and address of person entitled to possession of the firearm.

**(b) By whom registered.**—Each manufacturer, importer, and maker shall register each firearm he manufactures, imports, or makes. Each firearm transferred shall be registered to the transferee by the transferor.

**(c) How registered.**—Each manufacturer shall notify the Secretary of the manufacture of a firearm in such manner as may by regulations be prescribed and such notification shall effect the registration of the firearm required by this section. Each importer, maker, and transferor of a firearm shall, prior to importing, making, or transferring a firearm, obtain authorization in such manner as required by this chapter or regulations issued thereunder to import, make, or transfer the firearm, and such authorization shall effect the registration of the firearm required by this section.

**(d) Firearms registered on effective date of this Act.**—A person shown as possessing a firearm by the records maintained by the Secretary pursuant to the National Firearms Act in force on the day immediately prior to the effective date of the National Firearms Act of 1968 shall be considered to have registered under this section the firearms in his possession which are disclosed by that record as being in his possession.

**(e) Proof of registration.**—A person possessing a firearm registered as required by this section shall retain proof of registration which shall be made available to the Secretary upon request.

**26 U.S.C. § 5845**

## § 5845. Definitions

For the purpose of this chapter—

**(a) Firearm.**—The term "firearm" means (1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined in subsection I; (6) a machinegun; (7) any silencer (as defined in section 921 of title 18, United States Code); and (8) a destructive device. The term "firearm" shall not include an antique firearm or any device (other than a machinegun or destructive device) which, although designed as a weapon, the Secretary finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon.

**(b) Machinegun.**—The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

**(c) Rifle.**—The term "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge.

**(d) Shotgun.**—The term "shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of projectiles (ball shot) or a single projectile for each pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed shotgun shell.

**(e) Any other weapon.**—The term "any other weapon" means any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination

shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any such weapon which may be readily restored to fire. Such term shall not include a pistol or a revolver having a rifled bore, or rifled bores, or weapons designed, made, or intended to be fired from the shoulder and not capable of firing fixed ammunition.

***

# Other Provisions of Title 26 of the U.S. Code

**26 U.S.C. § 7801**

**§ 7801. Authority of Department of the Treasury**

**(a) Powers and duties of Secretary.**--

**(1) In general.**--Except as otherwise expressly provided by law, the administration and enforcement of this title shall be performed by or under the supervision of the Secretary of the Treasury.

**(2) Administration and enforcement of certain provisions by Attorney General.**--

**(A) In general.**--The administration and enforcement of the following provisions of this title shall be performed by or under the supervision of the Attorney General; and the term "Secretary" or "Secretary of the Treasury" shall, when applied to those provisions, mean the Attorney General; and the term "internal revenue officer" shall, when applied to those provisions, mean any officer of the Bureau of Alcohol, Tobacco, Firearms, and Explosives so designated by the Attorney General:

**(i)** Chapter 53.

**(ii)** Chapters 61 through 80, to the extent such chapters relate to the enforcement and administration of the provisions referred to in clause (i).

**(B) Use of existing rulings and interpretations.**--Nothing in the Homeland Security Act of 2002 alters or repeals the rulings and interpretations of the Bureau of Alcohol, Tobacco, and Firearms in effect on the effective date of such Act, which concern the provisions of this title referred to in subparagraph (A). The Attorney General shall consult with the Secretary to achieve uniformity and consistency in administering provisions under chapter 53 of title 26, United States Code.