No. 23-40556

# In the United States Court of Appeals For the Fifth Circuit

BLAKE J. WATTERSON,

*Plaintiff-Appellant,*

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; STEVEN DETTELBACH, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; UNITED STATES DEPARTMENT OF JUSTICE; MERRICK GARLAND, U.S. Attorney General; UNITED STATES OF AMERICA,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Texas

## APPELLANT'S REPLY BRIEF

ROBERT HENNEKE
CHANCE WELDON
MATTHEW MILLER
CLAYTON WAY CALVIN
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone: (512) 472-2700
Facsimile: (512) 472-2728

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.............................................................................iii

INTRODUCTION.........................................................................................1

ARGUMENT..............................................................................................1

   I.   THIS COURT HAS JURISDICTION OVER WATTERSON'S APPEAL. ........1

   II.   WATTERSON IS LIKELY TO SUCCEED ON THE MERITS. ....................5

      A.   The Rule, and the Statutes If the Rule Properly Interprets
          Them, Violate the Second Amendment. ....................................5

      B.   The Rule Violates Separation-of-Powers Principles. .................9

         1.   Congress may not delegate inherently legislative
             activity. ..............................................................................10

         2.   Congress did not provide the Department with an
             intelligible principle for promulgating the Rule. ..............18

      C.   The Rule Exceeds the Department's Statutory Authority.......20

   III.   THE REMAINING EQUITABLE FACTORS SUPPORT RELIEF. ............24

      A.   Irreparable Harm. ...................................................................24

      B.   Balance of the Equities and Public Interest. ...........................28

   IV.   THIS COURT SHOULD INSTRUCT THE DISTRICT COURT TO ISSUE
        BOTH EQUITABLE AND STATUTORY RELIEF. .................................30

CONCLUSION .........................................................................................33

CERTIFICATE OF COMPLIANCE ...............................................................34

CERTIFICATE OF SERVICE .......................................................................35

# TABLE OF AUTHORITIES

## *Cases*

*Alliance for Hippocratic Medicine v. FDA*,
  78 F.4th 210 (5th Cir. 2023) ................................................................ 29

*Britto v. ATF*, No. 23-CV-19,
  2023 WL 7418291 (N.D. Tex. Nov. 8, 2023) ................................ 24, 29

*BST Holdings, L.L.C. v. OSHA*,
  17 F.4th 604 (5th Cir. 2021) .............................................................. 26

*Calmaquip Engineering West Hemisphere Corp. v. West Coast
  Carriers, Ltd.*,
  650 F.2d 633 (5th Cir. Unit B 1981) ................................................. 4, 5

*Cargill v. Garland*,
  57 F.4th 447 (5th Cir. 2023) .............................................................. 15

*Carson v. American Brands, Inc.*,
  450 U.S. 79 (1981) ................................................................................ 3

*Clarke v. CFTC*,
  74 F.4th 627 (5th Cir. 2023) ................................................................ 3

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ........................................................................... 6, 7

*DOT v. Association of American Railroads*,
  575 U.S. 43 (2015) ..................................................................... passim

*Forrest General Hospital v. Azar*,
  926 F.3d 221 (5th Cir. 2019) .............................................................. 11

*Frein v. Pennsylvania State Police*,
  47 F.4th 247 (3d Cir. 2022) .............................................................. 7, 8

*Gordon v. Holder*,
  721 F.3d 638 (D.C. Cir. 2013) ........................................................... 28

*Gundy v. United States,*
    139 S. Ct. 2116 (2019)................................................................ passim

*In re Fort Worth Chamber of Commerce,*
    2024 U.S. App. LEXIS 10849 (5th Cir. May 4, 2024) ...........................2

*Industrial Union Department, AFL-CIO v. API,*
    448 U.S. 607 (1980)................................................................... 13

*Jarkesy v. SEC,*
    34 F.4th 446 (5th Cir. 2023) ..................................................... 18, 19

*Loving v. United States,*
    517 U.S. 748 (1996)................................................................... 12

*McCoy v. Louisiana State Board Of Education,*
    332 F.2d 915 (5th Cir. 1964)..........................................................3

*Mistretta v. United States,*
    488 U.S. 361 (1989)....................................................... 10, 11, 12, 15

*Mock v. Garland,*
    75 F.4th 563 (5th Cir. 2023) ...................................................... passim

*National Broadcasting Co. v. United States,*
    319 U.S. 190 (1943)................................................................... 16

*New York State Rifle & Pistol Association v. Bruen,*
    597 U.S. 1 (2022)................................................................... passim

*Opulent Life Church v. City of Holly Springs,*
    697 F.3d 279 (5th Cir. 2012)...................................................... 25, 26

*Panama Refining Co. v. Ryan,*
    293 U.S. 388 (1935)................................................................... 11

*R.J. Reynolds Vapor Co. v. FDA,*
    65 F.4th 182 (5th Cir. 2023) ......................................................... 29

*SEC v. Hallam,*
    42 F.4th 316 (5th Cir. 2022) ...........................................................5

*SEC v. Jarkesy,*
    143 S. Ct. 2688 (2023) ........................................................ 18

*Thomas v. Pohlmann,*
    681 F. App'x 401 (5th Cir. 2017) ........................................ 4

*Trans World Airlines v. Mattox,*
    897 F.2d 773 (5th Cir. 1990) ............................................ 26

*United States v. 1407 N. Collins St.,*
    901 F.3d 268 (5th Cir. 2018) ............................................ 3

*United States v. Lynd,*
    301 F.2d 818 (5th Cir. 1962) ............................................ 3

*United States v. Miller,*
    307 U.S. 174 (1939) ........................................................ 8

*Vanderstok v. Garland,*
    86 F.4th 179 (5th Cir. 2023) ............................................ 10

*Wayman v. Southard,*
    23 U.S. (10 Wheat.) 1 (1825) ..................................... 11, 13

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022) .................................................... 21

*Whitman v. American Trucking Associations,*
    531 U.S. 457 (2001) ........................................................ 17

*Winter v. NRDC,*
    555 U.S. 7 (2008) ............................................................ 29

*Yakus v. United States,*
    321 U.S. 414 (1944) ........................................................ 16

**Statutes**

18 U.S.C. § 921 ................................................................... 21

26 U.S.C. § 5821 ................................................................. 27

26 U.S.C. § 5845 ............................................................................... 21, 24

26 U.S.C. § 7805 ...................................................................................... 19

28 U.S.C. § 1292 ........................................................................................ 2

5 U.S.C. § 702 ......................................................................................... 31

5 U.S.C. § 705 ................................................................................... 31, 32

Tex. Pen. Code § 46.05 .......................................................................... 32

### Other Authorities

1 WILLIAM BLACKSTONE,
   COMMENTARIES ON THE LAWS OF ENGLAND (1765) ............................... 11

11A WRIGHT & MILLER,
   FED. PRAC. AND PROC. § 2962 (3d ed.) .................................................... 3

16 WRIGHT & MILLER,
   FED. PRAC. AND PROC. § 3924.1 (3d ed.) ................................................. 2

David Schoenbrod, *The Delegation Doctrine: Could the Court Give
   It Substance?*,
   83 MICH. L. REV. 1223, 1227 (1985) .................................................... 12

JOHN LOCKE,
   SECOND TREATISE OF CIVIL GOVERNMENT § 22 (J. Gough ed. 1947) .... 11

The Federalist ........................................................................... 10, 14, 15

### Regulations

Final Rule, *Factoring Criteria for Firearms With Attached
   "Stabilizing Braces,"*
   88 Fed. Reg. 6,478 (Jan. 31, 2023) ...................................................... 23

## INTRODUCTION

The Department's response brief is unpersuasive for several reasons. Principally, it relitigates a jurisdictional issue which has already been fully briefed, it does not apply the proper analyses for this case's constitutional issues, and it otherwise mischaracterizes the Department's activity under the relevant law. It therefore fails to show that the district court correctly denied Watterson's motion for preliminary relief.

## ARGUMENT

### I.   THIS COURT HAS JURISDICTION OVER WATTERSON'S APPEAL.

Rather than respond to Watterson's merits arguments, the Department spends a significant portion of its appellate brief relitigating the jurisdictional issues already addressed in the motion-to-dismiss briefing. Since that briefing concluded, this Court has ordered briefing on the merits, *see* ECF No. 29, and this case's constitutional and statutory questions are now presented squarely, as the Court requested.

There is no reason this Court should now dispose of this case and require Watterson to refile and re-brief his appeal, simply to attach it to one particular district court denial rather than another. That would defeat the purpose of this Court's March 21 order that the current

briefing be "carried with the case," ECF No. 68, and would obstruct this Court's March 25 request for merits briefing, ECF No. 71. The Court should ignore the Department's attempts to absorb it in an already-litigated issue. The Court should instead acknowledge its jurisdiction over this case and proceed to its decision on the motion, which is fully briefed upon the filing of this reply.

As Watterson has shown, *see* ECF Nos. 35, 66, this Court has jurisdiction over this case because under 28 U.S.C. § 1292(a)(1) it may review "orders that explicitly grant, continue, modify, refuse, or dissolve injunctions or that refuse to dissolve or modify injunctions, as well as to those that have the practical effect of doing so." "It's generally understood that a motion for preliminary injunctive relief 'must be granted promptly to be effective,' so if a district court does not timely rule on a preliminary-injunction motion, it can effectively deny the motion. We have accordingly recognized that simply sitting on a preliminary-injunction motion for too long can effectively deny it." *In re Fort Worth Chamber of Commerce*, 2024 U.S. App. LEXIS 10849, at *8 (5th Cir. May 4, 2024) (quoting 16 WRIGHT & MILLER, FED. PRAC. AND PROC. § 3924.1 (3d ed.)).

Before the district court eventually ruled on Watterson's motion for an injunction and motion to modify that injunction, that court's failure to provide relief beyond the issuance of the mandate in *Mock v. Garland* had the "practical effect" of "deny[ing] a preliminary injunction." *See Clarke v. CFTC*, 74 F.4th 627, 635 (5th Cir. 2023) (quoting *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 83 (1981)). *See also United States v. 1407 N. Collins St.*, 901 F.3d 268, 272 (5th Cir. 2018) (collecting cases); *McCoy v. La. State Bd. Of Educ.*, 332 F.2d 915, 917 (5th Cir. 1964); *United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962); 11A WRIGHT & MILLER, FED. PRAC. AND PROC. § 2962 (3d ed.) ("[W]hen a court declines to make a formal ruling on a motion for a preliminary injunction, but its action has the effect of denying the requested relief, its refusal to issue a specific order will be treated as equivalent to the denial of a preliminary injunction and will be appealable.").

Additionally, the district court's "explicit[]" order on March 1, 2024, denying Watterson's preliminary motions, unquestionably provides this Court with jurisdiction under § 1292(a)(1). Whether this Court's appellate jurisdiction is based on the district court's effective denial or the district court's "explicit[]" denial is at this point inconsequential

3

because an appellate court may "exercise[] jurisdiction over a premature notice of appeal when, subsequent to the filing of that notice of appeal and prior to our consideration, the district court entered a final judgment." *Thomas v. Pohlmann*, 681 F. App'x 401, 404-05 (5th Cir. 2017) (per curiam). The Department's attempt to cabin *Thomas*'s reasoning to situations involving "final judgment[s]" is unpersuasive.

The Department relies on *Calmaquip Engineering West Hemisphere Corp. v. West Coast Carriers, Ltd.* to support its strained jurisdictional argument. 650 F.2d 633, 635-36 (5th Cir. Unit B 1981). But, if anything, that case supports Watterson's position because the Court there faced two appeals of the same ruling and simply dismissed the redundant, premature one. *Id.* Here, the Court faces only one appeal and may simply preempt any redundancy by refraining from ordering another appeal. Moreover, Watterson's notice of appeal was not premature because, when it was filed, the district court had already effectively denied Watterson's preliminary motions, and that denial is appealable under § 1292(a)(1). Lastly, the *Calmaquip* Court "emphasize[d]" that "the appellant suffer[ed] no prejudice" from that dismissal, where it already had an another appeal before the Court. *Id.*

4

at 636. Here, requiring the parties to refile and re-brief the merits would cause Watterson prejudice because it would delay his relief from the violation of his constitutional rights.[1]

## II.  Watterson Is Likely to Succeed on the Merits.

### A. The Rule, and the Statutes If the Rule Properly Interprets Them, Violate the Second Amendment.

The Department continues to misapply the Second Amendment framework articulated by the Supreme Court in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). There the Supreme Court provided the following test—and the following test *only*—as the proper analysis for determining whether the Second Amendment has been violated:

> [W]hen the Second Amendment's *plain text* covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government … must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.

*Id.* at 17.

---

[1] Similarly, *SEC v. Hallam* is inapposite because it involved an appellant's failure to raise arguments in its opening brief. 42 F.4th 316, 327 (5th Cir. 2022). Watterson has exhibited no such failure, and his substantive arguments have not changed now that the district court's denial of relief for him is express.

The *Bruen* test is emphatically *not* the two-part test annunciated in *District of Columbia v. Heller*, 554 U.S. 570 (2008), that "[(1)] the government may justify its regulation by establish[ing] that the challenged law regulates activity falling outside the scope of the right as originally understood … based on its historical meaning… [and if at least inconclusively protected, then (2)] analyze … the severity of the law's burden on that right." *Bruen*, 597 U.S. at 18 (quotations omitted). *Bruen* jettisoned this test. *Id.* at 19. The Department therefore errs by applying *Heller*'s first step—its historical analysis—where *Bruen* instead creates a rebuttable presumption of constitutionality based on the Second Amendment's *plain text*.

Under the correct test, in *Bruen*, it is only after that presumption has been created that the historical analysis is undertaken to rebut it and justify the restriction. Unlike in *Heller*, where the Court "relied on the historical understanding of the Amendment to demark the limits on the exercise of that right," 554 U.S. at 626, *Bruen* relies on history and tradition to defend the restriction where the Second Amendment's plain text covers it. Both the Department and the district court misunderstood this.

Multiplying its error, the Department uses yet more language from *Heller* to argue "dangerous and unusual" weapons are excluded from the right altogether.  Appellees' Br. at 32.  This analysis does not follow *Bruen* because it attempts to exclude certain arms from constitutional protection rather than rebut the presumption of their constitutionality. Moreover, the term "dangerous and unusual" is dicta, even in *Heller*, and is not a standard for determining whether a firearm restriction is constitutional.  *See Heller*, 554 U.S. at 627.   Indeed, the discussion in *Heller* where this broad and subjective term is used actually emphasizes that weapons "in common use at the time" are protected.[2]  *Id.*

Under *Bruen*, the Second Amendment's plain text covers pistols with attached stabilizing braces because they are "bearable arms, even [though they] … were not in existence at the time of the founding." *Bruen*, 597 U.S. at 28.  *See also Frein v. Pa. State Police*, 47 F.4th 247, 254 (3d Cir. 2022) ("[T]he Supreme Court recently instructed us to closely scrutinize *all* gun restrictions for a historically grounded approach."). The government therefore bears the burden of "demonstrat[ing] that the

---

[2] Even so, stabilizing braces are not dangerous and unusual.  *See* Appellant's Br. at 28-31.  Instead, they make pistols "*safer.*"  *Mock v. Garland*, 75 F.4th 563, 588 (5th Cir. 2023) (Willett, J., concurring).  They are also in common use because between 3 million and 40 million of them have been sold.  ROA.195, 258.

regulation is consistent with this Nation's historical tradition of firearm regulation," and it may not "simply posit that the regulation promotes an important interest." *Id.* at 17. Here, rather than bear its burden under *Bruen*, the Department's attempts to exclude certain firearms altogether from the scope of the right, and does so *by* arguing the Rule, as well as the National Firearms Act ("NFA") and the Gun Control Act ("GCA") (collectively, the "statutes"), promote an important interest.

This approach is not supported by the caselaw. The Department cites *United States v. Miller*, 307 U.S. 174 (1939) to argue the arms at issue here are not even covered by the Second Amendment. Appellees' Br. at 33. But *Miller* was written long before *Bruen* crystalized the proper analysis for Second Amendment claims, and before *Heller* even articulated an individual right to keep and bear arms. The Department cites *Miller* and *Heller* to argue *short-barreled rifles* fall outside the Second Amendment's scope. *Id.* at 32-39. Yet it makes no attempt to show pistols with attached stabilizing braces are *in fact* short-barreled rifles. More fundamentally, short-barreled rifles themselves—and certainly pistols with attached stabilizing braces—do *not* fall outside the

scope of *Bruen*'s presumption, for which the touchstone is whether the arm is "bearable." 597 U.S. at 28.

Watterson is likely to succeed on the merits of his Second Amendment claim. The Department has not addressed the fact the Rule and the statutes fall within the Second Amendment's plain text. It has consequently not carried its burden of showing the Rule, and statutes insofar as the Rule correctly interprets them, are analogous to the Nation's history and tradition of firearm regulation, as it is required to do under *Bruen*. This Court should reject the Department's line of argumentation because it flouts binding Supreme Court precedent. The Rule does not accord with the Nation's historical firearm regulations.

## B. The Rule Violates Separation-of-Powers Principles.

Aside from violating the Second Amendment, the Rule also violates the structural provisions of the Constitution. The Department suggests *any* delegation of power by Congress to an executive agency is permissible so long as it guided by an intelligible principle, and then proceeds to analyze this case as if courts have made no meaningful distinction between legislative and executive activity. However, first, Congress may not delegate the sort of inherently legislative activity captured by the

Rule.  Second, in any case, Congress provided no intelligible principle here to guide the Department's enforcement of the statutes.

### 1. *Congress may not delegate inherently legislative activity.*

The Department argues any delegation is "constitutional so long as Congress lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform."  Appellees' Br. at 25 (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)).  This cannot be the case.  This overbroad argument neglects centuries of case law—and Founding Era documents[3]—highlighting the difference between legislative and executive activity in the context of delegations of power.  It is well-established "law-making power—the ability to transform policy into real-world obligations—lies solely with the legislative branch." *Vanderstok v. Garland*, 86 F.4th 179 (5th Cir. 2023).

"How much lawmaking power?  'All,' declares the Constitution's first substantive word." *Forrest Gen. Hosp. v. Azar*, 926 F.3d 221, 228

---

[3] *See, e.g.,* The Federalist Nos. 47-51 (James Madison).  Justice Thomas has observed that the Framers of the Constitution "were concerned not just with the starting allocation, but with the 'gradual concentration of the several powers in the same department.'" *DOT v. Ass'n of Am. R.R.*, 135 S. Ct. at 1244 (2015) (Thomas, J., concurring in the judgment) (quoting The Federalist No. 51, at 321 (James Madison)).

(5th Cir. 2019). This is because vesting the executive branch with the "right of both *making* and of *enforcing* the laws" is the definition of "a tyrannical government." *DOT v. Ass'n of Am. R.R.*, 575 U.S. 43, 72-74 (2015) (Thomas, J., concurring) (citing 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND (1765); and JOHN LOCKE, SECOND TREATISE OF CIVIL GOVERNMENT § 22, p. 13 (J. Gough ed. 1947)).

While "Congress may certainly delegate to others powers which the legislature may rightfully exercise itself," *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825), it cannot reassign powers that have been "assigned by the Constitution to the *exclusive* jurisdiction of any one of the three Branches of Government." *Mistretta*, 488 U.S. at 364. Accordingly, "Congress manifestly is not permitted to abdicate, or to transfer to others, the essential legislative functions with which it is thus vested." *Panama Refining Co. v. Ryan*, 293 U.S. 388, 421 (1935). The purpose of the nondelegation doctrine is to "bar[] Congress from transferring its legislative power to another branch of Government." *Gundy v. United States*, 139 S. Ct. 2116, 2121 (2019).

Courts have long expressed that the bar on delegation hinges on the *nature* of the delegated power, rather than merely its extent or the

11

standards by which it is delegated, as the Department suggests. The "test of permissible delegation should look not to what quantity of power a statute confers but to what kind—statutes should be permitted to create an occasion for the exercise of executive or judicial power, but not to delegate legislative power." David Schoenbrod, *The Delegation Doctrine: Could the Court Give It Substance?*, 83 MICH. L. REV. 1223, 1227 (1985).

The essential question "is whether the particular function requires the exercise of a certain *type* of power, [because] if it does, then only the branch in which that power is vested can perform it." *Ass'n of Am. R.R.*, 575 U.S. at 69 (2015) (Thomas, J., concurring in the judgment) (emphasis added). And because "legislative power is nondelegable," *Loving v. United States*, 517 U.S. 748, 777 (1996) (Scalia, J., concurring in part and concurring in the judgment) it follows, "[s]trictly speaking, there is *no* acceptable delegation of legislative power," *Mistretta*, 488 U.S. at 419 (Scalia, J., dissenting) (emphasis added).

Indeed, the Department's over-emphasis on intelligibility "would serve only to accelerate the flight of power from the legislative to the executive branch, turning the latter into a vortex of authority that was

constitutionally reserved for the people's representatives in order to protect their liberties." *Gundy*, 139 S. Ct. at 2142 (Gorsuch, J., dissenting). *See also Ass'n of Am. R.R.*, 575 U.S. at 76-86 (Thomas, J., concurring in the judgment) (explaining the problems with a less robust use of the nondelegation doctrine). To guard against this, the Court should view the issue not as a difference between permissible and excessive delegation, but between non-legislative activity and inherently legislative activity.

Courts have repeatedly identified a distinction between legislative and executive activity. However, it remains true "[t]he line has not been exactly drawn which separates those important subjects, which must be entirely regulated by the legislature itself, from those of less interest," *Wayman*, 23 U.S. (10 Wheat.) at 43. As it stands, agencies may be left to "fill up the details." *Indus. Union Dep't, AFL-CIO v. API*, 448 U.S. 607, 675 (1980) (Rehnquist, J., concurring). This often manifests itself in areas where the field being regulated is "sufficiently technical" and members of Congress are "not necessarily expert in the area." *Id.* However, "the core of the legislative power that the Framers sought to protect from consolidation with the executive is the power to make 'law'

in the Blackstonian sense of generally applicable rules of private conduct." *Ass'n of Am. R.R.* at 1245 (Thomas, J., concurring in the judgment). "When it came to legislative power, the framers understood it to mean the power to adopt generally applicable rules of conduct governing future actions by private persons—the power to 'prescrib[e] the rules by which the duties and rights of every citizen are to be regulated,' or the power to 'prescribe general rules for the government of society." *Gundy*, 139 S. Ct. at 2133 (Gorsuch, J., dissenting) (quoting The Federalist No. 78). Justice Thomas has elaborated on this view, grounding it in Blackstone, Greek and Roman treatment of the rule of law, English jurist Matthew Hale's writings on the scope of monarchical power, Lord Coke's opinion in the *Case of Proclamations*, John Locke's *Second Treatise of Civil Government*, and James Madison's views as expressed in Federalist No. 47. *See Ass'n of Am. R.R.*, 575 U.S. at 70-76 (Thomas, J., concurring in the judgment).

Here, the Rule modifies a statutory definition determining the scope of behavior subject to criminal prosecution. This is a paradigmatic example of "adopt[ing] applicable rules of conduct governing future actions by private persons." *Gundy*, 139 S. Ct. at 2133 (Gorsuch, J.,

dissenting). Statutes apply to the whole of the American people, and thus they "prescrib[e] the rules by which the duties and rights of every citizen are to be regulated." *Id.* (quoting The Federalist No. 78). Altering their meaning, therefore, is necessarily an inherently legislative activity.

The Department relies heavily on *Mistretta* in suggesting intelligibility is the only limiting principle on a delegation of power. Appellees' Br. at 25-26. But *Mistretta* involved the Sentencing Reform Act of 1984, and the power it delegated to the United States Sentencing Commission "to promulgate determinative-sentence guidelines," acting "as an independent commission in the *judicial* branch of the United States." 488 U.S. at 368-69 (quotation omitted) (emphasis added). That case was also decided significantly before this Court had the opportunity to address situations like the one at hand. *See, e.g., Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023). It is one thing for an agency to establish judicial bodies with the power to standardize sentences for those who have already committed crimes defined by Congress. It is quite another to delegate the act of *defining* a crime (by definitively altering the interpretation of a statutory term) to the unelected bureaucrats of an executive agency. There is no reason to read *Mistretta* as requiring the

Department be able to alter the scope of criminal liability to which "future actions by private persons" are subject. *Gundy*, 139 S. Ct. at 2133 (Gorsuch, J., dissenting).

Because the Rule vastly expands the statutes' application to new individuals, the present case is also distinguishable from the other cases the Department cites. It does not involve setting rates on already-regulated commodities, *see Yakus v. United States*, 321 U.S. 414 (1944); or determining the applicability of a crime-registration requirement to already-convicted criminals, *see Gundy*, 139 S. Ct. at 2123-25; or regulating licensure within a limited space over which Congress has already asserted plenary authority, *see National Broad. Co. v. United States*, 319 U.S. 190 (1943). Instead, this case in which an agency is augmenting a statutory term by executive fiat, and thereby applying it more expansively to the American citizenry at large. *See Gundy*, 139 S. Ct. at 2123 (noting if the statute had granted the Attorney General authority to determine the statute's "applicability to [certain] offenders—to require them to register, or not, as she sees fit, and to change her policy for any reason and at any time," as the Department effectively argues the

NFA and GCA give it the authority to do, then the Court "would face a nondelegation question").

This case presents this Court with the opportunity to clarify the contours of inherently legislative activity, and thereby clarify when delegations are impermissible. Far from being bound to accept the Department's virtually limitless position giving no regard to the nature of the delegated power, the Court may give proper meaning to the acknowledged role the power's nature must play in determining whether it can be delegated at all. "Whether the statute delegates legislative power is a question for the courts, and an agency's voluntary self-denial has no bearing upon the answer." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 473 (2001). This case also presents the Court with the most appropriate place to draw the line: the reworking of a statutory term to which criminal penalties attach, and which covers a vast swathe of the American population. *See, e.g., Mock v. Garland*, 75 F.4th 563, 574 (5th Cir. 2023) (noting under the Rule, "approximately 99% of pistols with stabilizing braces would be classified as rifles").

**2.** ***Congress did not provide the Department with an intelligible principle for promulgating the Rule.***

Even if Congress could delegate the authority the Department claims it has (and it cannot), the statutes would still have to provide an intelligible principle for their execution. Despite the Department's resting its entire delegation theory on the existence of an intelligible principle, Appellees' Br. at 25-28, the statutes here do not provide one. The Department argues "the NFA provides more than sufficient standards to guide agency decision-making" because it (1) "sets forth a clear federal policy," (2) "authorizes the Attorney General to issue 'all needful rules and regulations for the enforcement'" of the statute, and (3) provides a statutory definition of the arms it proscribes. Appellees' Br. at 27. None of these arguments, however, ensures the Department "exercises only executive power." *Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2023), *cert. granted*, 143 S. Ct. 2688 (June 30, 2023). Therefore, as shown below, no intelligible principle exists to justify the Department's attempted regulation.

First, the existence of a particular federal goal is unrelated to whether the power an agency exercises is in fact executive. It is factually possible for an agency to both execute and legislate in furtherance of a

goal. The relevant question is therefore not whether the statute articulates a policy, but whether the statute directs an agency intelligibly enough to ensure that agency is "*only* execut[ing]" its goal, and not adding to the policy's substance in the agency's own discretion. *Id.*

Second, the Department argues the NFA provides an intelligible principle because it directs the Department to issue "all needful rules and regulations." Appellees' Br. at 27 (quoting 26 U.S.C. § 7805(a)). But this broad language does virtually nothing to ensure an agency "exercises *only* executive power," which is required for an intelligible principle. *Jarkesy*, 34 F.4th at 461 (emphasis added). The term "needful" has a vast and subjective meaning; it allows an agency to engage in virtually any legislative action and simply claim it was necessary, as the Department has done here. Because this language does not *limit* the Department to executive activity, it does not provide an intelligible principle.

Third, the Department suggests the statutory definitions of "designed," "made," and "intended" to be fired from the shoulder are so clear, they act as an intelligible principle adequately guiding the Department's exercise of power. But the touchstone for an intelligible principle is not whether the guidance is adequate, but whether it ensures

19

only executive (as opposed to legislative) activity will occur. *Id.* Although these statutory definitions *could* support the mere execution of the statutes, the Department does not use them for this purpose. Instead, the Department attempts to alter their application and their very meanings—a legislative activity. In so doing, it reverses years of precedent and criminalizes millions more Americans under the statutes. *See* ROA.195, 258. For purposes of the Rule, therefore, the statutory definitions have supplied no intelligible principle. Consequently, none of the Department's intelligible-principle arguments are availing.

## C. The Rule Exceeds the Department's Statutory Authority.

The statutes at issue here do not delegate the power to alter or supplement their definitions, nor do they indicate any congressional intention to do so. The Department maintains the Rule is merely the best "interpretation" of the statutes' terms. Appellees' Br. at 19-20. Yet this Court has already dismissed the notion the Rule is merely interpretive. *See Mock*, 75 F.4th at 582-83. Nevertheless, the Department offers two principal arguments upon this premise: (1) the Rule merely provides that evidence shall be *objective* for what constitutes "designed," "made," and "intended to be fired from the shoulder"; and (2) the Rule merely catalogs

the type of evidence used to determine whether a firearm meets these definitions. Appellees' Br. at 20. But in reality the Rule does far more than this: it augments the statutes' terms to create *new crimes*, which Congress did not—and could not—permit the Department to do. For the reasons Watterson explained in his opening brief, Appellant's Br. at 47-49, Congress did not hide such "elephants in mouseholes," *West Virginia v. EPA*, 142 S. Ct. 2587, 2622 (2022), despite the Department's downplaying the Rule's vast impact.

First, the Department argues the Rule merely clarifies that objective evidence will be used to determine whether a firearm comes within the statutes' scope, and therefore the Rule falls safely within the statutes' confines. Appellees' Br. at 20-21. But this is a distraction. Regardless of the manner in which the Department assesses evidence, the statutes explicitly constrain it to looking for evidence a firearm is "designed," "made," and "intended" to be fired from the shoulder. 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). Such is the statutory limitation. The terms do not cover any firearm that *could be* fired from the shoulder. And, although the Department claims the Rule does not redefine the terms this way, Appellees' Br. at 22-24, practical reality shows otherwise.

Even though most pistols with stabilizing braces are designed, made, and intended to be fired from the forearm and not the shoulder, the Rule's new "objective" assessment method miraculously sweeps "99% of stabilizing braces on the market" within the statutes' coverage, as this Court has acknowledged. *Mock*, 75 F.4th at 583-84. It is clear, in light of this drastic impact, any claim to be using "objective" evidence is in fact a pretense providing the Department a platform to summarily define the meaning of that evidence and criminalize 99% of stabilizing braces in existence.

Second, the Department uses this newfound authority to create evidentiary criteria for defining its new crimes. The criteria are not merely an evidentiary "catalog[]" as the Department argues, Appellees' Br. at 20, 22, because cataloging or identifying evidence a firearm is covered by the statutes would necessarily describe only firearms that are already short-barreled rifles. The Rule's new criteria reach *millions* of firearms, and citizens, ROA.195, ROA.258, that have never previously fallen within the statutes' scope, and are in fact different weapons with different stated purposes, used on different parts of the body, ROA.55-87, 199-201, 217-26. In fact, this was intentional: the Department wanted to

address the "proliferation" of these new items. ROA.147. It is therefore entirely more accurate to describe the Rule's criteria as a set of factors altering the substantive scope of statutory terms, rather than as a "holistic" inquiry into the terms' meaning. The Department's characterizations to the contrary avoid discussing the Rule's real-world operation.

Also consider the extra-statutory compliance options the Rule creates. *See, e.g.*, *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 88 Fed. Reg. 6,478, 6,570-71 (Jan. 31, 2023) (detailing the Rule's compliance options, including "1. Remov[ing] the short barrel … [2. Registering the firearm] … 3. Permanently remov[ing] and dispos[ing] of, or alter[ing], the 'stabilizing brace' such that it cannot be reattached … 4. Turn[ing] the firearm into [the] local ATF office … 5. Destroying the firearm"). *See also Mock*, 75 F.4th at 581 (discussing the compliance scheme). They are an expression of pure policymaking. The compliance options cannot even be disguised as "interpretation" because they are found nowhere in the statutes, they independently govern private conduct, and they reflect the Department's own judgment about how to ensure individuals comply with federal policy. The legislative

judgment of compliance policy belongs in the statutes, which did not express such judgment here.[4]  This is even clearer given the GCA grants the Department the authority to *remove* certain weapons from the definition of "firearm," a discrepancy which the Department completely evades in its response.  *See* 26 U.S.C. § 5845(a).

## III.  THE REMAINING EQUITABLE FACTORS SUPPORT RELIEF.

### A. Irreparable Harm.

The Department claims Watterson does not face irreparable harm. Appellees' Br. at 40-45.  Namely, it argues (1) the Northern District of Texas's stay in *Britto v. ATF*, No. 23-CV-19, 2023 WL 7418291 (N.D. Tex. Nov. 8, 2023) undermines the ongoing irreparable harm Watterson faces due to the Department's threat of prosecution; (2) Watterson's constitutional injuries do not amount to irreparable harm; (3) the compliance costs Watterson faces are *de minimis* and otherwise can be recovered; and (4) Watterson's ability to comply with the Rule negates the irreparable harm he faces.  As shown below, each argument is flawed.

---

[4] Notably, Watterson does not challenge the compliance options themselves, so the Department's standing arguments here are inapposite.  The compliance options are simply glaring evidence that the Rule exceeds its statutory authority.

First, Watterson faces irreparable harm despite the *Britto* stay. This is because the *Britto* plaintiffs did not request that court to enjoin prosecution of the statutes in alignment with the Rule, as Watterson did. *Compare* Compl., ECF No. 1, at 21, *Britto*, 2023 WL 7418291 (N.D. Tex. Jan. 31, 2023) *with* ROA.52.  Consequently, the Department is free to prosecute Watterson for possession of a short-barreled rifle under the statutes regardless of whether the Rule itself is stayed or not.  And in fact, it intends to.  The Department has already indicated its belief that Watterson's specific brace will transform his firearm into a short-barreled rifle.  ROA.205.  And because the Rule is merely the "best interpretation of the statutes" according to the Department, Appellees' Br. at 19-20, it will come as no surprise the Department will prosecute Watterson in line with the Rule even if the Rule itself is not operative, unless it is enjoined from doing so.  Therefore, although the *Britto* stay grants broad relief, it does not obviate Watterson's irreparable harm.

Second, the Department argues *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279 (5th Cir. 2012) does not support the fact that allegations of constitutional harm may satisfy the irreparable-harm requirement, Appellees' Br. at 42, but the case itself explains otherwise.

*Opulent Life*, 697 F.3d at 295-96 ("Opulent Life has satisfied the irreparable-harm requirement because it has alleged violations of its" constitutional rights).  The Department also attempts to distinguish *Opulent Life* on the basis that the Court there examined a much more complete record.  Appellees' Br. at 42.  But the Court looked to the record in that case only after it had determined irreparable harm existed, and only "assuming *arguendo* that [it was] required" to do so.  *Opulent Life*, 697 F.3d at 296.  In any case, "the record [here, too] is replete with evidence of irreparable harm."  *Id.*  And although *Opulent Life* is a free-exercise case, the Department itself asserts parallels between the First and Second Amendments, Appellees' Br. at 36, and this Court has recognized that constitutional injuries beyond the First Amendment and even beyond the Bill of Rights still "unquestionably constitute[] irreparable injury."  *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021).  *See also Trans World Airlines v. Mattox*, 897 F.2d 773, 783 (5th Cir. 1990).  Here, the Department's conduct both chills Watterson's Second Amendment rights and infringes on his right to be regulated within a constitutional framework.

Third, the Department's argument the Rule only imposes *de minimis* burdens on Watterson is unavailing. Appellees' Br. at 42-43. The Rule subjects Watterson to a tax for attaching his stabilizing brace to his pistol. *See* 26 U.S.C. § 5821(a). This tax was specifically and intentionally designed to make covered firearms prohibitively expensive. ROA.260; *see also Mock*, 75 F.4th at 569-70. This Court should not accept the Department's advancement of a substantial cost-burden policy on the one hand, and also accept the Department's arguments that that cost is *de minimis* on the other. Both simply cannot be true. Moreover, Watterson's compliance costs are also not *de minimis. See Rest. Law Ctr. v. United States DOL*, 66 F.4th 593, 597 (5th Cir. 2023) ("the nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm.").

Fourth, the Department suggests, mystifyingly, that "so long as he complies with the NFA's requirements," Watterson "suffers [no] irreparable harm based on the perceived threat of prosecution." Appellees' Br. at 44. In other words, the Department argues that so long as an individual complies with a government restriction, that restriction imposes no obstacle. On top of the authoritarian implications of this

argument on its face, the Supreme Court has condemned the Hobson's Choice of "plac[ing a] hapless plaintiff between the Scylla of intentionally flouting [the] law and the Charybdis of forgoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in criminal proceeding." *Steffel v. Thompson*, 415 U.S. 452, 462 (1974) (Stewart, J., concurring). Watterson's potential compliance with the Rule has nothing to do with the harm it imposes. The Department argues unpersuasively that Watterson is not currently facing ongoing irreparable harm.

## B. Balance of the Equities and Public Interest.

The Department also argues the balance of the equities and the public interest weigh against granting a preliminary injunction primarily because (1) the first two preliminary-injunction factors do not automatically determine the last two, and (2) the Rule promotes public safety in Congress's judgment. Once again, this is incorrect.

First, as Watterson has stated, the "enforcement of an unconstitutional law is always contrary to the public interest" because "the Constitution is the ultimate expression" of that interest. *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (quotations omitted); *see*

Appellant's Br. at 57-58. Furthermore, as statutes manifest an even more direct expression of the public will, there is no public "interest in enforcing a regulation that violates federal law." *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 252 (5th Cir. 2023). Therefore, no matter the objective the government asserts, it must be implemented lawfully to be in the public interest. *See R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 195 (5th Cir. 2023); *Britto*, 2023 U.S. Dist. LEXIS 200933, at *13. This does not "discount[] public-interest equities" as the Department incorrectly emphasizes, Appellees' Br. at 46, but rather illustrates why the equities and public-interest factors naturally flow in favor of a party suffering irreparable harm from a likely constitutional injury. Accordingly, the Department's discussion of *Winter v. NRDC*, 555 U.S. 7 (2008) is inapposite, especially in light of the glaring distinction that it involved the interests of sea mammals rather than the constitutional rights of human beings.

Second, the Department argues as if the Court should balance Watterson's assessments about public safety against Congress's (and defer to Congress's), Appellees' Br. at 48, but this obfuscates the proper inquiry. At least for purposes of a stay of the Rule, the equities and

public-interest inquiry does not concern Congress's judgment as expressed in the statutes concerning short-barreled rifles, but instead concerns *the Department*'s judgment as expressed in *the Rule* concerning *pistols with attached stabilizing braces*.  If the Department wishes to justify *the Rule* (which it evades doing in this discussion), it may not simply impute arguments about the safety of short-barreled rifles.  The reality is stabilizing braces on pistols are no significant threat to public safety.  *See* Appellant's Br. at 60-61.  The Rule therefore would not be in the public interest even if it did not violate the Constitution or the statutes.  Moreover, the Department's public-safety argument also effectively sidesteps *Bruen*'s clear instruction that courts no longer balance interests when analyzing Second Amendment claims.  597 U.S. at 19.

## IV.  THIS COURT SHOULD INSTRUCT THE DISTRICT COURT TO ISSUE BOTH EQUITABLE AND STATUTORY RELIEF.

The Department argues Watterson's request for relief is too broad and thus contravenes the principles of equity.  But both equitable and broader statutory relief are necessary to address Watterson's injuries.

Watterson requires an injunction against the Department to ensure it does not enforce the statutes in accordance with the Rule even if the

Rule itself is stayed.  Because the Department has indicated the Rule is merely the "best interpretation of the statutes," Appellees' Br. at 19-20, and because it believes Watterson's specific brace will transform his firearm into a short-barreled rifle, ROA.205, an injunction against the Department itself from prosecuting the statutes in accordance with the Rule is necessary to protect Watterson from prosecution, regardless of whether the Rule remains in effect.

Furthermore, Department continuously conflates the statutory stay provided in 5 U.S.C. § 705 with a nationwide injunction.  Watterson does not demand purely equitable relief, like a nationwide injunction, beyond the bounds of his own case.  Instead, he seeks to avail himself of the remedy Congress provided for the very circumstances at issue here, where an executive agency acts in excess of its statutory and constitutional authority and "adversely affect[s]" a plaintiff.  5 U.S.C. § 702.  Indeed, the Department's position asks this Court to ignore the text of the APA, which allows "the reviewing court … [to] issue all necessary and appropriate process to *postpone the effective date of an agency action*." *Id.* at § 705 (emphasis added).  The fact that the statutory remedy is broader than a purely equitable remedy does not undermine

Watterson's need for it. Additionally, the fact that the statute also provides for equitable relief does not mean the entire statutory remedy is limited by the principles of equity; it is still statutory.

This Court should also stay the Rule pursuant to 5 U.S.C. § 705 to protect Watterson from the harms that only a stay can address. A stay in this case is necessary despite the existence of the *Britto* stay because that stay could terminate at any time. This would require Watterson to re-petition this Court for complete relief, as he needed to petition the district court to modify his motion for preliminary injunction after it expired with the *Mock* decision, which unnecessarily complicated this case. *See* ROA.880-95. A stay, and only a stay, also assuages the threat of state prosecution, whereas an injunction in this case can only prevent federal agents from enforcing federal law. *See* Tex. Pen. Code § 46.05(a)(1) (hinging a state crime on NFA registration). And only a stay can undo the Rule's revocation of the Department's previous letters classifying Watterson's brace as *not* violative of the statutes, *see* ROA.55-87, which create a reliance interest and thus a defense for possessing a pistol with an attached stabilizing brace. This Court should therefore recognize Watterson's need for both equitable and statutory relief.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's denial of Watterson's motion for a preliminary injunction and stay, grant that motion, and remand this case to the district court for a decision on the merits.

Dated: May 15, 2024,        Respectfully submitted,

                    */s/ Matthew Miller*
                    ROBERT HENNEKE
                    Texas Bar No. 24046058
                    rhenneke@texaspolicy.com
                    CHANCE WELDON
                    cweldon@texaspolicy.com
                    Texas Bar No. 24076767
                    MATTHEW MILLER
                          *Lead Counsel*
                    Texas Bar No. 24046444
                    mmiller@texaspolicy.com
                    CLAYTON WAY CALVIN
                    Texas Bar No. 24132780
                    ccalvin@texaspolicy.com
                    TEXAS PUBLIC POLICY FOUNDATION
                    901 Congress Avenue
                    Austin, Texas 78701
                    Telephone:(512) 472-2700
                    Facsimile: (512) 472-2728

                    *Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the typeface, type-style, and length requirements in 5th Circuit Rule 27.4 and Federal Rules of Appellate Procedure 27(d)(1)(E), (d)(2)(A) and 32(a)(5), (6) because it is in 14-point Century Schoolbook font and contains 6480 words, excluding the parts exempted by Federal Rules of Appellate Procedure 32(f).

*/s/ Matthew Miller*
Matthew Miller

## CERTIFICATE OF SERVICE

I hereby certify that, on May 15, 2024, a copy of the foregoing document was electronically filed and served via CM-ECF on all counsel who are registered CM/ECF users.

*/s/ Matthew Miller*
Matthew Miller